**IN THE UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

In re:                                                                              Case No.: 8:22-bk-05052
                                                                                        Chapter:   11

TREASURE ISLAND YACHT AND TENNIS
CLUB OF PINELLAS COUNTY, LLC,

           Debtor.

_____/

**DISCLOSURE STATEMENT**
**IN CONNECTION WITH PLAN OF REORGANIZATION OF**
**TREASURE ISLAND YACHT AND TENNIS CLUB OF PINELLAS COUNTY, LLC**

/s/ John A. Anthony
**JOHN A. ANTHONY, ESQ.**
Florida Bar Number:  0731013
janthony@anthonyandpartners.com
**STEPHENIE BIERNACKI ANTHONY, ESQ.**
Florida Bar Number:  0127299
santhony@anthonyandpartners.com
**CAMERYN R. LACKEY, ESQ.**
Florida Bar Number:  1038915
clackey@anthonyandpartners.com
**ANTHONY & PARTNERS, LLC**
100 South Ashley Drive, Suite 1600
Tampa, Florida 33602
Telephone:   813/273-5616
Telecopier:   813/221-4113
Attorneys for the Debtor

Dated:  May 31, 2023.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THE CONSOLIDATED HEARING TO CONSIDER THE ADEQUACY OF THIS DISCLOSURE STATEMENT PURSUANT TO BANKRUPTCY CODE §1125 AND CONFIRMATION OF THE PLAN OF REORGANIZATION PURSUANT TO BANKRUPTCY CODE §1129 **IS CURRENTLY SCHEDULED FOR JULY 12, 2023.**  THE DEBTOR RESERVES THE RIGHT TO MODIFY AND SUPPLEMENT THIS DISCLOSURE STATEMENT AND THE ACCOMPANYING PLAN OF REORGANIZATION UP TO AND INCLUDING THE TIME OF CONFIRMATION OF THE PLAN OF REORGANIZATION. THE DEBTOR IS NOT CURRENTLY SOLICITING VOTES ON THE PLAN OF REORGANIZATION.

# DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS PROVIDED FOR PURPOSES OF SOLICITING VOTES ON THE "PLAN OF REORGANIZATION OF TREASURE ISLAND YACHT & TENNIS CLUB OF PINELLAS COUNTY, LLC" (THE "PLAN").  THE INFORMATION MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF VOTES ON THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE STATED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT WILL BE CORRECT AT ANY TIME AFTERWARDS.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE §1125 AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 3016 AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS PURSUANT TO FEDERAL RULE OF EVIDENCE 408. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST TREASURE ISLAND YACHT AND TENNIS CLUB OF PINELLAS COUNTY, LLC IN THIS CASE.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT:  (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE TAX CODE; (B) SUCH DISCUSSION IS INCLUDED HEREBY BY THE DEBTOR IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE

MEANING OF CIRCULAR 230) BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## TABLE OF CONTENTS

DISCLAIMER……………………………………………………...………………2
TABLE OF CONTENTS……………......………………………………………3
I.    INTRODUCTION………………………………………………………………5
       A.    PURPOSE OF THIS DISCLOSURE STATEMENT……………………………5
       B.    CRITICAL DEADLINES AND DATES……………………………………7
II.   OVERVIEW OF CHAPTER 11………………………………………………...8
III.  OVERVIEW OF THE PLAN……………………………………………………9
IV.   SOLICITATION AND VOTING INSTRUCTION…………………………………11
       A.    WHO MAY VOTE………………………………………………………...11
       B.    HOW TO VOTE…………………………………………………………...12
       C.    ACCEPTANCE OF PLAN AND VOTE REQUIRED FOR CLASS ACCEPTANCE………………………………………………………13
       D.    SPECIAL NOTICE CONCERNING CLAIM CLASSIFICATION…………………14
       E.    SPECIAL NOTICE TO HOLDERS OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES CONCERNING CONTINGENT VOTING…………14
       F.    THE CONFIRMATION HEARING…………………………………………14
V.    GENERAL INFORMATION CONCERNING THE DEBTOR…………………………15
       A.    OVERVIEW OF THE BUSINESS AND THE FACILITY……………………15
       B.    OVERVIEW OF MANAGEMENT AND EMPLOYEES……………………15
       C.    FINANCIAL INFORMATION…………………………………………15
       D.    EVENTS LEADING TO COMMENCEMENT OF REORGANIZATION………..16
       E.    SECURED CREDITORS……………………………………………16
       F.    THE REMANDED CITY LITIGATION………………………………17
VI.   SUMMARY OF THE PLAN OF REORGANIZATION……………………………..17
       A.    GENERAL DESCRIPTION OF PLAN……………………………………18
       B.    CLASSIFICATION AND TREATMENT OF CLAIMS UNDER THE PLAN……………………………………………………………………19
       C.    ALLOWED CLAIMS, DISTRIBUTION RIGHTS, AND  OBJECTIONS TO CLAIMS……………………………………………………………25
       D.    DISPOSITION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES….28
       E.    REVESTING OF ASSETS; RELEASE OF LIENS……………………………30
       F.    RESTRUCTURING TRANSACTIONS……………………………………31
       G.    POST-CONFIRMATION DEBTOR MANAGEMENT AND OPERATION………31
       H.    PRESERVATION OF CAUSES OF ACTION; RESULTING CLAIM TREATMENT………………………………………………………33
       I.    CONFIRMATION AND/OR CONSUMMATION……………………………34
VII.  CERTAIN RISK FACTORS TO BE CONSIDERED…………………………………35
       A.    RISKS RELATED TO THE DEBTOR'S BUSINESS……………………35
       B.    GENERAL CONSIDERATIONS……………………………………35
       C.    CERTAIN BANKRUPTCY CONSIDERATIONS……………………………...36

      **D.**      **CONDITIONS PRECEDENT TO CONSUMMATION; TIMING**......................36
      **E.**      **INHERENT UNCERTAINTY OF FINANCIAL PROJECTIONS**......................37
      **F.**      **OPERATIONAL RISK FACTORS**.................................................................37
      **G.**      **COMPETITION**........................................................................................37
      **H.**      **LEVERAGE**.............................................................................................37
      **I.**      **LITIGATION**...........................................................................................39
      **J.**      **ADVERSE PUBLICITY**............................................................................39
      **K.**      **CERTAIN TAX CONSIDERATIONS**...........................................................39
**VIII.****CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN**............................39
      **A.**      **U.S. FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTOR**..............40
      **B.**      **U.S.FEDERAL INCOME TAX CONSEQUENCES TO CLAIM HOLDERS**..........40
      **C.**      **INFORMATION REPORTING AND BACKUP WITHHOLDING**.....................41
      **D.**      **IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE**..........42
**IX.**    **FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS**.................42
      **A.**      **FEASIBILITY OF THE PLAN**....................................................................42
      **B.**      **ACCEPTANCE OF THE PLAN**..................................................................43
      **C.**      **BEST INTERESTS TEST**..........................................................................43
      **D.**      **LIQUIDATION ANALYSIS**......................................................................44
      **E.**      **APPLICATION OF THE "BEST INTERESTS" OF CREDITORS**
              **TEST TO THE LIQUIDATION ANALYSIS**.................................................44
      **F.**      **CONFIRMATION WITHOUT ACCEPTANCE OF ALL IMPAIRED CLASSES:**
              **THE "CRAMDOWN" ALTERNATIVE**........................................................45
**X.**      **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN**..............46
      **A.**      **ALTERNATIVE PLAN(S) OF REORGANIZATION**......................................46
      **B.**      **LIQUIDATION UNDER CHAPTER 7 OR CHAPTER 11**................................46
**XI.**     **RECOMMENDATION AND CONCLUSION**.......................................................  47

**DISCLOSURE STATEMENT
IN CONNECTION WITH PLAN OF
REORGANIZATION OF TREASURE
ISLAND YACHT & TENNIS CLUB OF PINELLAS COUNTY, LLC**

## I.    INTRODUCTION

The Debtor and debtor-in-possession in the above-referenced Chapter 11 case is Treasure Island Yacht and Tennis Club Of Pinellas County, LLC (the "Debtor"). The Debtor submits this Disclosure Statement (the "Disclosure Statement") pursuant to Bankruptcy Code §1125, for use in the solicitation of votes on the "Plan of Reorganization of Treasure Island Yacht & Tennis Club of Pinellas County, LLC" dated May 31, 2023 (the "Plan"). **As more fully described below, copy of the Plan is attached hereto as Composite Exhibit "A." Your rights may be affected. You should read the Plan and this Disclosure Statement carefully and discuss them with your attorney. If you do not have an attorney, you may wish to consult one.** All capitalized terms used in this Disclosure Statement but not otherwise defined herein have the meanings ascribed to such terms in Article I of the Plan.

### A.    Purpose Of This Disclosure Statement

This Disclosure Statement sets forth certain information regarding the Debtor's pre-petition operating and financial history, its reasons for seeking protection and reorganization under Chapter 11, significant events that have occurred during the Chapter 11 Case and the anticipated organization, operations, and financing of the Debtor upon its successful emergence from Chapter 11. This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

By order dated _____, 2023, the Bankruptcy Court has scheduled a hearing to determine whether this Disclosure Statement contains "adequate information" in accordance with Bankruptcy Code §1125 to enable a hypothetical, reasonable investor, typical of holders of Claims against the Debtor, to make an informed judgment as to whether to accept or reject the Plan, and conditionally authorizing its use in connection with the solicitation of votes with respect to the Plan. **CONDITIONAL APPROVAL OF THIS DISCLOSURE STATEMENT STILL DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.** No solicitation of votes may be made except pursuant to this Disclosure Statement and Bankruptcy Code §1125. In voting on the Plan, holders of Claims entitled to vote should not rely on any information relating to the Debtor or its business, other than that contained in this Disclosure Statement, the Plan, and all appendices, supplements, or exhibits to the Plan and Disclosure Statement.

PURSUANT TO THE PROVISIONS OF THE BANKRUPTCY CODE, ONLY CLASSES OF CLAIMS THAT ARE (I) "IMPAIRED" BY A PLAN OF REORGANIZATION

AND (II) ENTITLED TO RECEIVE A DISTRIBUTION UNDER SUCH PLAN ARE ENTITLED TO VOTE ON THE PLAN.  IN THE DEBTOR'S CASE, ONLY CLAIMS IN CLASSES 2, 3, 4, 5, 6, 7, AND 8 ARE IMPAIRED BY AND ENTITLED TO RECEIVE A DISTRIBUTION UNDER THE PLAN, AND ONLY THE HOLDERS OF CLAIMS IN CLASSES 2, 3, 4, 5, 6, AND 7 ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN.  CLAIMS IN CLASS 1 ARE UNIMPAIRED BY THE PLAN, AND SUCH HOLDERS ARE CONCLUSIVELY PRESUMED TO HAVE ACCEPTED THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN DOCUMENTS RELATING TO THE PLAN, CERTAIN EVENTS THAT HAVE OCCURRED IN THE CHAPTER 11 CASE, AND CERTAIN FINANCIAL INFORMATION.  ALTHOUGH THE DEBTOR BELIEVES THAT ALL SUCH SUMMARIES ARE FAIR AND ACCURATE AS OF THE DATE HEREOF, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE UNDERLYING DOCUMENTS AND TO THE EXTENT THAT THEY MAY CHANGE AS PERMITTED BY THE PLAN AND APPLICABLE LAW.  INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR'S MANAGEMENT, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  THE DEBTOR DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE REORGANIZATION AS TO HOLDERS OF ALLOWED CLAIMS. YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR WITH RESPECT TO ANY QUESTIONS OR CONCERNS REGARDING TAX, SECURITIES, OR OTHER LEGAL CONSEQUENCES OF THE PLAN.

CERTAIN OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BY ITS NATURE FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS, AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS.

Except with respect to any pro forma financial projections that may be offered in connection with this Disclosure Statement or the confirmation of the Debtor's Plan, and except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof.  Those future events may have a material impact on the correctness and completeness of the information, assumptions, and statements contained in this Disclosure Statement.  The Debtor did not undertake any obligation to, and does not intend to, update any of the projections; thus, the projections will not reflect the impact of any subsequent events not already accounted for in the assumptions underlying the projections.  Further, the Debtor does not anticipate that any amendments or supplements to this

Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Disclosure Statement will not under any circumstance imply that the information herein is correct or complete as of any time subsequent to the date hereof. Moreover, any projections will be based on assumptions that, although believed to be reasonable by the Debtor, may differ from actual results.

**THE DEBTOR BELIEVES THAT THE PLAN WILL ENABLE THE DEBTOR TO SUCCESSFULLY REORGANIZE AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11, AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR AND THE HOLDERS OF CLAIMS. THE DEBTOR URGES SUCH HOLDERS TO VOTE TO ACCEPT THE PLAN.**

**B.**    **Critical Deadlines And Dates**

The Court has not yet confirmed the Plan described in this Disclosure Statement. This section describes certain critical deadlines and dates that relate to the process by which the Plan will or will not be confirmed. In certain instances, your failure to act on or before certain deadlines or dates could adversely affect your rights. Please carefully review these dates and deadlines. All such deadlines and dates are subject to change and parties are encouraged to review the record of the Bankruptcy Court to stay apprised of any such changes.

1.    <u>Time and Place of the Hearing to Finally Approve This Disclosure Statement</u>

Although the Court conditionally approved this Disclosure Statement, the hearing to consider final approval of this Disclosure Statement will take place on **_____, 2023, at _____ .m.** in Courtroom 9A, Sam M. Gibbons United States Courthouse, 801 North Florida Avenue, Tampa, Florida.

2.    <u>Deadline for Voting to Accept or Reject the Plan</u>

If you are entitled to vote to accept or reject the Plan, vote on the enclosed Ballot and file the Ballot via electronic service, U.S. Mail, or overnight delivery to Clerk, Bankruptcy Court, Sam M. Gibbons United States Courthouse, 801 North Florida Avenue, Tampa, Florida 33602, with a copy to John A. Anthony, Esq., Stephenie B. Anthony, Esq., or Cameryn R. Lackey, Esq., 100 S. Ashley Dr., Ste. 1600, Tampa, FL 33602. **Your Ballot must be received by the Clerk on or before _____, 2023, or it will not be counted.**

3.    Deadline for Objecting to the Adequacy of the Disclosure Statement and <u>Confirmation of the Plan</u>

Objections to final approval of this Disclosure Statement must be filed with the Court on or before **_____, 2023**. Objections to Confirmation of the Plan must be filed with the Bankruptcy Court and properly served on or before **July 5, 2023.**

4.      Time and Place of the Hearing to Confirm Plan

The hearing at which the Court will determine whether to confirm the Plan will take place on **July 12, 2023 at 2:00 p.m.**, in Courtroom 9A, Sam M. Gibbons United States Courthouse, 801 North Florida Avenue, Tampa, Florida

5.      Identity of Person to Contact for More Information

If you want additional information about the Plan, you should contact John A. Anthony, Esq., Stephenie B. Anthony, Esq., or Cameryn R. Lackey, Esq., 100 S. Ashley Dr., Ste. 1600, Tampa, FL 33602, 813- 273-5616.

## II.     **OVERVIEW OF CHAPTER 11**

Chapter 11 is the section of the Bankruptcy Code that primarily addresses business reorganizations.  Chapter 11 allows a new beginning for a debtor's business and promotes the equal treatment for similarly situated creditors and similarly situated equity interest holders, subject to the priority scheme for distributions established by the Bankruptcy Code.  The filing of a bankruptcy petition commences a bankruptcy case and creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the bankruptcy commencement date. Chapter 11 of the Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."  Upon the filing of a petition for relief under Chapter 11, Bankruptcy Code §362 provides for an automatic stay, which enjoins substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the Chapter 11 case.

Under Chapter 11, a debtor is authorized to reorganize its business for the benefit of its creditors and shareholders.  The primary objective of a Chapter 11 case is the confirmation and consummation of a Chapter 11 plan.

Prior to soliciting acceptances of a proposed Chapter 11 plan, Bankruptcy Code §1125 requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Chapter 11 plan.  The confirmation of a Chapter 11 plan by the bankruptcy court binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code, whether or not such creditor or equity interest holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions, and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes for such debt the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

The terms of the Debtor's Plan are based upon, among other things, the Debtor's assessment of its ability to achieve the goals of its business plan, make the distributions

contemplated under the Plan, and pay its continuing obligations in the ordinary course of its business. Under the Plan, Claims against the Debtor are divided into Classes according to their relative seniority and other criteria.

In this Chapter 11 case, if the Plan is confirmed by the Bankruptcy Court and consummated, (i) the Claims in certain Classes will be reinstated or modified and receive distributions equal to the full amount of such Claims, (ii) the Claims of certain other Classes will be modified and receive distributions constituting a partial recovery on such Claims. On the Effective Date and at certain times thereafter, the Debtor will distribute Cash and other property in respect to certain Classes of Claims as provided in the Plan. The Classes of Claims against the Debtor created under the Plan, the treatment of those Classes under the Plan, and the other property to be distributed under the Plan, are described below.

## III.    <u>OVERVIEW OF THE PLAN</u>

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to the full text of the Plan. For a more detailed description of the terms and provisions of the Plan, see the provisions below contained in this Disclosure Statement.

The Plan designates eight (8) Classes of Claims. These Classes take into account the differing nature and priority under the Bankruptcy Code of the various Claims. Claims are treated generally in accordance with the priorities established under the Bankruptcy Code. Claims that have priority status under the Bankruptcy Code or that are secured by valid liens on collateral are to be paid in full or as provided in the Plan. Holders of other Claims will receive Cash in satisfaction of their respective Claims under the Plan or if applicable, be provided with new membership agreements with revised rights and obligations.

The following is an overview of certain material terms of the Plan:

a. The Debtor anticipates that it will be reorganized pursuant to the Plan and will continue in operation, achieving the objectives of Chapter 11 for the benefit of its creditors, customers, suppliers, members, and employees. The Plan contemplates that the Debtor may establish the value of its assets, and thus its post-confirmation debt structure, through a Bankruptcy Court determination and/or exposure to the market. The Plan also contemplates alternatives that involve the transfer of the Debtor's Assets to third parties.

b. Generally, each Holder of an Allowed Priority Claim shall receive, in full satisfaction, settlement, release and discharge thereof, Cash in an amount equal to the unpaid portion of such Allowed Priority Claim on the later of: (i) the Effective Date; or (ii) the date upon which there is a Final Order allowing such Claim as an Allowed Priority Claim or any other date specified in such Final Order, or (iii) as soon thereafter as is practicable, unless the holder of an Allowed Priority Claim and the Debtor agree to a less favorable treatment thereof.

c. Generally, the OZK Claim shall be bifurcated pursuant to Bankruptcy Code

§506(c) in a manner consistent with the result in the Valuation Contested Matter, and shall be separated into the "Secured OZK Claim" and the "OZK Deficiency Claim" for purposes of treatment under the Plan. The Secured OZK Claim shall be allowed in a manner consistent with the result in the Valuation Contested Matter. In accordance with the result in the Valuation Contested Matter, the OZK Deficiency Claim shall be treated as a General Unsecured Claim for all purposes under the Plan.

d. Generally, the Capri Claim shall be Allowed in its full Amount, subject to bifurcation pursuant to Bankruptcy Code §506(c) in a manner consistent with the result in the Valuation Contested Matter. If the Capri Claim is adjudicated to be bifurcated, it shall be separated into the "Secured Capri Claim" and the "Capri Deficiency Claim" for purposes of treatment under the Plan. No further action will be required for Capri to retain its Liens as they presently exist. However, if the Capri Claim is adjudicated to be fully Unsecured, then no portion will be treated as the Secured Capri Claim.

e. Generally, Claims asserted by the Pinellas County Tax Collector for the present amount of ad valorem property taxes and tangible personal property taxes, for 2022, will be treated with the understanding that they will not be paid by the current deadline of May 31, 2023, and that will therefore constitute a Lien upon the Facility. Because tax claims are a senior lien on the subject property, valuation is subject to these liens; however, because the Plan contemplates repayment separately, certain exhibits to the Disclosure Statement do not account for Secured tax liability, even though that might otherwise impact the Valuation Contested Matter.

f. Generally, the SBA Claim shall be Allowed in its full Amount, but shall be bifurcated into the "Secured SBA Claim" in the Amount of $30,000 and the "SBA Deficiency Claim" in the Amount of $120,000 for purposes of treatment under the Plan. No further action will be required for SBA to retain its Liens as they presently exist.

g. The Debtor shall pay the Trade Creditors Claims in full in connection with the Lot Sale, described elsewhere in the Plan, from proceeds not allocated for OZK. To the extent that any Trade Creditor objects to the Amount of its Claim as Scheduled, the Debtor shall reserve the right to fund the balance of the Trade Creditors' Claims and not to reserve funds from Lot Sale proceeds. If such an objection occurs, the Debtor shall have a right to dispute the Claim as Scheduled, even though all Claims of Trade Creditors are being deemed undisputed, fixed, and liquidated for purposes of the Plan.

h. Based upon the adjudication and computation of deficiency Claims elsewhere in the Plan, and all such additional General Unsecured Claims as are filed in this Reorganization, a pool of Creditors shall be created for purposes of Pro Rata participation in the Unsecured Claims Pool.

i.   Edwards shall retain the Equity interest in the Debtor post-Confirmation.  As of the Effective Date, the Debtor's management will no longer be debtor-in-possession, and Edwards rights as management of the Debtor will be subject to the Plan, the Confirmation Order, and the Business Judgment Rule, but shall not be subject to Bankruptcy Code §§1107 or 1108.

The Debtor believes that the Plan provides the best means currently available for its emergence from Chapter 11.

## IV.    SOLICITATION AND VOTING INSTRUCTIONS

### A.    Who May Vote

Only the Holders of Claims which are deemed "allowed" under the Bankruptcy Code and which are "impaired" under the terms and provisions of the Plan are permitted to vote to accept or reject the Plan (the "Voting Classes").  The Plan classifies Claims into various Classes depending upon the nature of the Claims. Holders of Claims not impaired by the Plan are deemed to accept the Plan under Bankruptcy Code §1126(f) and, therefore, are not entitled to vote on the Plan.  Holders of Claims impaired by the Plan and receiving no Distribution under the Plan are not entitled to vote because they are deemed to have rejected the Plan under Bankruptcy Code §1126(g).

Notwithstanding the foregoing, only holders of Allowed Claims in the Voting Classes are entitled to vote on the Plan.  A Claim which is unliquidated, contingent, or disputed is not an Allowed Claim and is, therefore, not entitled to vote, unless and until the amount is estimated or determined, or the dispute is determined, resolved, or adjudicated in the Bankruptcy Court or another court of competent jurisdiction, or pursuant to agreement as may be permitted. However, the Bankruptcy Court may deem a contingent, unliquidated, or disputed Claim to be allowed on a provisional basis, for purposes only of voting on the Plan.  If your Claim is contingent, unliquidated, or disputed, you should consider seeking temporary allowance of your Claim for voting purposes and it will be your responsibility to obtain an order provisionally allowing your Claim.

The following sets forth both the Classes that are entitled to vote on the Plan, and the Classes that are not entitled to vote on the Plan:

a.   The Debtor IS NOT seeking votes from the Holders of Claims in Class 1 because such Class, and each Holder of a Claim in such Class, is Unimpaired under the Plan.  Pursuant to Bankruptcy Code §1126(f), such Class is conclusively presumed to have accepted the Plan.

b.   The Debtor IS soliciting votes to accept or reject the Plan from those Holders of Claims, in Classes 2, 3, 4, 5, 6, and 7 because Claims in those Classes are Impaired under the Plan and the Holders of Allowed Claims in those Classes may receive Distributions under the Plan.  As such, the Holders of such Claims have the right to

vote to accept or reject the Plan.

**B.**    **How To Vote**

Accompanying this Disclosure Statement is a copy of the Plan, which is attached hereto as Exhibit "A."   After carefully reviewing all of the documents contained in the Solicitation Package, its exhibits, and any other documents referenced therein, Creditors in Voting Classes should complete a Ballot, indicating its vote thereon with respect to the Plan, and return it as provided below.

If you are a member of a Voting Class and did not receive a Ballot, if your Ballot is damaged or lost, or if you have any questions concerning voting procedures, please immediately call Debtor's Counsel at (813) 273-5616.

**CREDITORS IN VOTING CLASSES SHOULD COMPLETE AND SIGN A COPY OF THE ENCLOSED BALLOT AND RETURN IT AS DESCRIBED BELOW.    EACH HOLDER OF A CLAIM IN A VOTING CLASS MAY CAST ONLY ONE BALLOT FOR EACH SUCH CLAIM HELD. IN ORDER TO BE COUNTED, BALLOTS MUST BE DULY COMPLETED AND EXECUTED AND RECEIVED NO LATER THAN _____, 2023, UNLESS EXTENDED (THE "BALLOT DATE").    ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM AND TIMELY SUBMITTED, BUT WHICH DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR WHICH INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, SHALL NOT BE COUNTED.**

All completed and executed Ballots should be returned by electronic service, regular mail, hand delivery, or overnight delivery to:

> United States Bankruptcy Court
> Middle District of Florida
> 801 North Florida Avenue
> Tampa, FL  33602

and a copy of the completed and executed Ballot should also be mailed or electronically provided to:

> John A. Anthony, Esq.
> Florida Bar Number:  0731013
> janthony@anthonyandpartners.com
> Stephenie Biernacki Anthony, Esq.
> Florida Bar Number:  0127299
> santhony@anthonyandpartners.com
> Cameryn R. Lackey, Esq.
> Florida Bar Number:  1038915
> clackey@anthonyandpartners.com
> Anthony & Partners, LLC

100 South Ashley Drive, Suite 1600
Tampa, Florida 33602
Telephone:  813/273-5616
Telecopier:  813/221-4113
Attorneys for the Debtor

**C.    Acceptance Of Plan And Vote Required For Class Acceptance**

The votes of Holders of Allowed Claims in the Voting Classes are extremely important. For the Plan to be accepted and thereafter confirmed by the Bankruptcy Court without resorting to the "cramdown" provisions of Bankruptcy Code §1129(b) as to other classes of Allowed Claims, votes representing at least two-thirds in amount and more than one-half in number of Allowed Claims of each Impaired Class that are voted must be cast for the acceptance of the Plan.  The Debtor is soliciting acceptances only from members of the Voting Classes.  You may be contacted by the Debtor or its agents with regard to your vote on the Plan.

Ballots will be tabulated in accordance with applicable provisions of the Bankruptcy Code, the Federal Rule of Bankruptcy Procedure, and the Disclosure Statement Order.  Among other things:

    a.  Ballots that are unsigned or where a company name is not shown on the signature line will not be counted either as an acceptance or rejection;

    b.  Where the amount shown as owed on the Ballot differs from the scheduled Claim or filed proof of claim, the amount shown on the proof of claim will be used for the purpose of determining the amount voting. If no proof of claim is filed, the amount shown on the schedules will be used;

    c.  Ballots that do not show a choice of either acceptance or rejection will not be counted as either accepting or rejecting the Plan;

    d.  Ballots that are filed after the last date set for the filing of Ballots will not be counted as either accepting or rejecting the Plan, without leave of the Court; and/or

    e.  Where duplicate Ballots are filed with respect to a single Claim, and one Ballot elects to accept and the other elects to reject the Plan, neither Ballot will be counted unless the later Ballot is clearly designated as amending the prior Ballot.

If any Impaired Class entitled to vote shall not accept the Plan by the requisite statutory majorities provided in Bankruptcy Code §§1126(c) or 1126(d), as applicable, or if any impaired Class is deemed to have rejected the Plan, the Debtor reserves the right (a) to undertake to have the Bankruptcy Court confirm the Plan under Bankruptcy Code §1129(b) and (b) to amend the Plan in accordance with the provisions of the Plan to the extent necessary to obtain entry of the Confirmation Order.

To meet the requirements for confirmation of the Plan under the "cramdown" provisions

of the Bankruptcy Code with respect to any Impaired Class which votes to reject the Plan (a "Rejecting Class"), the Debtor would have to show that all Classes junior to the Rejecting Class will not receive or retain any property under the Plan unless all Holders of Claims in the Rejecting Class receive under the Plan property having a value equal to the full amount of its Allowed Claims.  A complete description of the implementation of the "cramdown" provisions of the Bankruptcy Code pursuant to the Plan is further set forth in the Disclosure Statement.

### D.    Special Notice Concerning Claim Classification

If you have a Claim that is entitled to vote on the Plan, you may receive a Ballot that identifies the Class in which the Debtor believe your Claim belongs.  If so, and you disagree and believe that your Claim belongs in another Class, you should file with the Bankruptcy Court, on or before _____, 2023, a "Motion for Determination of Plan Class."  Your motion must identify the Class in which you believe your Claim belongs and the basis for your belief. Alternatively, in the event the Ballot you receive does not designate the Class to which the Debtor believes your Claim belongs, you must fill in the space provided to identify the Class to which you believe your Claim(s) belongs.  If the Debtor disagrees with the Class designation you select, it may file an objection and request that the Bankruptcy Court determine the appropriate Class designation.  If you do not identify the Class to which you believe your Claim belongs, your Claim will be treated for all purposes as the type of Claim designated by the Debtor.

### E.    Special Notice To Holders Of Executory Contracts And Non-Residential Leases Concerning Contingent Voting

If you are the counter-party to an executory contract or unexpired real estate lease with the Debtor that has not yet been assumed or rejected (or that the Debtor has previously agreed to assume at or prior to Confirmation), but if rejected would potentially give rise to a rejection damage claim, the Debtor encourages you to (a) file with the Bankruptcy Court and properly serve a motion (a "Contingent Vote Motion") in which you request temporary allowance of your rejection damage claim for voting purposes and specify the amount of your possible rejection damage claim, and (b) properly complete and return a Ballot on account of such rejection claim on or before the Voting Deadline.  Unless otherwise ordered by the Bankruptcy Court, the Debtor will only count votes allowed by virtue of a Contingent Vote Motion if a motion to reject your contract or lease is filed prior to or at the Confirmation Hearing.  If you received a Ballot with respect to a pre- petition claim owing under your contract or lease, the amount of the pre-petition claim will be aggregated with the rejection damage claim, resulting in you being counted as having one vote for purposes of numerosity.  The Debtor (and any other party, if applicable) will have the right to object to the asserted amount of any rejection damage claim and to ask the Bankruptcy Court at the Confirmation Hearing to reduce the amount of such claim temporarily for voting purposes.

### F.    The Confirmation Hearing

Pursuant to Bankruptcy Code §1128(a), after notice, the Bankruptcy Court shall hold a hearing on confirmation of the Plan.  Bankruptcy Code §1128(b) provides that any party-in-interest may object to confirmation of the Plan.  The Bankruptcy Court has scheduled the

Confirmation Hearing for **July 12, 2023,** before the Honorable Caryl E. Delano, Chief Bankruptcy Judge, in the United States Bankruptcy Court for the Middle District of Florida, Tampa Division, located at the **Sam M. Gibbons United States Courthouse, 801 North Florida Avenue, Tampa, Florida, Courtroom 9A**. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof. Objections to confirmation of the Plan must be filed and served on the Debtor, Debtor's Counsel, the U.S. Trustee, and certain other parties designated by the Bankruptcy Court, by no later than **July 5, 2023** (the "Plan Objection Deadline"). Any objection to confirmation of the Plan must be in writing and specify in detail the name and address of the objector, the basis for the objection, the specific grounds for the objection, and the amount of the Claim held by the objector. **UNLESS OBJECTIONS TO CONFIRMATION OF THE PLAN ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER, THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

## V.    GENERAL INFORMATION CONCERNING THE DEBTOR

### A.    Overview Of The Business And The Facility

The Debtor acquired the Facility from the Prior Debtor out of the 2008 Reorganization. Since during or about 2009, the Debtor has owned and operated the Facility. The Facility consists of commercial land and improvements, with multiple permitted uses that have continued over four (4) sets of owners in succession. The Business is centered within a restaurant and event center within a 38,166 square foot building, with 27,561 square feet of air-conditioned space. There is also a 44-slip marina, an Olympic size swimming pool, and a set of six (6) tennis courts. There is ample parking and excess space. The Facility consists of approximately 7.67 acres of waterfront property in one of the most coveted vacation venues in the United States

### B.    Overview Of Management And Employees

The Debtor is owned and operated by Mr. Edwards, individually and through executives compensated through the Insider Lender, including David Lattner and Michael Garavaglia. The Business employs approximately forty (40) individuals in the ordinary course, in all aspects of its operation. The Business has hosted many prestigious events, although deferred maintenance has presented a challenge in recent years. Cash flow during the pendency of the Reorganization has been relatively steady, as evidenced by monthly operating reports that have been timely filed by the debtor throughout this Reorganization, a copy of the summary of the monthly operating reports is attached hereto as Exhibit "B."

### C.    Financial Information

The Insider Lender has been a constant source of working capital for the Debtor, funding operating losses in the ordinary course. The Insider Lender is a business entity that is an Insider of the Debtor and is controlled by Mr. Edwards. The Debtor's operating losses do not relate to any form of mismanagement per se, but instead to the limitations associated with the Facility.

Historically, four (4) sets of owners in succession have tried and failed at operating the Business successfully. The problem is obvious: The debt service has been incurred based upon the likely value of excess land within the tract, assuming its current zoning entitlements are fully effective and enforceable. However, this is not the case: For decades the zoning has been Residential Medium, RM-15, or fifteen (15) dwelling units per acre. However, the City has wrongfully prevented any potential development of excess land included within the tract. The excess land not necessary to the operation of the Business should be sold to meet the obligations of the Plan, and the Business can then be run successfully and profitably.

## D.    Events Leading To Commencement Of Reorganization

The Facility was initially acquired by a conduit entity of the Debtor in connection with a prior bankruptcy case (the "2008 Reorganization") involving an unrelated business entity that previously operated the Business (the "Prior Debtor"). Pursuant to the loan documents evidencing the OZK Claim OZK possesses a mortgage lien and security interest encompassing both the Facility and the going concern assets of the Business. The Facility also secures subordinated debt owed to Capri.

After the Debtor acquired the Facility, Mr. Edwards was disappointed to learn that the City impeded all efforts to develop acreage included in the acquisition. The City has recently taken the position that the Bankruptcy Court's order authorizing and directing the sale of the Facility from the Prior Debtor to the Debtor (the "Sale Order") carried with it certain putative restrictions that were not of record in either the 2008 Reorganization or the public records of Pinellas County at the time. This violates the concept of the estate's "strong arm powers" and the express provisions of the Sale Order in the 2008 Reorganization.

The City has severely limited efforts of the Debtor to develop relevant portions of the Facility. Edwards has facilitated the Debtor's marketing of the Facility for development for nearly two (2) years and has seen several offers withdrawn and LOIs expire based upon land use impediments caused by the City's actionable obstruction of development.

Pursuant to governing loan documents, the OZK Obligation was due to contractually mature on December 31, 2022. If Mr. Edwards were to have agreed to deed the Facility to OZK on the maturity date, this would be a major disappointment in several key respects. Absent the effort to reorganize, the Debtor would cease operation of the Business, further depressing the going concern value of the Facility, leading to a larger write off for OZK, preventing any recovery for Capri, and costing the community a number of jobs.

## E.    Secured Creditors

The Debtor Appraisal accurately reflects that the Facility is presently worth $7,080,000, which is less than the amount of the $15,175,048.94 OZK Claim. A copy of the relevant portions of the Debtor Appraisal explaining the starting point for the Reorganization is attached hereto as Exhibit "C." However, with proper land use entitlements, the value would be augmented to enough to fully secure the OZK Claim, increasing the value for OZK by

$8,179,005.43. Under such circumstances, some are all of the Capri Claim would also be secured.

The OZK Appraisal affirms that the Debtor's assessment of the Business is correct: The OZK Appraiser sets the value of the Facility at $18,990,000, based upon the completely ridiculous assumption that the property may presently be developed as Residential Medium, RM-15, or 15 dwelling units per acre. But multiple contracts and letters of intent have terminated under the weight of such an erroneous assumption. So, assuming that the Debtor can and does address the land use problem in the Remanded City Litigation, OZK would have to concede that the benefit to OZK would be $8,179,005.43, assuming exercise of its' Bankruptcy Code §1111(b) rights. Then OZK would be paid in full in connection with a sale or refinancing of acreage not necessary for the going concern of the Business or repurposing the Facility.

With the respective claims of OZK and Capri at $15,175,048.94 and $16,912,645 (or $21,600,892 with annual compounding), and with the Tax Collector and SBA possessing additional encumbrances, the obvious question is how the Valuation Contested Matter will impact OZK and Capri. From there, OZK and Capri may make their election under Bankruptcy Code §1111(b) if they believe that the Remanded City Litigation will be successfully resolved as things relate to the City Development Rights Claim. But because the Remanded City Litigation also involves the City Litigation Damage Claim, they can participate in the Unsecured Claims Pool to the extent that it is funded with proceeds of the City Litigation Damage Claim.

Other than the Secured Creditors referenced above, there is no party in interest that possesses a Secured Claim or other in rem right of any kind, whether it be a mortgage, a Lien, an easement, a right of way, or any other ownership interest or encumbrance.

## F.    **The Remanded City Litigation**

The Remanded City Litigation, at its core, represents the Debtor's efforts to prevent continuing improper denial from the City of the Debtor's rights in the form of (a) development rights consistent with the zoning of the Facility over the past several decades, and (b) money damages for the City having deprived the Debtor of its rights to develop the Facility in a manner consistent with existing zoning. By prevailing in the Remanded City Litigation, the Debtor can satisfy the claims of Secured Creditors, create an Unsecured Claims Pool for unsecured and deficiency Creditors, and (c) keep the Business operating. Mr. Edwards and his staff have the tenacity and public-spiritedness to prevail. Sole Law has the experience and expertise to ardently represent the Debtor. All the Creditors need to do is wait for the results. A copy of a four-part summary by Sole Law of the Remanded City Litigation, including (a) the factual basis and legal basis for the Debtor's claims against the City, (b) the procedural posture at present, (c) the specific relief requested as to the City Development Rights Claim, and its likely monetary impact on the Facility, and (d) the specific relief requested as to the City Litigation Damage Claim, and the most likely monetary recovery is attached hereto as Exhibit "D."

## VI.    **SUMMARY OF THE PLAN OF REORGANIZATION**

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND

IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS UNDER THE PLAN. THIS SECTION IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, AND TO THE EXHIBITS ATTACHED THERETO.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CLAIMS AGAINST THE DEBTOR UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST THE DEBTOR AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

A.    **General Description Of Plan**

  1.    Reorganization Concept

There are several interlocking steps in the reorganization concept presented in the Plan, as follows:

  a.  The Valuation Contested Matter must conclude.

  b.  OZK and Capri must be permitted the opportunity to elect under Bankruptcy Code §1111(b), or accept bifurcation under Bankruptcy Code §506(c).

  c.  The Remanded City Litigation must produce a result as to the City Development Rights Claim, which will then allow the entire Facility to be repurposed or unneeded acreage to be sold or refinanced to pay off Secured Claims.

  d.  The Remanded City Litigation must also produce a result to fund the City Litigation Damage Claim, funding the Valuation Contested Matter.

  e.  The Lot Sale, as well as income from the Insider Lender, will continue to fund Sole Law, and the expert witness fees and other expenses needed to get the Remanded City Litigation to its conclusion(s). Post-Confirmation, the Insider Lender may seek to secure prospective advances for attorney's fees and costs of the Remanded City Litigation.

f.  If at any time the Debtor defaults in debt service or fails to achieve anticipated results in the Remanded City Litigation, the Quitclaim Deed will be issued by the Escrow Agent and the creditors will clearly be no worse off.  Under such circumstances, the Confirmation Order will expressly preclude the City and any other government entity from interfering with the operation of the Business by a fiduciary to be appointed by any court of competent jurisdiction as receiver, custodian, liquidating agent, or some other comparable role, pending OZK's final determination as to liquidation.  Under Bankruptcy Code §§105(a) and 1142(b), such relief is appropriate.

A copy of a pro forma of the likely financial impact of the Plan as presently contemplated is attached hereto as Exhibit "E."

## B.  Classification And Treatment Of Claims Under The Plan

Claims (other than Allowed Administrative Claims and Allowed Priority Tax Claims) are classified, for all purposes, including entitlement to vote on, confirmation of, and Distributions pursuant to the Plan, as follows:

| Class | Description | Status | Entitled to Vote |
|---|---|---|---|
| Class 1: Other Priority Claims | This Class is comprised of Allowed Claims entitled to priority treatment pursuant to Bankruptcy Code §507, other than Administrative Claims and Priority Tax Claims. | Unimpaired | No |
| Class 2 OZK Claim: | This Class is comprised of the Allowed Secured Claim of OZK (the "OZK Claim") arising out of or in connection with a loan to Mr. Edwards and the Debtor, that is in the approximate principal amount of $15,175,048.94, together with interest, attorney's fees, and court costs, but subject to the disposition of the Valuation Contested Matter.  In these regards, it is noted that the Debtor Appraiser sets the value of the Facility at $7,080,000, such that the OZK Claim would be Allowed Secured at this amount, but that the remaining $8,209,005.47 would be deemed a General Unsecured Claim for purposes of the Plan.  However, the OZK Appraiser contends that the Facility is valued at $18,990,000, that would leave the OZK Claim fully Secured, and leave additional Equity for a junior lienholder, Capri.  The Debtor contends that the OZK Appraisal is premised on the erroneous assumption that the Facility is presently able to be developed in a manner consistent with its highest and best use:  To be sure, the Remanded City Litigation would be completely unnecessary if this were the case.  For so long as the Remanded City Litigation remains unresolved, development rights cannot be assumed.  Moreover, if the Business were to cease operations, the value of the Facility would plummet. | Impaired | Yes |

| Class 3: Capri Claim | This Class is comprised of the Allowed Secured Claim of Capri (the "Capri Claim") arising out of the same transaction in which the Debtor or its predecessor acquired the Facility in the 2008 Reorganization, and through which Capri acquired the residual Secured Claim of Regions Bank. The Capri Claim is in the principal amount of $9,297,771, together with interest accruing at the non-default rate under terms and conditions of the controlling documents, for a total balance in excess of $16,912,645 if computed simple interest, and $21,600,892 if compounded annually (either way, interest is calculated through the Petition Date). Under the Debtor Appraisal, the entire balance of the Capri Claim is Unsecured; however, under the OZK Appraisal, at least $2,077,355 of the Capri Claim is fully Secured. Because both OZK and Capri are parties to the Valuation Contested Matter, the outcome of the Valuation Contested Matter will be dispositive of Plan treatment, in a manner consistent with Section 4.2.1 above. Capri is seeking alternative counsel as of the date of filing the Plan, based upon a recent disqualification of counsel previously retained by OZK. However, the Debtor and Capri will interface when Capri is properly represented to ascertain the exact balance, and to address the matter of whether interest can/should be calculated at simple interest or compounding annually. | Impaired | Yes |
| Class 4: Pinellas County Secured Tax Claims | This Class is comprised of the Pinellas County Tax Collector for the present amount of ad valorem property taxes and tangible personal property taxes, for 2022, with the understanding that they will not be paid by the current deadline of May 31, 2023, and that will therefore constitute a Lien upon the Facility. Because tax claims are a senior lien on the subject property, valuation is subject to these liens; however, because the Plan contemplates repayment separately, certain exhibits to the Disclosure Statement do not account for Secured tax liability, even though that might otherwise impact the Valuation Contested Matter. | Impaired | Yes |
| Class 5: SBA Claim | This Class is comprised of the SBA for $150,000 (the "SBA Claim"), based upon its having qualified for a loan program under the CARES Act, referred to as "EIDL," an acronym for Economic Injury Disaster Loan. The SBA holds a Lien on the Debtor's inventory, equipment, instruments, chattel paper, documents, letter of credit rights, accounts, deposit accounts, commercial tort claims, general intangibles, and other rights (collectively, the "SBA Collateral"), more fully described in a UCC-1 financing statement recorded on or as of August 2, 2020. Based upon the senior Liens and security interests of OZK and Capri, the Claim of | Impaired | Yes |

| | | | |
|---|---|---|---|
| | SBA may be de facto Unsecured; however, in the Debtor's business judgment, the Debtor is treating the SBA Claim as partially Secured by the SBA Collateral. No further action is required for the SBA to retain its Liens as they presently exist. | | |
| Class 6: Trade Creditor Claims | This Class is comprised of a set of General Unsecured Creditors (collectively, the "Trade Creditors") with comparatively small Claims (the "Trade Creditor Claims"), all arising out of the operation of the Business in the ordinary course. All such Claims are deemed to be undisputed, fixed, and liquidated. All Creditors in this Class are individuals or entities required for the Debtor to continue the Business in an uninterrupted manner post-confirmation. A potentially non-exclusive list of these Creditors is set forth in Part 2 of Schedule E of the Schedules. The Debtor did not seek "critical vendor" status for any of the Trade Creditors; however, one cannot operate the Business, predicated upon highest quality service and dining, without strategic business partners. | Impaired | Yes |
| Class 7: General Unsecured Claims | This Class is comprised of Holders of all Allowed Unsecured Claims that are not otherwise classified. This Class includes, among other Creditors, the OZK Deficiency Claim, the Capri Deficiency Claim, the SBA Deficiency Claim, and any other General Unsecured Claims that are not Claims of Trade Creditors. | Impaired | Yes |
| Class 8: Equity Interest of Edwards | This Class consists of the Equity interest of Edwards, and specifically that of "William L. Edwards as Trustee of the William Edwards Revocable Living Trust under agreement dated September 18, 1997," the owner of all authorized, issued, and outstanding securities in the Debtor. | Impaired | No |

The Debtor may modify, with the Bankruptcy Court's approval, the treatment then currently proposed in the Plan. Unless otherwise indicated, estimated Claim amounts are calculated as of the Petition Date. The treatment of the Classes of Claims are as follows:

1.    Treatment of Class 1: Other Priority Claims

Each Holder of an Allowed Priority Claim shall receive, in full satisfaction, settlement, release and discharge thereof, Cash in an amount equal to the unpaid portion of such Allowed Priority Claim on the later of: (i) the Effective Date; or (ii) the date upon which there is a Final Order allowing such Claim as an Allowed Priority Claim or any other date specified in such Final Order, or (iii) as soon thereafter as is practicable, unless the holder of an Allowed Priority Claim and the Debtor agree to a less favorable treatment thereof.

2.    Treatment of Class 2: OZK Claim

As of the Effective Date, the OZK Claim shall be bifurcated pursuant to Bankruptcy

Code §506(c) in a manner consistent with the result in the Valuation Contested Matter, and shall be separated into the "Secured OZK Claim" and the "OZK Deficiency Claim" for purposes of treatment under the Plan. The Secured OZK Claim shall be allowed in a manner consistent with the result in the Valuation Contested Matter and, in accordance with the result in the Valuation Contested Matter, the OZK Deficiency Claim shall be treated as a General Unsecured Claim for all purposes under the Plan.

With regards to the Secured OZK Claim, on the first (1st) day of the first (1st) month following the Effective Date, the Debtor shall commence making monthly payments of interest in the amount of $20,000 on the Secured OZK Claim, and shall continue making monthly payments until such time as the Secured OZK Claim has been paid, together with interest accruing at six (6%) percent per annum. It is expressly contemplated that all enhancements with respect to the City Development Rights Claim will redound to the benefit of OZK by augmenting the collateral position of the credit. Moreover, notwithstanding any other term or condition of the Plan, the Debtor shall be entitled to sell any ancillary portion of the Facility, not to exceed 25,000 square feet of surface area (the "Lot"), provided that such land will not be waterfront that OZK receives the greater of $1,000,000 or sixty-five (65%) percent of net closing proceeds from such sale to any bona fide purchaser for Cash at closing.

Bankruptcy Code §1111(b) provides certain substantive rights to electing Creditors, in connection with the valuation of Collateral pursuant to Bankruptcy Code §506(b). In connection with adjudication of the Valuation Contested Matter, OZK shall have the right to make an election Bankruptcy Code §1111(b), so as to forfeit its entitlement to Distribution on the OZK Deficiency Claim. If such an election is timely made by OZK in a manner consistent with the Bankruptcy Code, pursuant to Bankruptcy Code §1111(b), OZK will be paid an Amount over the Plan Term that is the same as the discounted present value of the Secured OZK Claim, but which is equivalent to the entire OZK Claim, notwithstanding bifurcation. The exact amount of monthly payments, as well as the length of the term, is subject to a final determination as to the calculation under Bankruptcy Code §1111(b); however, counsel for the Debtor believes that the election will be comparable to the monthly payment coming due should OZK not make an election. Final determination will be up to the Bankruptcy Court. Under such circumstances, OZK will retain its Secured status as to the Facility through the completion of payments, and the default provisions and completion of payment provisions set forth above will continue to apply. Furthermore, at any point during the Plan Term, the Debtor may elect to instruct the Escrow Agent to deliver the Quitclaim Deed to OZK in full satisfaction of the OZK Claim.

In a manner consistent with the Confirmation Order, judgment will be entered in the 105(a) Adversary Proceeding, in favor of the Debtor and Mr. Edwards, precluding OZK from taking any action against the Debtor or Mr. Edwards under Bankruptcy Code §§105(a), 362, 1123, and 1141. However, in the event of a default under the Plan, injunctive relief shall automatically terminate, subject to any right of the Debtor or Mr. Edwards to seek a determination in the 105(a) Adversary Proceeding as to whether a default has in fact occurred. The rights of the Debtor and Mr. Edwards to seek such a determination will not be construed as a right to seek an extension or opportunity to cure.

     3.      <u>Treatment of Class 3:  Capri Claim</u>

As of the Effective Date, the Capri Claim shall be Allowed in its full Amount, subject to bifurcation pursuant to Bankruptcy Code §506(c) in a manner consistent with the result in the Valuation Contested Matter.  If the Capri Claim is adjudicated to be bifurcated, it shall be separated into the "Secured Capri Claim" and the "Capri Deficiency Claim" for purposes of treatment under the Plan.  In accordance with the result in the Valuation Contested Matter, the Capri Deficiency Claim shall be treated as a General Unsecured Claim for all purposes under the Plan.

From any sale or refinance transaction involving any portion of the Facility, the Secured Capri Claim shall be satisfied subject to lien priority.  Interest shall accrue on the Secured Capri Claim at a rate of six (6%) percent <u>per</u> <u>annum</u>, during the Plan Term. It is expressly contemplated that any default with respect to treatment of OZK will be a default with respect to Capri.  And although Capri will not receive the Quitclaim Deed in the event of such default, Capri will be permitted to assert any rights that it possesses as Secured Creditor, subject to the rights of OZK. Notwithstanding any other term or condition of the Plan or Confirmation Order, Capri shall have the right, but not the obligation, to satisfy the OZK Secured Claim at any time that it is outstanding, for the then outstanding balance of the same, in order to better ensure its collateral position.

Bankruptcy Code §1111(b) provides certain substantive rights to electing Creditors, in connection with the valuation of Collateral pursuant to Bankruptcy Code §506(b).  In connection with adjudication of the Valuation Contested Matter, Capri shall have the right to make an election Bankruptcy Code §1111(b), so as to forfeit its entitlement to Distribution on the Capri Deficiency Claim.

     4.      <u>Treatment of Class 4:  Pinellas County Secured Tax Claims</u>

Beginning on the first (1st) day of the first (1st) month following the Effective Date, the Debtor will begin making a series of thirty-six (36) equal payments of principal and interest accruing on the principal amount of this Claim at a rate of six (6%) percent <u>per</u> <u>annum</u>, with ten (10) days' grace period, until the balance of this Claim is paid.  No further action is required for the Pinellas County Tax Collector to retain its Liens as they presently exist.

     5.      <u>Treatment of Class 5:  SBA Claim</u>

As of the Effective Date, the SBA Claim shall be Allowed in its full Amount, but shall be bifurcated into the "Secured SBA Claim" in the Amount of $30,000 and the "SBA Deficiency Claim" in the Amount of $120,000 for purposes of treatment under the Plan.  From any sale or refinance transaction involving any portion of the Facility, the Secured SBA Claim shall be satisfied subject to lien priority.  Interest shall accrue on the Secured SBA Claim at a rate of six (6%) percent <u>per</u> <u>annum</u>, during the Plan Term.  The Debtor shall make equal payments of $1,000 per month on the Secured SBA Claim until satisfied.  Alternatively, the Debtor will have the obligation to satisfy the entire outstanding balance of the Secured SBA Claim in connection with any sale or refinance of the Facility after the City Development Rights Claim has been

adjudicated.  In accordance with the result in the Valuation Contested Matter, the SBA Deficiency Claim shall be treated as a General Unsecured Claim for all purposes under the Plan.

### 6.    Treatment of Class 6:  Trade Creditors Claim

The Debtor shall pay the Trade Creditors Claims in full in connection with the Lot Sale, described elsewhere in the Plan, from proceeds not allocated for OZK.  To the extent that any Trade Creditor objects to the Amount of its Claim as Scheduled, the Debtor shall reserve the right to fund the balance of the Trade Creditors' Claims and not to reserve funds from Lot Sale proceeds.  If such an objection occurs, the Debtor shall have a right to dispute the Claim as Scheduled, even though all Claims of Trade Creditors are being deemed undisputed, fixed, and liquidated for purposes of the Plan.

### 7.    Treatment of Class 7:  General Unsecured Claims

Based upon the adjudication and computation of deficiency Claims elsewhere in the Plan, and all such additional General Unsecured Claims as are filed in this Reorganization, a pool of Creditors shall be created for purposes of Pro Rata participation in the Unsecured Claims Pool. The Unsecured Claims Pool shall be maintained by the Escrow Agent, with full access to account information by Mr. Edwards, the Debtor, OZK, Capri, and the SBA, as to Amount at any given time.  The Unsecured Claims Pool shall receive (a) all proceeds from the sale or refinance of the Facility after payment of Secured Claims in the manner described above, (b) all proceeds from the City Litigation Damage Claim, and (c) any other recoveries not expressly pledged as Collateral in favor of Creditors specifically identified above.  Notwithstanding any other term or condition, the Unsecured Claims Pool shall be in an amount of not less than $5,000,000 and not more than $8,000,000.

### 8.    Treatment of Class 8:  Equity Interest of Edwards

Edwards shall retain the Equity interest in the Debtor post-Confirmation.  As of the Effective Date, the Debtor's management will no longer be debtor-in-possession, and Edwards rights as management of the Debtor will be subject to the Plan, the Confirmation Order, and the Business Judgment Rule, but shall not be subject to Bankruptcy Code §§1107 or 1108, as more fully described in Article 8 below.  Subject to the other terms and conditions of the Plan, Equity shall be entitled to cause the Debtor to retain title to all or so much of the Facility as it wishes, to the extent consistent with Plan treatment for Creditor set forth above.  In connection with any sale of the Facility, Edwards shall be entitled to any excess proceeds after satisfying Secured Claims as defined above.  After funding the Unsecured Claims Pool, Edwards shall be entitled to Disbursement or dividend of any excess funds from the recovery on the City Litigation Damage Claim.

THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AGAINST THE DEBTOR AND THUS STRONGLY RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.

### C.    Allowed Claims, Distribution Rights, And Objections To Claims

#### 1.    Allowance Requirement

Only holders of Allowed Claims are entitled to receive distributions under the Plan.  An Allowed Administrative Claim is all or any portion of an Administrative Claim (a) that has been allowed, or adjudicated in favor of the Holder by estimation or liquidation, by a Final Order, or (b) that was incurred by the Debtor in the ordinary course of business during the Reorganization.  A post-Petition obligation that is contingent or disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding claims arising under workers' compensation law), secondary payor liability, or any other disputed legal or equitable claim based on tort, statute, contract, equity or common law, is not considered to be an obligation that is payable in the ordinary course of business.

An Allowed Claim (other than an Administrative Claim) is such Claim or any portion thereof (a) that has been allowed, or adjudicated in favor of the holder by estimation or liquidation, by a Final Order, or (b) as to which (i) no Proof of Claim has been filed with the Bankruptcy Court and (ii) the liquidated and non-contingent amount of which is included in the Schedules, other than a Claim that is included in the Schedules at zero, in an unknown amount, or as Disputed, or (c) for which a Proof of Claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court, or other applicable bankruptcy law, and as to which either (i) no objection to its allowance has been filed within the periods of limitation fixed by the Plan, the Bankruptcy Code, or any order of the Bankruptcy Court, or (ii) any objection to its allowance has been settled, withdrawn, or denied by a Final Order, or (d) that is expressly allowed in a liquidated amount in the Plan.

Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim shall receive in respect of such Claim any Distribution of a value as of the Effective Date in excess of the Allowed amount of such Claim.  In no event will those Administrative Claims or those other Claims subject to disallowance under Bankruptcy Code §502(d) be deemed to be an Allowed Claim.

#### 2.    No Interest on Claims; Dividends; Attorney's Fees

The Plan provides that unless otherwise specifically provided for in the Plan or the Confirmation Order, post-petition interest, costs, and attorney's fees will not accrue or be paid on Claims, and no holder of a Claim will be entitled to interest accruing on or after the Petition Date on any Claim.

#### 3.    Making of Distributions

Distributions to Holders of Allowed Claims will be made by the Debtor (a) at the addresses set forth on the Proofs of Claim filed by such holders, (b) at the addresses reflected in the Schedules if no Proof of Claim has been filed, or (c) at the addresses set forth in any written

notices of address changes delivered to the Debtor after the date of any related Proof of Claim, or after the date of the Schedules if no Proof of Claim was filed.  The Debtor may establish one or more Distribution Accounts from which to make Distributions required under the Plan.

If any Holder's Distribution is returned as undeliverable, a reasonable effort will be made to determine the current address of such holder, but no further distributions to such holder will be made unless and until the Debtor is notified of such holder's then current address, at which time all missed distributions will be made to such holder without interest.  Unless otherwise agreed by the Debtor, amounts with respect to undeliverable Distributions will be returned to the Debtor. After the Effective Date, the Debtor may select a Disbursing Agent to make Distributions under this Plan, subject to Bankruptcy Court Approval.

All claims for undeliverable Distributions must be made within the later of one (1) year after the Effective Date and one (1) year after Distribution is made to such holder; after which date all unclaimed property will revert to the Debtor free of any restrictions thereon and the claims of any holder or successor to such holder with respect to such property will be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

4.    Means of Cash Payment

The Plan provides that Cash payments made pursuant to the Plan will be in U.S. funds, by the means agreed to by the payor and the payee, including by check, and/or wire transfer or, in the absence of an agreement, such commercially reasonable manner as the payor will determine in its sole discretion.

For purposes of effectuating Distributions under the Plan, any Claim denominated in foreign currency will be converted to U.S. Dollars pursuant to the applicable published exchange rate in effect on the Petition Date.

5.    Fractional Distributions

The Plan provides that notwithstanding any other provision of the Plan to the contrary, no payment of fractional cents will be made pursuant to the Plan.  Whenever any payment of a fraction of a dollar would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollars (rounding up in the case of $0.50 or more and rounding down in the case of less than $0.50).

6.    De Minimis Distributions

The Plan provides that notwithstanding anything to the contrary contained in the Plan, de minimis Distributions of Cash or property having a value of less than five dollars ($5.00) shall not be made.  If a Distribution pursuant to the Plan to any holder of an Allowed Claim is returned to the Debtor due to an incorrect or incomplete address for the holder of such Allowed Claim, as to such Distribution, within ninety (90) days of the return of such Distribution the amount of Cash attributable to such Distribution will be deemed to be unclaimed and such holder will be

deemed to have no further Claim in respect of such Distribution and will not participate in any further Distributions under the Plan.

       7.    <u>Reserves for Disputed Claims; Distributions on Account Thereof</u>

No payments or distributions will be made on account of a Disputed Claim or, if less than the entire Claim is a Disputed Claim, the portion of a Claim that is Disputed, until such Claim becomes an Allowed Claim.

With respect to any Administrative Claim, other than an Administrative Claim that has been Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court or that was incurred by the Debtor in the ordinary course of business during the Reorganization, a Disputed Claim is a Claim that is contingent or disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding claims arising under workers' compensation law), secondary payor liability, or any other disputed legal or equitable claim based on tort, statute, contract, equity, or common law.

With respect to any Claim that is not an Administrative Claim, other than a Claim that has been Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court, a Disputed Claim is a Claim:  (a) if no Proof of Claim has been filed or deemed to have been filed by the applicable Bar Date, that has been or hereafter is listed on the Schedules as unliquidated, contingent, or disputed; (b) if a Proof of Claim has been filed or deemed to have been filed by the applicable Bar Date, as to which a Debtor has timely filed an objection or request for estimation in accordance with the Plan, the Bankruptcy Code, the Federal Rule of Bankruptcy Procedure, and any orders of the Bankruptcy Court, or which is otherwise disputed by a Debtor in accordance with applicable law, which objection, request for estimation, or dispute has not been withdrawn or determined by a Final Order; (c) for which a Proof of Claim was required to be filed by the Bankruptcy Code, the Bankruptcy Rules, or an order of the Bankruptcy Court, but as to which a Proof of Claim was not timely or properly filed; (d) for damages based upon the rejection by a Debtor of an executory contract or unexpired lease under Bankruptcy Code §365 and as to which the applicable Bar Date has not passed; (e) that is disputed under the provisions of the Plan; or (f) if not otherwise Allowed, as to which the applicable Claims Objection Deadline has not expired.

The Debtor will, on the applicable Distribution Dates, make Distributions on account of any Disputed Claim that has become an Allowed Claim.  Such Distributions will be made pursuant to the provisions of the Plan governing the applicable Class.  Such Distributions will be based upon the distributions that would have been made to the holder of such Claim under the Plan if the Disputed Claim had been an Allowed Claim on the Effective Date in the amount ultimately Allowed.

       8.    <u>Objection Procedures</u>

All objections to Claims, other than Claims that are deemed to be Disputed, must be filed and served on the holders of such Claims by the Claims Objection Deadline.  Objections to

Claims (other than Administrative Claims), shall be filed on the later of ninety (90) days after the Effective Date, or (b) ninety (90) days after the applicable Proof of Claim is filed. If an objection has not been filed to a Proof of Claim or a scheduled Claim by the Claims Objection Deadline, unless such Proof of Claim asserts a Claim that is deemed to be a Disputed Claim, the Claim to which the Proof of Claim or scheduled Claim relates will be treated as an Allowed Claim if such Claim has not been allowed earlier.

        9.      <u>Estimation of Disputed Claims</u>

The Debtor, at any time and from time to time, may request that the Bankruptcy Court estimate any Disputed Claim pursuant to Bankruptcy Code §502(c) regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim against any party or Entity, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor may elect to pursue any supplemental proceedings to object to any ultimate Distribution on account of such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, objected to, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. Because the Debtor contends that disposition of the Valuation Contested Matter is required to advance to Confirmation, the Debtor believes that estimation of Claims is unlikely.

        10.      <u>Maximum Distributions for Claims</u>

Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim shall receive in respect of such Claim any Distribution of a value as of the Effective Date in excess of the Allowed amount of such Claim.

        11.      <u>Reservation of Rights Regarding Claims</u>

Except as otherwise explicitly provided in the Plan, nothing will affect the Debtor's rights and defenses, both legal and equitable, with respect to any Claims, including, but not limited to, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

**D.**      **<u>Disposition Of Executory Contracts And Unexpired Leases</u>**

        1.      <u>Executory Contracts and Unexpired Leases Deemed Assumed</u>

The Plan provides for the assumption of all executory contracts or unexpired leases upon the Effective Date. Specifically, any unexpired lease or executory contract that has not been expressly rejected by a Debtor or treated in the Plan with the Bankruptcy Court's approval on or

prior to the Confirmation Date shall, as of the Effective Date, be deemed to have been assumed by the Debtor unless there is pending before the Bankruptcy Court on the Effective Date a motion to reject such unexpired lease or executory contract or such executory contract or unexpired lease is otherwise designated for rejection, provided that such lease or executory contract is ultimately rejected.

2.    Rejection Damages Bar Date for Rejections Pursuant to Plan

Other than General Unsecured Claims arising out of the rejection of an executory contract or unexpired lease designated for rejection hereunder or pursuant to the Confirmation Order, all Claims must be filed with the Bankruptcy Court and served upon the Debtor by no later than thirty (30) days after the notice of entry of an order approving such rejection or as otherwise may be provided in the Confirmation Order. Any Claims not filed within such time will be forever barred from assertion against the Debtor, the Estate, the Debtor, and its property, and the holders thereof shall not be entitled to any Distribution under the Plan or otherwise from the Debtor. Unless otherwise ordered by the Bankruptcy Court, all Claims arising from the rejection of executory contracts and unexpired leases shall be treated as General Unsecured Claims under the Plan. At present, the Debtor is unaware of the existence of any damages arising from rejection of executory contracts and/or unexpired non-residential real estate leases.

3.    Assumption of Executory Contracts and Unexpired Leases

Under the Plan, the Debtor reserves the right, at any time prior to the Effective Date, except as otherwise specifically provided in the Plan, to seek to assume or reject any executory contract or unexpired lease to which the Debtor is a party and to file a motion requesting authorization for the assumption or rejection of any such executory contract or unexpired lease.

4.    Cure with Respect to Assumed Executory Contracts and Unexpired Leases

Any monetary defaults under executory contracts and/or unexpired leases to be assumed pursuant to the Plan shall be satisfied under Bankruptcy Code §365(b)(1), by the respective Cure. If there is a dispute regarding (a) the nature or amount of any Cure, (b) the ability of any Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of Bankruptcy Code §365) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order by the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be; provided, however, that if the Debtor, in the exercise of its sound business judgment, concludes that the amount of the Cure obligation as determined by such Final Order, renders assumption of such executory contract or unexpired lease unfavorable to the Debtor, it may elect to reject such contract or lease.

The foregoing applies only to assumptions that will occur pursuant to the provisions of the Plan, rather than to assumptions that will occur pursuant to separate motions. The Debtor's motions to assume have generally sought to fix cure amounts. Parties to the contracts and leases proposed to be assumed under such motions have the opportunity to file an objection disputing

the amount of cure designated by the Debtor in such motions. If the dispute cannot be consensually resolved, the Bankruptcy Court will determine the amount of cure the Debtor must pay to assume the contract or lease at issue.

        5.      <u>Assumption of Governmental Licenses</u>

If any license granted to the Debtor by a governmental unit, and in effect immediately prior to the Effective Date, is considered to be an executory contract and is not otherwise terminated or rejected by the Debtor, such license shall be deemed to be assumed pursuant to Bankruptcy Code §365 under the Plan.

With the exception of the executory contracts or agreements that the Debtor has previously assumed or rejected pursuant to an order of the Bankruptcy Court, the Debtor is continuing to review its other executory contracts to determine whether to assume or reject, as of the Effective Date, such other agreements. The fact that an executory contract has not been included in a motion as of the date hereof does not mean that it will not be included in a later motion. Any and all Claims (including Cure Claims) arising under or related to any executory contracts that are assumed by the Debtor prior to or as of the Effective Date: (i) will not be discharged; (ii) will be Allowed Administrative Claims; and (iii) will be paid in full in the ordinary course of business of the Debtor or as provided for as Cure Claims under the Plan.

        6.      <u>Limited Extension of Time to Assume or Reject</u>

Under the Plan, in the event of a dispute as to whether a contract or lease is executory or unexpired, the right of the Debtor to move to assume or reject such contract or lease will be extended until the date that is thirty (30) days after entry of a Final Order by the Bankruptcy Court determining that the contract or lease is executory or unexpired.

In the event the Debtor becomes aware after the Confirmation Date of the existence of an executory contract or unexpired lease that was not included in the Schedules, the right of the Debtor to move to assume or reject such contract or lease will be extended until the date that is thirty (30) days after the date on which the Debtor became aware of the existence of such contract or lease. The deemed assumption provided for in the Plan will not apply to any such contract or lease.

        7.      <u>Post-Petition Contracts and Leases</u>

The Plan provides that the Debtor will not be required to assume or reject any contract or lease entered into by the Debtor after the Petition Date. Any such contract or lease will continue in effect in accordance with its terms after the Effective Date, unless the Debtor has obtained a Final Order of the Bankruptcy Court approving rejection of such contract or lease.

**E.**      <u>**Revesting Of Assets; Release Of Liens**</u>

The property of Debtor's Estate, together with any property of Debtor that is not property

of its Estate and that is not specifically disposed of or abandoned pursuant to the Plan, will revest in the Debtor on the Effective Date. Thereafter, the Debtor may operate its Business and may use, acquire, and dispose of such property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court except as may be otherwise specifically provided under the Plan. As of the Effective Date, all such property of the Debtor will be free and clear of all Liens and Claims. All pre-Effective Date Claims, liabilities and obligations of the Debtor are treated and/or discharged in accordance with the terms of the Plan and, except as otherwise set forth herein, shall not in any manner be (or be deemed to be) transferred or assumed by the Debtor.

**F.        Restructuring Transactions**

Under the Plan, the Debtor may enter into such transactions and may take such actions as may be necessary or appropriate, in accordance with any applicable state law to effect a corporate or operational restructuring of its business, to otherwise simplify the overall corporate or operational structure of the Debtor, to achieve corporate or operational efficiencies, or to otherwise improve financial results; provided, however, that such transactions or actions are not otherwise inconsistent with the Plan, the distributions to be made under the Plan, the new Restated Corporate Documents (as defined below). Such transactions or actions may include such mergers, consolidations, restructurings, dispositions, liquidations, refinancing, or dissolutions, as may be determined by the Debtor to be necessary or appropriate.

**G.        Post-Consummation Corporate Structure, Management And Operation**

1.        Continued Corporate Existence

The Debtor shall continue to exist after the Effective Date as a separate legal entity in accordance with the laws of the jurisdiction in which it was incorporated and pursuant to its Articles and By-Laws as may be amended pursuant to the Plan, including any other amendments necessary to effectuate the provisions of the Plan and such other provisions as are necessary to comply with the Bankruptcy Code or applicable law.

2.        Post-Consummation Governance Documents

The Debtor may, pursuant to the Plan, amend its governing documents (collectively, the "Debtor Restated Articles") as necessary to satisfy the provisions of the Plan and the Bankruptcy Code.

3.        Participation in Incentive or Severance Plans

Any pre-existing understandings, either oral or written, between the Debtor and any director, officer, or employee as to entitlement to participate in any incentive or severance plan of any kind will be null and void as of the Effective Date and will not be binding on the Debtor after the Effective Date.

4.        Effectiveness of Plan Documents

On the Effective Date, unless otherwise provided, all documents, instruments, mortgages, and agreements to be entered into, delivered, or confirmed thereunder on the Effective Date, will become effective.

5.        Exemption from Certain Transfer Taxes

Pursuant to Bankruptcy Code §146(a), (a) the issuance, transfer or exchange of any securities, instruments, or documents; (b) the creation of any other lien, mortgage, deed of trust, or other security interest; or (c) the making or assignment of any lease or sublease, or the making, delivery, filing, or recording of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with the Plan, will not be taxed under any law imposing a stamp tax, documentary tax, real estate transfer tax, sales or use tax, intangible tax, recording or filing fee, privilege tax, or other similar tax or fee.   Such exemption specifically applies, without limitation, to all documents necessary to evidence and implement the provisions of and the distributions to be made under the Plan, including the Restated Certificate.

6.        Corporate Action

On the Effective Date the adoption and filing of the Debtor Restated Articles, the appointment of directors and officers of the Debtor, and all actions contemplated by the Plan will be authorized and approved in all respects pursuant to the Plan.  All matters provided for in the Plan involving the corporate structure of the Debtor and any corporate action required by the Debtor in connection with the Plan will be deemed to have occurred and will be in effect, without any requirement of further action by the directors of the Debtor.  On the Effective Date the appropriate officers or directors of the Debtor will be authorized and directed to issue, execute, and deliver the agreements, documents, and instruments contemplated by the Plan in the name of and on behalf of the Debtor without the need for any required approvals, authorizations, or consents, except for express consents required under the Plan.

7.        Discharge and Discharge Injunction

Confirmation of the Plan affects a discharge of all Claims against the Debtor.  As set forth in the Plan, except as otherwise provided therein or in the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims of any nature whatsoever against the Debtor or any of its assets or properties and, regardless of whether any property will have been abandoned by order of the Bankruptcy Court, retained, or distributed pursuant to the Plan on account of such Claims, upon the Effective Date, the Debtor will be deemed discharged and released under Bankruptcy Code §1141(d)(1)(A) from any and all Claims, including, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in Bankruptcy Code §502, whether or not (i) a Proof of Claim based upon such debt is filed or deemed filed under Bankruptcy Code §501, (ii) a Claim based upon such debt is Allowed under Bankruptcy Code §502, (iii) a Claim based upon such debt is or has been disallowed by order of

the Bankruptcy Court, or (iv) the holder of a Claim based upon such debt accepted the Plan.

Under the Plan, as of the Effective Date, except as provided in the Plan or the Confirmation Order, all Persons will be precluded from asserting against the Debtor, directly or indirectly, any other or further claims, debts, rights, causes of action, claims for relief, liabilities, or equity interests relating to the Debtor based upon any act, omission, transaction, occurrence, or other activity of any nature that occurred prior to the Effective Date. In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination of discharge of all such Claims and other debts and liabilities against the Debtor pursuant to Bankruptcy Code §§524 and 1141, and such discharge will void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim.

In furtherance of the discharge of Claims, the Plan provides that, except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons that have held, currently hold, may hold, or allege that they hold, a Claim or other debt or liability that is discharged or an Interest or other right of an equity security holder that is terminated pursuant to the terms of the Plan, are permanently enjoined from taking any of the following actions against the Debtor, or its property on account of any such discharged Claims, debts, or liabilities: (a) commencing or continuing, in any manner or in any place, any action or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any Lien or encumbrance; (d) asserting a setoff, right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtor; or (e) commencing or continuing any action, in each such case in any manner, in any place, or against any Person that does not comply with or is inconsistent with the provisions of the Plan.

## H.    Preservation Of Causes Of Action; Resulting Claim Treatment

Under the Plan, Causes of Action consist of claims, rights of action, suits, or proceedings, whether in law or in equity, whether known or unknown, that the Debtor or its Estate may hold against any Person. The Debtor may also elect, prior to confirmation, to pursue litigation against any Person arising out of a debt to the Debtor. The Plan provides that except as otherwise provided in the Plan or the Confirmation Order, or in any contract instrument, release, indenture, or other agreement entered into in connection with the Plan, in accordance with Bankruptcy Code §1123(b), on the Effective Date, the Debtor will retain all of the respective Causes of Action that such Debtor may hold against any Person. The Debtor will retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all such Causes of Action. The Debtor or its respective successor(s) may pursue such retained Causes of Action, as appropriate, in accordance with the best interests of the Debtor or its successor(s) who hold such rights in accordance with applicable law and consistent with the terms of the Plan.

If, as a result of the pursuit of any Causes of Action, a Claim would arise from a recovery pursuant to Bankruptcy Code §550 after distributions under the Plan have commenced, making it impracticable to treat the Claim in accordance with the applicable provisions of the Plan, the Debtor will be permitted to reduce the recovery by an amount that reflects the value of the

treatment that would have been accorded to the Claim, thereby effectively treating the Claim through the reduction.

Causes of Action include potential avoidance or other bankruptcy causes of action. Such causes of action may exist as a result of "preferential" payments or other transfers made by the Debtor on account of antecedent debts within ninety (90) days of the Petition Date, or one (1) year in the case of Insiders. The deadline for commencing preference actions is two (2) years after the Petition Date. A decision with respect to whether to pursue such transfers will be made by the New Board prior to the expiration of that deadline. All creditors and other parties who received potentially preferential payments are advised that such payments are subject to possible avoidance in proceedings to be commenced by the Debtor. The New Board may decide that the interests of the Debtor would not be served by pursuing any such actions, as doing so could impair valuable relationships with continuing vendors and suppliers. In addition, Causes of Action include non-bankruptcy claims, rights of action, suits, or proceedings that arise in the ordinary course of the Debtor's business.

The Debtor reserves the right to pursue, settle, or otherwise not pursue any pending or potential claims, rights of action, suits, or proceedings against any of the parties described herein. Neither the listing nor the failure to list any party or claim herein will prejudice the Debtor's rights to pursue any claims, rights of action, suits, or proceedings that have arisen or may arise in the future in the ordinary course of the Debtor's Business.

## I.  <u>Confirmation And/Or Consummation</u>

Described below are certain important considerations under the Bankruptcy Code in connection with confirmation of the Plan.

Before the Plan can be confirmed, the Bankruptcy Court must determine at the hearing on confirmation of the Plan (the "Confirmation Hearing") that, among others, the following requirements for confirmation set forth in Bankruptcy Code §1129 have been satisfied:

a.  The Plan complies with the applicable provisions of the Bankruptcy Code.

b.  The Debtor has complied with the applicable provisions of the Bankruptcy Code.

c.  The Plan has been proposed in good faith and not by any means forbidden by law.

d.  Any payment made or promised by the Debtor or by a Person who shall acquire property under the Plan for services or for costs and expenses in, or in connection with, the Reorganization, or in connection with the Plan and incident to the Reorganization, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

e.  The Debtor has disclosed (a) the identity and affiliations of (i) any individual

proposed to serve after confirmation of the Plan as a director, officer, or voting trustee of the Debtor, (ii) any affiliate of the Debtor participating in a joint plan with the Debtor, or (iii) any successor to the Debtor under the Plan (and the appointment to, or continuance in, such office of such individual(s) is consistent with the interests of Claim holders and with public policy), and (b) the identity of any Insider that will be employed or retained by the Debtor and the nature of any compensation to such Insider.

f.   With respect to each Class of Claims, each Impaired Claim holder either has accepted the Plan or will receive or retain under the Plan, on account of the Claims held by such holder, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtor were liquidated on such date under Chapter 7 of the Bankruptcy Code.

g.   The Plan provides that Administrative Claims and Priority Claims other than Priority Tax Claims will be paid in full on the Effective Date and that Priority Tax Claims will receive on account of such Claims deferred cash payments, over a period not exceeding five (5) years from the order of relief, of a value, as of the Effective Date, equal to the Allowed Amount of such Claims, except to the extent that the holder of any such Claim has agreed to a different treatment and in a manner not less favorable than the most favored non-priority Unsecured Claim provided for by the Plan (other than cash payments made to a class of creditors under Bankruptcy Code §1122(b).

h.   At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by Insiders holding Claims in such Class.

i.   Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.

The Debtor believes that, upon receipt of the votes required to confirm the Plan, the Plan will satisfy all the statutory requirements of Chapter 11 of the Bankruptcy Code, that the Debtor has complied or will have complied with all of the requirements of Chapter 11, and that the Plan has been proposed and submitted to the Bankruptcy Court in good faith.

## VII.   <u>CERTAIN RISK FACTORS TO BE CONSIDERED</u>

The holders of Claims in Voting Classes should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the related documents annexed or referenced by this Disclosure Statement) before deciding whether to vote to accept or reject the Plan.  These risk factors should not, however, be regarded as constituting the only risks associated with the Plan and its implementation.

### A.   <u>Risks Related To The Debtor's Business</u>

The Debtor is of the belief that the zoning for the Lot is such that there can increased

density for the Facility may be awarded.

**B.**     **General Considerations**

The Plan sets forth the means for satisfying the Claims against the Debtor.  Certain Claims may receive reduced or no Distributions pursuant to the Plan.  Nevertheless, reorganization of the Debtor's Business and operations under the proposed Plan avoids the potentially adverse impact of liquidation on the Debtor's customers, suppliers, employees, community, and other stakeholders.

**C.**     **Certain Bankruptcy Considerations**

Even if all voting Impaired Classes vote in favor of the Plan, and even if with respect to any Impaired Class deemed to have rejected the Plan the requirements for "cramdown" are met, the Bankruptcy Court, which, as a court of equity, may exercise substantial discretion, may choose not to confirm the Plan.  Bankruptcy Code §1129 requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtor and that the value of distributions to dissenting Holders of Claims will not be less than the value such Holders would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.  Although the Debtor believes that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

If a liquidation or protracted reorganization were to occur, there is a significant risk that the value of the Debtor's business would be substantially eroded to the detriment of all Creditors.

The Debtor's future results are dependent upon the successful confirmation and implementation of a Plan of reorganization.  Failure to obtain this approval in a timely manner could adversely affect the Debtor's operating results, as the Debtor's ability to operate and/or obtain financing to fund its operations, and its relations with Members and suppliers may be harmed by protracted bankruptcy proceedings. Furthermore, the Debtor cannot predict the ultimate amount of all settlement terms for its liabilities that will be subject to a Plan of reorganization.  Once a Plan of reorganization is approved and implemented, the Debtor's operating results may be adversely affected by the possible reluctance of prospective lenders, and suppliers to do business with a company that recently emerged from bankruptcy proceedings.

**D.**     **Conditions Precedent To Consummation; Timing**

The Plan provides for certain conditions that must be satisfied (or waived) prior to the Confirmation Date and for certain other conditions that must be satisfied (or waived) prior to the Effective Date.  As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived).  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

E.     **Inherent Uncertainty Of Financial Projections**

The Debtor's projected financial performance will necessarily be based on numerous assumptions, including: confirmation and consummation of the Plan in accordance with its terms, realization of the operating strategy of the Debtor, industry performance, the absence of any unanticipated material adverse changes in applicable legislation or regulations (or the administration thereof), no unanticipated material adverse changes in general business and economic conditions, no material adverse changes in competition, the Debtor's retention of key management and other key employees, adequate access to financing and capital, the absence of material contingent or unliquidated litigation, indemnity, or other claims, and other matters, many of which will be beyond the control of the Debtor, and some or all of which may not materialize.

To the extent that any assumptions are based upon future business decisions and objectives, they are subject to change.  In addition, although they are presented with numerical specificity and are based on assumptions considered reasonable by the Debtor, the assumptions and estimates are subject to significant business, economic, and competitive uncertainties and contingencies, many of which will be beyond the control of the Debtor.  It can be expected that some or all of the assumptions will not be realized and that actual results will vary.  In light of the foregoing, Holders of Claims are cautioned not to place undue reliance on any projections that may be provided in connection with the Plan Supplement.  The projected financial information should not be regarded as a representation or warranty by the Debtor, the Debtor's advisors, or any other Person that such projections can or will be achieved.

F.     **Operational Risk Factors**

The Debtor will face a number of risks with respect to its continuing business operations upon emergence from Chapter 11, including but not limited to the following:  The Debtor's ability to generate revenues and generate positive operating cash flow; the Debtor's ability to increase sales of goods and services; the Debtor's response to the entry of new competitors into its markets; the Debtor's ability to further reduce the level of operating losses experienced in recent years; the Debtor's ability to implement effective pricing and membership programs; the Debtor's ability to successfully implement effective business continuity; general economic conditions; increases in labor and employee benefit costs, such as health care and related expenses; and changes in accounting standards, taxation requirements. and bankruptcy laws.

G.     **Competition**

The Debtor will face intense competition from other local restaurants, pools, tennis courts, and other related amenities, which could harm its financial condition and results of operations. Principal competitors are nearby tennis, swimming, boating, and fitness clubs, which are probably affected by the economic downturn as well and are therefore providing attractive membership programs and benefits.

H.     **Leverage**

The Debtor believes that it will emerge from Chapter 11 with a reasonable level of debt

that can be effectively serviced in accordance with its business plan.  Circumstances, however, may arise which might cause the Debtor to conclude that it is overleveraged, which could have significant negative consequences, including:

    a.  it may become more difficult for the Debtor to satisfy all of its obligations;

    b.  the Debtor may be vulnerable to a further or sustained downturn in the markets in which it operates, or to a similar downturn in the economy in general;

    c.  the Debtor may be required to dedicate a substantial portion of its cash flow from operations to fund working capital, capital expenditures, and other general corporate requirements;

    d.  the Debtor may be limited in its flexibility to plan for, or react to, changes in its business and the industry in which it operates or the entry of new competitors into its market;

    e.  the Debtor may be placed at a competitive disadvantage compared to its competitors that have less debt, including with respect to implementing effective pricing and promotional programs; and

    f.  the Debtor may be limited in borrowing additional funds.

The covenants and other provisions of the Debtor's financing agreements may also restrict the Debtor's flexibility.  Such covenants may place restrictions on  the ability of the Debtor to incur indebtedness, and make other payments or investments, sell assets, make capital expenditures, engage in certain mergers and acquisitions, and/or refinance existing indebtedness.

Additionally, there may be factors beyond the control of the Debtor that could impact its ability to meet debt service requirements.  The ability of the Debtor to meet debt service requirements will depend on its future performance, which, in turn, will depend on the Debtor's ability to sustain sales conditions in the markets in which the Debtor operates, the economy generally, and other factors that are beyond its control.  The Debtor can provide no assurance that the Business of the Debtor will generate sufficient cash flow from operations or that future borrowings will be available in amounts sufficient to enable the Debtor to pay its indebtedness or to fund its other liquidity needs.  Moreover, the Debtor may need to refinance all or a portion of its indebtedness on or before maturity.  The Debtor cannot make assurances that the Debtor will be able to refinance any of its indebtedness on commercially reasonable terms or at all.  If the Debtor is unable to make scheduled debt payments or to comply with the other provisions of its debt instruments, its various lenders will be permitted under certain circumstances to accelerate the maturity of the indebtedness owing to them and exercise other remedies provided for in those instruments and under applicable law.

I.      **Litigation**

The Debtor may be subject to various claims and legal actions arising in the ordinary course of its business.  The Debtor is not able to predict the nature and extent of any such claims and actions and cannot guarantee that the ultimate resolution of such claims and actions will not have a material adverse effect on the Debtor.

J.      **Adverse Publicity**

Adverse publicity or news coverage relating to the Debtor, including but not limited to publicity or news coverage in connection with the Reorganization, may negatively impact the Debtor's efforts to establish and promote name recognition and a positive image after the Effective Date.

K.      **Certain Tax Considerations**

There are a number of income tax considerations, risks, and uncertainties associated with consummation of the Plan.  Interested parties should read carefully the discussions set forth in the provisions of this Disclosure Statement regarding certain U.S. Federal income tax consequences of the transactions proposed by the Plan to the Debtor and to certain holders of Claims who are entitled to vote to accept or reject the Plan.

## VIII.    CERTAIN U.S. FEDERAL TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain anticipated U.S. federal income tax consequences of the Plan to the Debtor and certain Holders of Claims in Voting Classes.  This summary is provided for information purposes only and is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect as of the date hereof and all of which are subject to change, possibly with retroactive effect, that could adversely affect the U.S. federal income tax consequences described below.

This summary does not address all aspects of U.S. federal income taxation that may be relevant to a particular holder of a Claim in light of its particular facts and circumstances or to certain types of holders of Claims subject to special treatment under the Tax Code (for example, non-U.S. taxpayers, financial institutions, broker-dealers, life insurance companies, tax-exempt organizations, real estate investment trusts, regulated investment companies, grantor trusts, persons holding a Claim as part of a "hedging," or claims trading, persons holding claims through a partnership or other pass-through entity, persons that have a "functional currency" other than the U.S. dollar, and persons who have acquired an equity interest or a security in a debtor in connection with the performance of services).  Except to the extent discussed below, this summary does not address the tax considerations applicable to holders who obtained its Claims (or the rights underlying such Claims) in connection with the performance of service. In addition, this summary does not discuss any aspects of state, local, or non-U.S. taxation and does not address the U.S. federal income tax consequences to holders of Claims that are unimpaired under the Plan or holders of Claims that are not entitled to receive or retain any property under

the Plan, if any.

A substantial amount of time may elapse between the date of this Disclosure Statement and the receipt of a final distribution under the Plan.  Events occurring after the date of this Disclosure Statement, such as additional tax legislation, court decisions, or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder.  There can be no assurance that the Internal Revenue Service (the "IRS") will not take a contrary view with respect to one or more of the issues discussed below.  No ruling will be sought from the IRS with respect to any of the tax aspects of the Plan, and no opinion of counsel has been or will be obtained by the Debtor with respect to the statements regarding tax consequences made in this Disclosure Statement.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER IS REMINDED THAT:  (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR FILE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE TAX CODE; (B) SUCH DISCUSSION IS INCLUDED HEREBY BY THE DEBTOR IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

A.    **U.S. Federal Income Tax Consequences To The Debtor**

For U.S. federal income tax purposes, the Debtor is classified as a tax-exempt organization under Internal Revenue Code §501(c)(7).  Accordingly, the Debtor does not believe the confirmation of this Plan will have any substantive consequences to the Debtor or its individual members.

B.    **U.S. Federal Income Tax Consequences To Claim Holders**

The U.S. federal income tax consequences to holders of allowed claims arising from the distributions to be made in satisfaction of their claims pursuant to a bankruptcy plan of reorganization may vary, depending upon, among other things:  (a) the type of consideration received by the holder of a claim in exchange for the indebtedness it holds; (b) the nature of the indebtedness owed to it; (c) whether the holder has previously claimed a bad debt or worthless security deduction in respect of its claim against the corporation; (d) whether such claim constitutes a security; (e) whether the holder of a claim is a citizen or resident of the United States for tax purposes, or otherwise subject to U.S. federal income tax on a net income basis; (f) whether the holder of a claim reports income on the accrual or cash basis; and (g) whether the holder of a claim receives distributions under the bankruptcy plan in more than one taxable year.  For tax purposes, the modification of a claim may represent an exchange of the claim for a new claim, even though no actual transfer takes place.  In addition, where a gain or loss is recognized by a holder, the character of such gain or loss as long-term or short-term capital gain or loss or as

ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the claim constitutes a capital asset in the hands of the holder and how long it has been held or is treated as having been held, whether the claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction with respect to the underlying claim.  A holder who purchased its claim from a prior holder at a market discount may be subject to the market discount rules of the Tax Code.  Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its claim (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such claim as of the date of the exchange.

     1.    <u>Holders of Secured Claims</u>

A holder of a Secured Claim who receives the collateral securing such Claim or who receives Cash with respect to such Claim pursuant to the Plan generally will be required to recognize gain or loss for U.S. federal income tax purposes equal to the difference between the fair market value of the Collateral or the amount of Cash, as the case may be, received in exchange therefor and such holder's adjusted tax basis in the Claim.

A holder of a Secured Claim who receives deferred Cash payments and realizes gain thereon may be eligible to report gain from such Cash payments.  Holders of Secured Claims who receive deferred Cash payments should consult its tax advisors regarding the application of the installment method, the determination of the amount of gain or loss to be recognized, and the imputed interest rules.

     2.    <u>Certain Priority Claims</u>

Any Cash Payments received by holders of Claims that are treated as compensation for the performance of services for U.S. federal income tax purposes may be treated as ordinary income and will be subject to federal income tax withholding and other applicable withholding rules.

     3.    <u>Unsecured Claims</u>

In general, the receipt of Cash payments in respect to Administrative Convenience Claims should be treated as a taxable exchange for U.S. federal income tax purposes. Accordingly, holders of Class 7 Claims should recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference, if any, between the Cash payments received and such holder's adjusted tax basis in its Claim.

**C.**     **<u>Information Reporting And Backup Withholding</u>**

Certain payments, including certain payments of Claims pursuant to the Plan, if any, may be subject to information reporting to the IRS.  Moreover, such reportable payments may be subject to backup withholding unless the taxpayer: (i) comes within certain exempt categories

(which generally include corporations), or (ii) provides a correct taxpayer identification number and otherwise complies with applicable backup withholding provisions. In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult its tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

### D.      Importance Of Obtaining Professional Tax Assistance

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

### IX.      FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS

### A.      Feasibility Of The Plan

In connection with confirmation of the Plan, the Bankruptcy Court will be required to determine that the Plan is feasible pursuant to Bankruptcy Code §1129(a)(11), which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor.

The projections are based on numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms. To the extent that any assumptions are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and are based on assumptions considered reasonable by the Debtor, the assumptions and estimates are subject to significant business, economic, and competitive uncertainties and contingencies, many of which will be beyond the control of the Debtor. It can be expected that some or all of the assumptions will not be realized and that actual results will vary, which variations may be material and are likely to increase over time. In light of the foregoing, Holders are cautioned not to place undue reliance on the assumptions. The Debtor may be required to adopt "fresh start" accounting upon its emergence from Chapter 11. The actual adjustments for "fresh start" accounting that the Debtor may be required to adopt upon emergence may differ substantially from the projected financial information contained in this Disclosure Statement.

The assumptions should be read together with the information in the provisions of this Disclosure Statement entitled "Certain Risk Factors to be Considered," which sets forth

important factors that could cause actual results to differ from those in the projections.

The Debtor does not intend to (but may) update or otherwise revise the projections, including any revisions to reflect events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying assumptions do not come to fruition.  Furthermore, the Debtor does not intend to (but may) update or revise the projections to reflect changes in general economic or industry conditions.

## B.    <u>Acceptance Of The Plan</u>

As a condition to Confirmation, the Bankruptcy Code requires that each Class of Impaired Claims vote to accept the Plan, except under certain circumstances.  Bankruptcy Code §1126(c) defines acceptance of a plan by a Class of Impaired Claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of Claims in that Class, but for that purpose counts only those who actually vote to accept or to reject the Plan.  Thus, holders of Claims in the Voting Classes will have voted to accept the Plan only if two-thirds in amount and a majority in number of the Claims actually voting in each Class cast its ballots in favor of acceptance.  The procedure used to tabulate ballots is set forth in more detail in the provisions of this Disclosure Statement.  Holders of Claims who fail to vote are not counted as either accepting or rejecting a Plan.

## C.    <u>Best Interests Test</u>

As noted above, even if a plan is accepted by each class of claims, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the best interests of all holders of claims that are impaired by the plan and that have not accepted the plan.  The "best interests" test, as set forth in Bankruptcy Code §1129(a)(7), requires a bankruptcy court to find either that all members of an impaired class of claims have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtors were liquidated under Chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims if the debtor were liquidated under Chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code.  This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a Chapter 7 trustee.

Typically, forced liquidations of assets will generate considerably less value than the "operating" or "going concern" value of those assets.  In the current economic climate, the Debtor believes this tendency will be substantially exacerbated.  The amount received by unsecured creditors by virtue of liquidation of assets would then be reduced by the claims of secured creditors to the extent of the value of its collateral and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 case and the Chapter 11 case.  Costs of liquidation under Chapter 7 of the Bankruptcy Code would

include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the debtor in its Chapter 11 case (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the Chapter 7 cases, litigation costs, and claims arising from the operations of the debtor during the pendency of the Chapter 11 case.  The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business.  Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity security interests.  The liquidation would also prompt the rejection of executory contracts and unexpired leases and thereby significantly enlarge the total pool of unsecured claims by reason of resulting rejection damages claims.

Once the Bankruptcy Court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors from the remaining available proceeds in liquidation.  If such probable distribution has a value greater than the distributions to be received by such creditors under the plan, then the plan is not in the best interests of creditors.

### D.    Liquidation Analysis

For purposes of the Best Interest Test, in order to determine the amount of liquidation value available to Creditors, the Debtor, with the assistance of its advisors, prepared a liquidation analysis (the "Liquidation Analysis"), which is annexed hereto as Exhibit "F."  The Debtor's Liquidation Analysis concludes that in a Chapter 7 liquidation, approximate additional $3,944,358 impairment of collateral if the Facility goes dark.  This conclusion is premised upon the assumptions set forth in the Liquidation Analysis, which the Debtor believes are reasonable.

Notwithstanding the foregoing, the Debtor believes that any liquidation analysis with respect to the Debtor is inherently speculative.  The Liquidation Analysis for the Debtor necessarily contains estimates of the net proceeds that would be received from a forced sale of assets as well as the amount of Claims that would ultimately become Allowed Claims.  Claims estimates are based solely upon the Debtor's initial review of the Claims filed and the Debtor's books and records.  No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis.  In preparing the Liquidation Analysis, the Debtor has projected an amount of Allowed Claims that represents its best estimate of the Chapter 7 liquidation dividend to holders of Allowed Claims.  The estimate of the amount of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any Distributions to be made on account of Allowed Claims under the Plan. A Liquidation Analysis will be annexed to this Disclosure Statement.

### E.    Application Of The "Best Interests" Of Creditors Test Liquidation Analysis

Although based on its assumptions, the Debtor has attempted to estimate the recoveries of Holders of Claims in the Classes designated by the Plan, it is impossible to determine with any specificity the actual value each holder of an Unsecured Claim will receive as a percentage of its

Allowed Claim.

Notwithstanding the difficulty in quantifying recoveries with precision, the Debtor believes that the financial disclosures and projections contained in this Disclosure Statement imply a greater or equal recovery to holders of Claims in Impaired Classes than the recovery available in a Chapter 11 or other liquidation. Accordingly, the Debtor believes that the "best interests" test of Bankruptcy Code §1129 is satisfied.

**F.    Confirmation Without Acceptance Of All Impaired Classes: The "Cramdown" Alternative**

The Debtor may seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code in the event one or more Classes of Creditors vote to reject the Plan. The Debtor reserves the right to seek confirmation of the Plan with respect to the Claims of all Voting Classes in the event the holders of such Claims vote to reject the Plan. Specifically, Bankruptcy Code §1129(b) provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. The Bankruptcy Court may confirm a plan at the request of the Debtor if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the plan. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

The Debtor believes the Plan does not discriminate unfairly with respect to the Claims in the Voting Classes. It is anticipated that the Holders of such Claims are to be paid in a similar manner. Because all Holders of Claims in the Voting Classes are similarly treated, there is no unfair discrimination with respect to such holders of Claims.

A plan is fair and equitable to a class of secured creditors that rejects a plan if the Plan provides (i) that the holders of Secured Claims retain the liens in the property securing such Claims to the extent of the allowed amount of such Claims, and that the holders of such Claims receive on account of such Claims deferred Cash payments totaling at least the allowed amount of such Claims, of a value, as of the effective date of the Plan, of at least the value of such holders' interest in the estate's interest in such property; (ii) for the sale of any property subject to the liens securing such Claims, free and clear of such liens, with the liens attaching to the proceeds of such sale, and such liened proceeds being treated either pursuant to (i) or (ii); or (iii) for the realization by such holders of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims that rejects a plan if the plan provides (i) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim or (ii) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

The Debtor believes that it will meet the "fair and equitable" requirements of Bankruptcy Code §1129(b) with respect to holders of Claims in the Voting Classes and that no holders of

junior claims or interests will receive distributions under the Plan.

As to the Voting Classes, and in the event it becomes necessary to "cramdown" the Plan over the rejection of any such Classes, the Debtor will demonstrate at the Confirmation Hearing that the Plan does not discriminate unfairly and is fair and equitable with respect to such Classes.

## X.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor believes that the Plan affords holders of Claims the potential for the greatest realization on the Debtor's assets and, therefore, is in the best interests of such holders. If, however, the requisite acceptances are not received or the Plan is not confirmed and consummated, the theoretical alternatives include (a) formulation of an alternative plan or plans of reorganization or (b) liquidation of the Debtor under Chapter 7 or Chapter 11 of the Bankruptcy Code.

### A.   Alternative Plan(s) Of Reorganization

For nearly six months that the Reorganization has been pending, nobody has disputed the facts that (a) the Facility retains value while the Business is being operated, and (b) the Facility would substantially decline in value if it were to be shuttered.  Without Mr. Edwards and his associates to operate the Business, and without the Insider Lender to fund losses and fund the Remanded City Litigation, the only alternatives would be dismissal or conversion.  Under either scenario, OZK's recovery would be substantially smaller than under the Plan.  Capri, SBA, and Trade Creditors would be unlikely to have any meaningful recovery.  Employees would be terminated.  Insurance, taxes, and premises security would present new expenses for whoever were in possession.  Permitting, riparian rights, and other entitlements would be lost.  And Mr. Edwards would obviously then not be released from the OZK liability, leading inexorably to his own involvement in defense of collection litigation and a potential bankruptcy filing.

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtor or any other party in interest could attempt to formulate and propose a different plan or plans of reorganization.  Such a plan or plans might involve both a reorganization and continuation of the Debtor's business or an orderly liquidation of assets.  The Debtor believes that its Plan enables Creditors to realize the greatest possible value under the circumstances and has the greatest chance to be confirmed and consummated.

### B.   Liquidation Under Chapter 7 Or Chapter 11

If no plan is confirmed, it is unclear if the Bankruptcy Case could be converted to a case under Chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  This is because there are certain restrictions on the conversion of bankruptcy cases governing certain non-profit entities.  In the event the case could be converted, it is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against in the Debtor.

The Debtor believes that in a liquidation under Chapter 7, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants, and other professionals to assist such trustees would cause a substantial diminution in the value of the Debtor's Estate. The assets available for distribution to Creditors would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, arising by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater going concern value of the Debtor's assets. More importantly, conversion to Chapter 7 liquidation would likely result in the immediate cessation of the Debtor's business, as most Chapter 7 trustees are disinclined to continue operations.

The Debtor could also be liquidated pursuant to the provisions of a Chapter 11 plan of reorganization. This approach is already contemplated to some degree by the Plan. In liquidation under Chapter 11, the Debtor's assets theoretically could be sold in an orderly fashion over a more extended period of time than in liquidation under Chapter 7, thus resulting in a potentially greater recovery. On the other hand, the Debtor's efforts to liquidate its assets over a longer period of time theoretically could result in a lower net distribution to Creditors than they would receive through Chapter 7 liquidation due to the Debtor's belief that there will not be an ability to find a willing purchaser of the Assets in the existing economic climate for any purchase price that would generate any meaningful return to Creditors. Nevertheless, because there would be no need to appoint a Chapter 7 trustee and to hire new professionals, Chapter 11 liquidation might be less costly than Chapter 7 liquidation and thus provide larger net distributions to Creditors than in Chapter 7 liquidation. Any recovery in a Chapter 11 liquidation, while potentially greater than in a Chapter 7 liquidation, would also be highly uncertain.

In either liquidation scenario, Creditors would likely realize a substantially reduced recovery, because much of the Debtor's value (as well as the value of its assets), is dependent on the Debtor's continued operations, and that value would be lost in a liquidation. Likewise, any assets thereafter available for distribution would be further reduced by any valid Secured Claims of creditors, and again by additional administrative costs. Although preferable to a Chapter 7 liquidation, the Debtor believes that any alternative liquidation under Chapter 11 is a much less attractive alternative to Creditors than the Plan because of the greater return anticipated by the Plan.

## XI.    **RECOMMENDATION AND CONCLUSION**

For all of the reasons set forth in this Disclosure Statement, the Debtor believes that confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Debtor urges all holders of Claims in the Voting Classes to vote to ACCEPT the Plan, and to complete and return its ballots so that they will be RECEIVED on or before the Voting Deadline.

Dated:  May 31, 2023.

**TREASURE ISLAND YACHT AND TENNIS CLUB OF PINELLAS COUNTY, LLC**
**Debtor and Debtor-In-Possession**

/s/ William L. Edwards
**William L. Edwards, Manager**

# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

In re:                                                              Case No.: 8:22-bk-05052
                                                                    Chapter: 11

TREASURE ISLAND YACHT AND TENNIS
CLUB OF PINELLAS COUNTY, LLC,

      Debtor.

_____/

### PLAN OF REORGANIZATION OF
### TREASURE ISLAND YACHT AND TENNIS CLUB OF PINELLAS COUNTY, LLC

              /s/ John A. Anthony
              **JOHN A. ANTHONY, ESQ.**
              Florida Bar Number: 0731013
              janthony@anthonyandpartners.com
              **STEPHENIE BIERNACKI ANTHONY, ESQ.**
              Florida Bar Number: 0127299
              santhony@anthonyandpartners.com
              **CAMERYN R. LACKEY, ESQ.**
              Florida Bar Number: 1038915
              clackey@anthonyandpartners.com
              **ANTHONY & PARTNERS, LLC**
              100 South Ashley Drive, Suite 1600
              Tampa, Florida 33602
              Telephone:  813/273-5616
              Telecopier:  813/221-4113
              Attorneys for the Debtor

Dated: May 31, 2023.

**THIS PLAN OF REORGANIZATION HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.** THE HEARING TO CONSIDER THE CONFIRMATION OF THIS PLAN OF REORGANIZATION PURSUANT TO BANKRUPTCY CODE §1129 IS CURRENTLY SCHEDULED FOR **JULY 12, 2023**. THE DEBTOR RESERVES THE RIGHT TO MODIFY OR SUPPLEMENT THIS PLAN OF REORGANIZATION AND THE ACCOMPANYING DISCLOSURE STATEMENT UP TO AND INCLUDING THE TIME OF CONFIRMATION OF THE PLAN OF REORGANIZATION. THE DEBTOR **IS NOT** CURRENTLY SOLICITING VOTES ON THE PLAN OF REORGANIZATION.

1

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. 2
ARTICLE 1 DEFINITIONS AND CONSTRUCTION OF TERMS...................................... 4
ARTICLE 2 TREATEMENT OF ALLOWED ADMINISTRATIVE CLAIMS
 AND ALLOWED PRIORITY TAX CLAIMS............................................................ 13
2.1            Non-Classification ....................................................................... 13
2.2            Administrative Claims .................................................................. 13
2.3            Priority Tax Claims....................................................................... 15
ARTICLE 3 CLASSIFICATION AND IMPAIRMENT OF CLAIMS ............................... 15
ARTICLE 4 TREATMENT OF CLAIMS........................................................................ 16
4.1            Class 1 – Other Priority Claims.................................................... 16
4.2            Class 2 – OZK Claim ..................................................................... 16
4.3            Class 3 – Capri Claim ................................................................... 21
4.4            Class 4 – Pinellas County Secured Tax Claims ........................... 23
4.5            Class 5 – Small Business Administration Claim .......................... 23
4.6            Class 6 – Trade Creditor Claims .................................................. 24
4.7            Class 7 – General Unsecured Claims............................................ 25
4.8            Class 8 – Equity Interest of Edwards ........................................... 25
ARTICLE 5 MEANS OF IMPLEMENTATION AND EFFECT
OF CONFIRMATION OF PLAN .................................................................................. 26
5.1            Overview of the Business, the Facility
               and Secured Creditors, Reorganization Concept,
               Remanded City Litigation, and Alternatives to the Plan ................... 26
5.2            Amendment of Debtor's Articles and By-Laws............................. 31
5.3            Evidence of Plan Obligations/Exemption from State Transfer Taxes ............. 31
5.4            Continuation of Bankruptcy Injunction or Stays ......................... 31
5.5            Revesting of Assets ....................................................................... 31
5.6            General Release of Liens .............................................................. 32
5.7            Full and Final Satisfaction........................................................... 32
5.8            Non-Waiver of Causes of Action................................................. 32
5.9            Termination of Subordination Rights .......................................... 32
5.10           No Successor Liability; No Liability for Certain Released Claims ................. 32
5.11           Administration Pending Effective Date ....................................... 33
5.12           Setoffs ......................................................................................... 33
5.13           Post-Confirmation Fees, Final Decree.......................................... 33
5.14           Acceptance of Distribution .......................................................... 33
ARTICLE 6 VOTING AND DISTRIBUTIONS; TREATEMENT OF DISPUTED,
CONTINGENT, AND UNLIQUIDATED CLAIMS ......................................................... 33
6.1            Voting of Claims........................................................................... 33
6.2            Nonconsensual Confirmation....................................................... 34
6.3            Method of Distributions Under the Plan ...................................... 34
6.4            Estimation of Claims .................................................................... 36
6.5            Distributions Upon Allowance of Disputed Claims....................... 36
6.6            No Distribution in Excess of Allowed Amounts ........................... 36
6.7            No Post-Petition Interest, Costs, or Attorney Fees....................... 37

**ARTICLE 7 EXECUTORY CONTRACTS AND UNEXPIRED LEASES**.................................... 37
7.1                    **Executory Contracts and Unexpired Leases**...................................... 37
7.2                    **Claims Deadline for Filing Proofs of Claim**
                       **Relating to Executory Contracts and**
                       **Unexpired Leases Rejected Pursuant to the Plan**............................... 38
**ARTICLE 8 CORPORATE GOVERNANCE, MANAGEMENT, AND**
**STRUCTURE OF ORGANIZED DEBTOR**............................................................ 39
8.1                    **Management of Debtor**......................................................... 39
8.2                    **Directors and Officers of Debtor** .......................................... 39
8.3                    **Corporate Action**............................................................ 39
**ARTICLE 9 DISCHARGE, EXCULPATION, AND LIMITAION OF LIABILITY** .................... 40
9.1                    **Discharge**.................................................................. 40
9.2                    **Injunction Related to Discharge** .......................................... 40
9.3                    **Exculpation, Liability for Post-Petition Disclosures, and Solicitation** ............ 40
**ARTICLE 10 EFFECTIVENESS OF THE PLAN** ....................................................... 41
10.1                   **Conditions to Confirmation** ............................................... 41
10.2                   **Conditions Precedent to Effectiveness**...................................... 41
10.3                   **Waiver of Conditions** ..................................................... 41
**ARTICLE 11 RETENTION OF JURISDICTION**....................................................... 42
11.1                   **Retention of Jurisdiction** ................................................. 42
**ARTICLE 12 MISCELLANEOUS PROVISIONS** ....................................................... 43
12.1                   **Effectuating Documents and Further Transactions** .......................... 43
12.2                   **Exemption from Transfer Taxes**............................................ 43
12.3                   **Amendment or Modification of the Plan** ................................... 43
12.4                   **Severability** .............................................................. 43
12.5                   **Revocation or Withdrawal of the Plan**..................................... 43
12.6                   **Plan Supplement**.......................................................... 44
12.7                   **Binding Effect** ............................................................ 44
12.8                   **Notices** ................................................................... 44
12.9                   **Governing Law** ............................................................ 45
12.10                  **Withholding and Reporting Requirements**.................................. 45
12.11                  **Allocation of Plan Distributions Between Principal and Interest**.................... 45
12.12                  **Headings**.................................................................. 45
12.13                  **Inconsistency**.............................................................. 45

## PLAN OF REORGANIZATION OF
## TREASURE ISLAND YACHT &TENNIS CLUB OF PINELLAS COUNTY, LLC

Treasure Island Yacht and Tennis Club of Pinellas County, LLC (the "Debtor") proposes the following Plan (as defined below) pursuant to Chapter 11 of the Bankruptcy Code for resolution of outstanding Claims (as defined below).

Reference is made to the Disclosure Statement (as defined below) distributed contemporaneously with the Plan for treatment of the Debtor's history, business, property, results of operations, projections for operations, risk factors, and a summary and analysis of the Plan and certain related matters, including distributions to be made under the Plan. The Debtor is the proponent of the Plan within the meaning of Bankruptcy Code §1129.

A consolidated hearing to consider the adequacy of the Disclosure Statement pursuant to Bankruptcy Code §1125 and confirmation of the Plan pursuant to Bankruptcy Code §1129 is scheduled to be held on the 12th day of July, 2023.

## ARTICLE 1
## DEFINITIONS AND CONSTRUCTION OF TERMS

Definitions; Interpretation; Application of Definitions and Rules of Construction. For purposes of the Plan, the following terms shall have the meanings specified in this Article 1. A term used herein that is not specifically defined, but that is used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code and the rules of construction contained in Bankruptcy Code §§101 and 102 shall apply. Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter. Unless otherwise specified, all section, article, schedule, or exhibit references in the Plan are to the respective Section in, Article of, Schedule to, or Exhibit to, the Plan and headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan.

**1.1** "105(a) Adversary Proceeding" shall mean the proceeding initiated by the Debtor against OZK seeking to enjoin, stay, and otherwise preclude OZK from attempting to enforce any claims against Mr. Edwards during the pendency of this Reorganization, and during any confirmation term that might arise under a confirmed plan of reorganization, styled Treasure Island Yacht and Tennis Club of Pinellas County, LLC v. Bank OZK, Adversary Proceeding 8:22-ap-00268, that has produced a preliminary injunction in favor of Mr. Edwards as of the date of filing the Plan.

**1.2** "2008 Reorganization" shall mean In re Treasure Island Tennis & Yacht Club Corporation of Pinellas, Case No 8:08-bk-17339-CED, formerly pending before this Court, with the debtor therein (the "Prior Debtor") having confirmed a liquidating plan of reorganization on or as of July 1, 2009. [See Doc. 229]. Notwithstanding any other term or condition in the Plan, the Debtor has not and will not assume any liability of the Prior Debtor, other than the Secured Claim of Regions Bank that was assigned to Capri

in the context of the 2008 Reorganization.  The Confirmation Order will reflect the same.

**1.3**    "Administrative Claim" or "Administrative Expense Claim" shall mean a right to payment under Bankruptcy Code §§503(b) and 507(a)(1), including, without limitation, (a) any actual and necessary costs and expenses of preserving the Estate or administering the Reorganization as authorized and approved by a Final Order, (b) any actual and necessary costs and expenses incurred after the Petition Date in the ordinary course of the Debtor's business, (c) fees and expenses of Professionals to the extent allowed by Final Order under Bankruptcy Code §§330, 331, or 503, and (d) all fees and charges assessed against the Estate pursuant to 28 U.S.C. §1930.

**1.4**    "Administrative Claims Bar Date" shall mean the last date established for filing Administrative Claims, as ordered by the Bankruptcy Court.

**1.5**    "Affiliate" shall have the meaning set forth in Bankruptcy Code §101(2).

**1.6**    "Allowed" shall mean, with reference to any Claim:  (a) a Claim that has been listed by the Debtor in its Schedules, as such Schedules may be amended from time to time in accordance with Federal Rule of Bankruptcy Procedure 1009, and (i) is not listed as disputed, contingent or unliquidated, and (ii) is not a Claim as to which a proof of claim has been filed; (b) a Claim as to which a timely proof of claim has been filed as of the Bar Date in a sum certain and either (i) no objection thereto, or application to estimate, equitably subordinate, reclassify or otherwise limit recovery, has been made on or before any applicable deadline, or (ii) if an objection thereto, or application to estimate, equitably subordinate, reclassify or otherwise limit recovery, has been interposed, the extent to which such Claim (whether in whole or in part) has been allowed by a Final Order; (c) a Claim arising from the recovery of property under Bankruptcy Code §§550 or 553 and allowed in accordance with Bankruptcy Code §502(h); (d) any Claim expressly allowed under the Plan; or (e) any Claim expressly allowed by Final Order.

**1.7**    "Allowed [Class] Claim" shall mean an Allowed Claim of a specified Class or of a specified type.

**1.8**    "Avoidance Action" shall mean an action brought pursuant to Bankruptcy Code §§544, 547, 548, 549, 550, or 553 by or on behalf of the Debtor, it being noted that no such Avoidance Actions have been identified to exist by the Debtor during this Reorganization.

**1.9**    "Ballot" shall mean the form or forms distributed to each Holder of an impaired Claim entitled to vote on the Plan upon which an acceptance or rejection of the Plan shall be indicated in accordance with the instructions specified in such form or forms.

**1.10**    "Bankruptcy Code" means Title 11 of the Bankruptcy Reform Act of 1978, as set forth in Sections 101, et seq. of Title 11 of the United States Code, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, and as otherwise amended from time to time, and applicable portions of Titles 18 and 28 of the United States Code, as amended from time to time.

**1.11**    "Bankruptcy Court" shall mean the United States Bankruptcy Court for the Middle District of Florida, Tampa Division, having jurisdiction over the Chapter 11 Case and, to the extent of any reference

under 28 U.S.C. §157, the bankruptcy unit of such District Court under 28 U.S.C. §151.

1.12    "Bar Date" shall mean March 2, 2023 as fixed by the "Amended Notice of Chapter 11 Bankruptcy Case" [Doc. 25] dated December 30, 2022 (the "Bar Date Order") by which Persons asserting a Claim against the Debtor, and who are required to file a proof of claim on account of such Claim, must have filed a proof of claim or are forever barred from asserting a Claim against the Debtor or its property and from voting on the Plan and/or sharing in distributions hereunder as provided in the Bar Date Order.

1.13    "Business" shall mean the restaurant and yacht club business operated by the Debtor at the Facility.

1.14    "Business Day" shall mean any day other than a Saturday, Sunday, or a day which, in Tampa, Florida, is a legal holiday or any day designated in Federal Rule of Bankruptcy Procedure 9006(a) as a "legal holiday."

1.15    "Capri" shall mean Capri Isle Management, LLC, its successors and assigns.

1.16    "Cash" shall mean cash, cash equivalents, and other readily marketable direct obligations of the United States of America and certificates of deposit issued by banks.

1.17    "Causes of Action" shall mean, without limitation, any and all actions, causes of action (including Avoidance Actions), liabilities, obligations, rights, suits, debts, sums of money, damages, judgments, Claims and demands whatsoever, whether known or unknown, in law, equity or otherwise.

1.18    "City" shall mean the municipality of Treasure Island located in Pinellas County, Florida.

1.19    "City Development Rights Claim" shall mean all interim claims against the City involving its present efforts to develop the Facility's land in manner consistent with controlling law, whether achieved through a litigated result, settlement, mediation, or otherwise.

1.20    "City Litigation Damage Claim" means any recovery against the City, after reimbursement of all costs of prosecution (including Professional Fee Claims), derived by virtue of the City's unwillingness to enable the Debtor to develop the Facility's land in manner consistent with controlling law, whether achieved through a litigated result, settlement, mediation, or otherwise.

1.21    "Claim" shall have the meaning set forth in Bankruptcy Code §101(5), including, without limitation, (a) any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

1.22    "Class" shall mean any category of Claims which are substantially similar to each other as classified.

**1.23**    "Collateral" shall mean any property or interest in property of the Estate subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable law.

**1.24**    "Confirmation Date" shall mean the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

**1.25**    "Confirmation Hearing" shall mean the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to Bankruptcy Code §1129, as such hearing may be adjourned or continued from time to time.

**1.26**    "Confirmation Order" shall mean the order of the Bankruptcy Court confirming the Plan pursuant to the provisions of the Bankruptcy Code.

**1.27**    "Contingent Claim" shall mean any Claim for which a proof of claim has been filed with the Bankruptcy Court which was not filed in a sum certain, or which has not accrued and is dependent upon a future event that has not occurred or may never occur.

**1.28**    "Convenience Claim" or "Convenience Class Claims" means an Unsecured Claim in an amount equal to or less than $10,000, or a Claim filed or scheduled in a greater amount than the holder of such Claim has elected to reduce to $10,000.

**1.29**    "Creditor" shall mean a Person that has a Claim or Claims against the Debtor that arose at the time of or before the Petition Date, or a Person that has a Claim against the Estate of the Debtor of a kind specified in Bankruptcy Code §§502(g), 502(h), or 502(i).

**1.30**    "Cure" shall mean with respect to the assumption of an executory contract or unexpired lease pursuant to Bankruptcy Code §365(b), the (a) distribution of Cash or such other property as may be agreed by the parties or ordered by the Bankruptcy Court, in an amount equal to all unpaid monetary obligations, without interest, or such other amount as may be agreed by the parties under an executory contract or unexpired lease, to the extent such obligation is enforceable under the Bankruptcy Code and applicable bankruptcy law, or (b) the taking of such other actions as may be agreed by the parties or ordered by the Bankruptcy Court.

**1.31**    "Cure Claim" shall mean the aggregate dollar amount necessary to constitute a Cure with respect to the assumption of any specific executory contract or unexpired lease as agreed between the parties or ordered by the Bankruptcy Court.

**1.32**    "Debt" shall mean liability on a Claim.

**1.33**    "Debtor" shall mean Treasure Island Yacht and Tennis Club of Pinellas County, LLC.  When references are made to the Debtor's existence following the entry of the Confirmation Order, the reference shall mean "Debtor" as context may require.

**1.34**    "Debtor Appraiser" shall mean Tropical Valuation Advisory and Ronald Oxtal, MAI, that has issued an appraisal of the Facility as of December 8, 2022, at $7,080,000, based upon no extraordinary assumptions (the "Debtor Appraisal").

**1.35**    "Deficiency Claim" shall mean an Unsecured Claim that results from the value of the Collateral being less than the amount of a Secured Claim secured by such Collateral.

**1.36**    "Disallowed" shall mean, with respect to any Claim or portion thereof, any Claim against the Debtor which: (a) has been disallowed, in whole or part, by a Final Order of the Bankruptcy Court; (b) has been withdrawn by agreement of the Debtor and the holder thereof, in whole or in part; (c) has been withdrawn, in whole or in part, by the holder thereof; (d) if listed in the Schedules as zero or as disputed, contingent or unliquidated and in respect of which a proof of claim has not been timely filed or deemed timely filed pursuant to the Plan, the Bankruptcy Code or any Final Order of the Bankruptcy Court or other applicable bankruptcy law; (e) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the filed amount of any proof of claim; or (f) is evidenced by a proof of claim which has been filed, or which has been deemed to be filed under applicable law or order of the Bankruptcy Court or which is required to be filed by order of the Bankruptcy Court but as to which such proof of claim was not timely or properly filed.  In each case a Disallowed Claim is disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination, or estimation.

**1.37**    "Disallowed Claim" shall mean a Claim, or any portion thereof, that is Disallowed.

**1.38**    "Disclosure Statement" shall mean the Disclosure Statement relating to the Plan in the form approved by the Bankruptcy Court pursuant to Bankruptcy Code §1125 and all exhibits and schedules thereto.

**1.39**    "Disputed" shall mean, with respect to Claims, any such Claim: (a) that is listed in the Schedules as unliquidated, disputed or contingent for which no proof of claim has been timely filed; (b) as to which Debtor or any other party-in-interest has interposed a timely objection or request for estimation, or have sought to equitably subordinate or otherwise limit recovery in accordance with the Bankruptcy Code and the Federal Rule of Bankruptcy Procedure, or which is otherwise Disputed by Debtor in accordance with applicable law, which objection, request for estimation, action to limit recovery or dispute has not been withdrawn or determined by Final Order; (c) which is a contingent Claim; or (d) which has not been Allowed.  At present, the only known Claim that is Disputed is that of Mark Goodwin, that appears in the stay motion and order [Doc. Nos. 76 and 95], regarding the litigation described therein.

**1.40**    "Distribution" shall mean the distribution in accordance with the Plan.

**1.41**    "Distribution Account(s)" means one or more deposit accounts (also referred to herein as "Plan Fund(s)") established for the benefit of one or more classes of Creditors in order to receive and hold funds payable to the Holders of Allowed Claims in such Classes and to facilitate all payments required to be made to the Holders of Allowed Claims in such Classes under the Plan.

**1.42**    "Distribution Address" shall mean the last known address of a Creditor, whether derived from

the Schedules, a proof of claim filed with the Bankruptcy Court or other written notification to the Debtor as to where a Distribution under the Plan is to be sent.

**1.43**     "Distribution Date" shall mean one or more dates following the Effective Date on which the Debtor makes Distributions of Cash or other property under the Plan.

**1.44**     "District Court" shall mean the United States District Court for the Middle District of Florida.

**1.45**     "Edwards" shall mean William L. Edwards, individually and as Trustee of the William Edwards Revocable Living Trust under agreement dated September 18, 1997, as well as other business entities identified in the 105 Adversary Proceeding, including Sunshine Lane Investments, LLC, Gulf Golf Development, LLC, Central Avenue Properties, Inc., Marketing Solution Publications, Inc., 21st Century Venture Capital, L.L.C., and Devil Dog Properties I.  References to William L. Edwards shall be to "Mr. Edwards."

**1.46**     "Effective Date" shall mean a Business Day on or after the Confirmation Date specified by the Debtor on which all conditions precedent to the occurrence of the Effective Date set forth in the Plan have been satisfied or waived pursuant to any other provision of the Plan.

**1.47**     "Escrow Agent" shall mean Anthony & Partners, LLC, and its undersigned counsel of record, acting as escrow, without discretion to modify the terms of the Plan or the Confirmation Order, including actions taken to (a) take custody and disburse funds in connection with the City Litigation Damage Claim, (b) take custody and disburse funds in connection with the Lot Sale, (c) account for and disburse funds in connection with the Unsecured Claims Pool, (d) effectuate closings on conveyances on behalf of the Debtor relating to the Facility, (e) delivery or destruction of the Quitclaim Deed, as defined elsewhere in the Plan, and (f) any other responsibilities expressly conferred under the Confirmation Order.  It is anticipated that the Escrow Agent will open a dedicated trust account, this being the Distribution Account, for the purpose of facilitating compliance with the Plan and Confirmation Order.

**1.48**     "Estate" shall mean the Estate created in the Reorganization pursuant to Bankruptcy Code §541.

**1.49**     "Facility" shall mean the Debtor's primary asset located at 400 Treasure Island Causeway, Treasure Island, Florida 33706, in which the Business is operated out of, and all real, personal, intellectual, and other going concern assets.

**1.50**     "Final Distribution Date" shall mean the date established by the Debtor pursuant to which all Distributions shall have been made.

**1.51**     "Final Order" shall mean an order, ruling or judgment of the Bankruptcy Court as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending, or as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtor or, on and after the Effective Date, Debtor or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been determined by the highest court to which such order

was appealed, or certiorari, reargument or rehearing shall have been denied and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, however, that the possibility that a motion under Federal Rules of Civil Procedure 59 or 60, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed with respect to such order shall not cause such order not to be a Final Order.

**1.52** "General Unsecured Claim" shall mean any Claim that is not an Administrative Claim, Professional Fee Claim, Priority Tax Claim, Priority Claim, Secured Claim, Convenience Claim, or otherwise classified under the Plan.

**1.53** "Holder" shall mean, with reference to a Claim, the party legally vested and entitled to the rights appurtenant to that Claim.

**1.54** "Insider" shall have the meaning set forth in Bankruptcy Code §101(31).

**1.55** "Insider Lender" shall mean Marketing Solution Publications, Inc.

**1.56** "Lien" shall have the meaning set forth in Bankruptcy Code §101(37); except that a lien that has been avoided in accordance with Bankruptcy Code §§544, 545, 546, 547, 548, or 549 shall not constitute a lien.

**1.57** "Officers and Directors" shall mean with respect to the Debtor and/or the Debtor all of the officers and directors of such entities as determined commencing with the Petition Date.

**1.58** "OZK" shall mean Bank OZK, a state-chartered Arkansas bank, f/k/a Bank of the Ozarks, as successor in interest to C-1 Bank, and its successors and assigns.

**1.59** "OZK Appraiser" shall mean Cantrell Ray Real Estate, LLC Matthew P. Ray, MAI, that has issued an appraisal of the Facility as of as of April 14, 2023, at $18,990,000, based upon the extraordinary assumption that "[H]owever, it is the opinion of the appraiser that, due to physical and locational characteristics, there exists the possibility of a future rezoning to allow an alternate use or uses." (the "OZK Appraisal").

**1.60** "Person" shall mean any individual, corporation, limited liability company, partnership, joint venture, association, joint-stock company, estate, trust, unincorporated association or organization, governmental agency or political subdivision thereof, or other entity.

**1.61** "Petition Date" shall mean December 22, 2022, the date on which the Debtor filed its voluntary Chapter 11 petition with the Bankruptcy Court pursuant to the Bankruptcy Code.

**1.62** "Plan" shall mean this Chapter 11 Plan of Reorganization, including, without limitation, all exhibits, supplements, appendices and schedules hereto, either in its present form or as the same may be altered, amended or modified from time to time in accordance with the terms hereof or as approved by the Bankruptcy Court.

**1.63**    "Plan Documents" shall mean the Plan, the Disclosure Statement, all exhibits, schedules attached (or to be attached or supplemented) to the Plan and to the Disclosure Statement, and any other documents or instruments created in furtherance of, or in connection with, or to consummate the terms of the Plan or Disclosure Statement.

**1.64**    "Plan Supplement" shall mean one or more filings, exhibits, or appendices to supplement the Plan and/or the Disclosure Statement which may contain, among other things, forms of promissory notes and other documents further memorializing payments to be made pursuant to the Plan, new corporate governance documents, any appraisals of the Collateral, and any other documents not initially included in the Plan or the Disclosure Statement, to be filed with the Bankruptcy Court no later than ten (10) days prior to the confirmation hearing or as otherwise ordered by the Bankruptcy Court.

**1.65**    "Priority Claims" shall mean, unless otherwise designated, any and all Claims (or portions thereof), entitled to priority under Bankruptcy Code §§503(b) and 507(a) other than Priority Tax Claims, and Administrative Claims, set forth in Class 1, of which there are no known Claims at present. No such Claims are believed to exist.

**1.66**    "Priority Tax Claim" shall mean an Allowed Claim of a governmental unit for an amount entitled to priority under Bankruptcy Code §507(a)(8). No such Claims are believed to exist.

**1.67**    "Pro Rata" or "Pro Rata Share" shall mean a proportionate share, so that the ratio of the consideration distributed on account of an Allowed Claim in a Class (or classes, as designated by the Plan) to the amount of such Allowed Claim(s) is the same as the ratio of the amount of the consideration distributed on account of all Allowed Claims in such Class(es) to the amount of all Allowed Claims in such Class(es).

**1.68**    "Professional Fees" shall mean the reasonable fees and expenses of Professionals.

**1.69**    "Professionals" shall mean those Persons (a) employed by the Debtor pursuant to an order of the Bankruptcy Court in accordance with Bankruptcy Code §§327 or 1103 and to be compensated for services pursuant to Bankruptcy Code §§327, 328, 329, 330, and 331, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to Bankruptcy Code §503(b)(4).

**1.70**    "Record Date" shall mean the date which may be established in the Confirmation Order or some other Final Order of the Court, to be used for determining the identity of holders of Allowed Claims entitled to Distributions under the Plan. If no Record Date is established in the Confirmation Order, then the Record Date shall be the Confirmation Date.

**1.71**    "Remanded City Litigation" shall mean that certain litigation initiated in the Sixth Judicial Circuit in and for Pinellas County, Florida (the "Circuit Court"), styled Treasure Island Yacht and Tennis Club of Pinellas County, LLC v. The City Of Treasure Island, Case No. 225529-CI, formerly pending as Adversary Proceeding 8:23-ap-18-CED before this Court, and remanded back to the Circuit Court on May 19, 2023 [Adv. Doc. 36], in which the Debtor is advancing both the City Development Rights Claim and the City Litigation Damage Claim.

11

**1.72**    "Reorganization" shall mean the Debtor's case under Chapter 11 of the Bankruptcy Code.

**1.73**    "Debtor" shall mean the Debtor after the Effective Date.

**1.74**    "Restated Corporate Documents" shall mean any amended or Restated Article(s) of Incorporation or By-Laws of Debtor that may be created and implemented by the Debtor pursuant to the Plan.

**1.75**    "SBA" shall mean the United States Small Business Administration, in its capacity as agent for the Economic Injury Disaster Loan program administered in conjunction with the CARES Act and its progeny.

**1.76**    "Schedules" shall mean, collectively, the schedules of assets and liabilities, the lists of holders of interests, and the statements of financial affairs filed by the Debtor under Bankruptcy Code §521 and Federal Rule of Bankruptcy Procedure 1007, as such schedules, lists, and statements have been or may be supplemented or amended from time to time.

**1.77**    "Secured Claim" shall mean any Claim which is secured by a valid Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with Bankruptcy Code §506(a), or in the event that such Claim is subject to setoff under Bankruptcy Code §553, to the extent of such setoff.

**1.78**    "Setoff" shall mean any right of a Creditor to offset a mutual debt owing by such Creditor and any right of the Debtor to offset a mutual debt owing by Debtor to a Creditor against a Claim of Debtor, including, without limitation, such rights under Bankruptcy Code §553.

**1.79**    "Sole Law" shall mean Kathryn J. Sole, Esquire, and Sole Law, PLLC, both of which have been employed by the Debtor as special counsel.

**1.80**    "Subordinated Claim" shall mean any Claim: (a) the payment of which is subordinated in right of treatment or payment to other Claims under an agreement enforceable under applicable non-bankruptcy law, but only to the extent provided in such agreement; (b) for reimbursement or contribution of a Person that is liable with a Debtor on another Creditor's Allowed Claim unless and until such Claim is paid in full; or (c) subordinated in right of treatment or payment pursuant to Bankruptcy Code §§509(c) or 510.

**1.81**    "Unclaimed Property" shall mean any Distribution of Cash or other property made to the holder of an Allowed Claim pursuant to the Plan that: (a) is returned to the Debtor as undeliverable and no appropriate forwarding address is received within the later of six (6) months after Distribution is made to such holder; or (b) in the case of a Distribution made in the form of a check, is not negotiated and no request for reissuance is made by the holder of such Allowed Claim within six (6) months after Distribution is made to such holder.

**1.82**    "Unsecured Claim" shall mean any Claim for which no property of the Debtor's Estate is Collateral or serves as security.

**1.83**    "Unsecured Claims Pool" shall mean the Cash of the Debtor in the total amount of no less than

$5,000,000 and no more than $8,000,000 Pro Rata, to be paid by the Debtor that shall be distributed to the Holders of Allowed Unsecured Claims in Class 7, with the balance to be dividended to Equity, as provided elsewhere in the Plan.

**1.84**    "Valuation Contested Matter" shall mean the matter pending under Federal Rule of Bankruptcy Procedure 9014 that involves valuation of the Facility under Bankruptcy Code §506(c), as against OZK and Capri, presently framed by Doc. Nos. 127 and 136, and scheduled for final evidentiary hearing on August 22, 2023, and also including matters pertaining to OZK's proof of claim and the Debtor's objections set forth in Doc. No. 139.

**ARTICLE 2**
**TREATMENT OF ALLOWED**
**ADMINISTRATIVE CLAIMS AND ALLOWED PRIORITY TAX CLAIMS**

**2.1**    <u>Non-Classification</u>

As provided in Bankruptcy Code §1123(a)(1), Administrative Claims and Priority Tax Claims against the Debtor are not classified for the purposes of voting on or receiving Distributions under the Plan.  Such Unclassified Claims shall be treated as set forth below.

**2.2**    <u>Administrative Claims</u>

2.2.1    <u>In General</u>

Except as otherwise provided in the Plan, all Administrative Claims shall be (a) paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court upon the later of (i) the Effective Date, (ii) the date upon which there is a Final Order allowing such Claim as an Administrative Claim, or (iii) any other date specified in such order, or (b) as may be agreed upon between the holder of such Administrative Claim and the Debtor.  Notwithstanding the foregoing, Allowed Administrative Claims with respect to fixed and undisputed obligations incurred by Debtor in the ordinary course of business during the Chapter 11 Case shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto.

2.2.2    <u>Professional Compensation and Expense Reimbursement Claims</u>

Except as otherwise provided herein, all Persons seeking an award by the Bankruptcy Court of Professional Fees and/or reimbursement of expenses incurred through and including the Effective Date under Bankruptcy Code §§503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5), (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred through the Effective Date within thirty (30) days after the Effective Date (unless a different time is prescribed by the Bankruptcy Court).  To the extent any such application is approved by the Bankruptcy Court, the resulting Allowed amount of the Administrative Claim shall be paid in full the earlier of (i) the Confirmation Order becoming a Final Order, (ii) the Effective Date, (iii) upon such other terms as may be mutually agreed upon

13

between such Holder of an Allowed Administrative Claim and the Debtor, or (iv) in accordance with the terms of any other applicable order entered by the Bankruptcy Court. Unless otherwise ordered by the Bankruptcy Court, parties-in-interest shall have twenty (20) days after the filing of a final fee application to object to such fee application. All Professional Fees for services rendered after the Effective Date, including, without limitation, fees relating to the prosecution of Causes of Action preserved hereunder and the resolution of Disputed Claims, shall be paid by the Debtor upon receipt of an invoice therefore, or on such other terms as the Debtor may agree to, without the need for further Bankruptcy Court authorization or entry of a Final Order. Notwithstanding the foregoing, however, if the Debtor and any Professional cannot agree on the amount of post-Effective Date fees and expenses to be paid to such Professional on account of services arising out of or relating to implementation of the Plan or in connection with the Bankruptcy Code, then the reasonableness and amount of such fees and expenses shall be determined and awarded by the Bankruptcy Court.

2.2.3   Claims for the Value of Goods Received Within Twenty (20) Days Before the
        Petition Date

        All Persons asserting an Administrative Claim for the value of any goods sold to the Debtor in the ordinary course of business and received by the Debtor within the twenty (20) days immediately prior to the Petition Date must (a) be the holder of a Claim that is not a Disputed Claim or a Disallowed Claim, and (b) timely file and serve an application for allowance and payment of such Claim to the extent it is entitled to treatment under Bankruptcy Code §503(b)(9). Holders of Claims entitled to treatment under Bankruptcy Code §503(b)(9) shall file their application for allowance of such Claim by the Administrative Claims Bar Date. If approved by the Bankruptcy Court, the portion of such Claim entitled to treatment under Bankruptcy Code §503(b)(9) shall be paid as an Allowed Administrative Claim (i) on the later of the Effective Date or the date such Administrative Claim becomes an Allowed Administrative Claim, or as soon thereafter as is practicable, (ii) upon such other terms as may be mutually agreed upon between such holder of an Allowed Administrative Claim and the Debtor, or (iii) in accordance with the terms of any applicable administrative procedures order entered by the Bankruptcy Court. The Debtor and all other parties-in-interest shall have thirty (30) days after the filing of any such application to object to that application, unless otherwise ordered by the Bankruptcy Court. To the extent the holder of a Claim entitled to treatment under Bankruptcy Code §503(b)(9) fails to file an application for allowance and payment of such Claim as provided in this sub-section, or the Bankruptcy Court disapproves an application for treatment of a Claim under Bankruptcy Code §503(b)(9), to the extent otherwise, such Claim shall be classified and treated under the Plan as a Class 7 General Unsecured Claim without regard to the provisions of Bankruptcy Code §503(b)(9). No such Claims are believed to exist.

2.2.4   Cure Under Assumed Executory Contracts and Non-Residential Real Estate Leases

        Unless a different treatment is specified in the Plan, Allowed Cure Claims, if any, held by counterparties to Executory Contracts or Non-Residential Real Estate Leases Holding Cure Claims assumed by the Debtor pursuant to the Plan or a Final Order of the Bankruptcy Court shall be an Allowed Administrative Expense paid at the time(s) and in the amount(s) established

14

pursuant to the procedures set forth elsewhere in the Plan.  No such Claims are believed to exist.

### 2.2.5   U.S. Trustee Claims

U.S. Trustee Claims that are unpaid as of the Effective Date will be paid in Cash on the Effective Date.  No such Claims are believed to exist.

## 2.3   **Priority Tax Claims**

Allowed Priority Tax Claims shall be paid in full, in Cash, upon the later of:  (a) the Effective Date; (b) the date upon which there is a Final Order allowing such Claim as an Allowed Priority Tax Claim; (c) the date that such Allowed Priority Tax Claim would have been due if the Chapter 11 Case had not been commenced; or (d) upon such other terms as may be agreed to between Debtor and any holder of an Allowed Priority Tax Claim; provided, however, that the Debtor may, at its option, in lieu of payment in full of Allowed Priority Tax Claims under (a) through (c) above, make Cash payments respecting Allowed Priority Tax Claims deferred to the extent permitted by Bankruptcy Code §1129(a)(9) and, in such event, the principal amount of such Allowed Priority Tax Claims shall be amortized and payable in regular installment payments in Cash of a total value, as of the Effective Date, equal to the amount of such Allowed Priority Tax Claim, over a period ending not later than five (5) years after the Effective Date and in a manner not less favorable than the most favored non-priority unsecured claim by the Plan, as may be determined by the Bankruptcy Court from the Effective Date on the unpaid portion of such Allowed Priority Tax Claim at:  (i) any applicable statutory rate; (ii) the rate applicable to federal judgments pursuant to 28 U.S.C. §1961; or (iii) a rate to be agreed upon by the Debtor and the appropriate governmental unit or, if they are unable to agree, as determined by the Bankruptcy Court.

**ARTICLE 3**
**CLASSIFICATION AND IMPAIRMENT OF CLAIMS**

Claims (other than Allowed Administrative Claims and Allowed Priority Tax Claims) are classified, for all purposes, including entitlement to vote on, confirmation of, and Distributions pursuant to the Plan, as follows:

| **Class** | **Description** | **Status** | **Entitled to Vote** |
|---|---|---|---|
| Class 1: | Other Priority Claims | Unimpaired | No |
| Class 2: | OZK Claim | Impaired | Yes |
| Class 3: | Capri Claim | Impaired | Yes |
| Class 4: | Pinellas County Secured Tax Claims | Impaired | Yes |

| Class 5: | SBA Claim | Impaired | Yes |
| Class 6: | Trade Creditor Claims | Impaired | Yes |
| Class 7: | General Unsecured Claims | Impaired | Yes |
| Class 8: | Equity Interest of Edwards | Impaired | No |

## ARTICLE 4
## TREATMENT OF CLAIMS

**4.1    Class 1 – Other Priority Claims**

4.1.1    Description

This Class is comprised of Allowed Claims entitled to priority treatment pursuant to Bankruptcy Code §507, other than Administrative Claims and Priority Tax Claims.

4.1.2    Treatment

Each Holder of an Allowed Priority Claim shall receive, in full satisfaction, settlement, release and discharge thereof, Cash in an amount equal to the unpaid portion of such Allowed Priority Claim on the later of:  (i) the Effective Date; or (ii) the date upon which there is a Final Order allowing such Claim as an Allowed Priority Claim or any other date specified in such Final Order, or (iii) as soon thereafter as is practicable, unless the holder of an Allowed Priority Claim and the Debtor agree to a less favorable treatment thereof.

**4.2    Class 2 – OZK Claim**

4.2.1    Description

This Class is comprised of the Allowed Secured Claim of OZK (the "OZK Claim") arising out of or in connection with a loan to Mr. Edwards and the Debtor, that is in the approximate principal amount of $15,175,048.94, together with interest, attorney's fees, and court costs, but subject to the disposition of the Valuation Contested Matter.  In these regards, it is noted that the Debtor Appraiser sets the value of the Facility at $7,080,000, such that the OZK Claim would be Allowed Secured at this amount, but that the remaining $8,209,005.47 would be deemed a General Unsecured Claim for purposes of the Plan.  However, the OZK Appraiser contends that the Facility is valued at $18,990,000, that would leave the OZK Claim fully Secured, and leave additional Equity for a junior lienholder, Capri.  The Debtor contends that the OZK Appraisal is premised on the erroneous assumption that the Facility is presently able to be developed in a manner consistent with its highest and best use:  To be sure, the Remanded City Litigation would be completely unnecessary if this were the case.  For so long as the Remanded City Litigation remains unresolved, development rights cannot be assumed.

16

Moreover, if the Business were to cease operations, the value of the Facility would plummet.

4.2.2   <u>Treatment</u>

The Class 2 Claim of OZK shall be treated as follows:

    a.   **Allowance of OZK Claim as Bifurcated**:  As of the Effective Date, the OZK Claim shall be bifurcated pursuant to Bankruptcy Code §506(c) in a manner consistent with the result in the Valuation Contested Matter, and shall be separated into the "Secured OZK Claim" and the "OZK Deficiency Claim" for purposes of treatment under the Plan.  No further action is required for OZK to retain its Liens as they presently exist.

    b.   **Debt Service of Secured OZK Claim**:  The Secured OZK Claim shall be allowed in a manner consistent with the result in the Valuation Contested Matter, and shall be treated as follows:

        i.   **Installment Payments**:  On the first (1st) day of the first (1st) month following the Effective Date, the Debtor shall commence making monthly payments of interest in the amount of $20,000 on the Secured OZK Claim, and shall continue making monthly payments until such time as the Secured OZK Claim has been paid, together with interest accruing at six (6%) percent <u>per annum</u>.  It is noted in these regards that negative amortization of Debt is not contrary to Bankruptcy Code §1129.  <u>See e.g.</u>, <u>Great W. Bank v. Sierra Woods Grp.</u>, 953 F.2d 1174 (9th Cir. 1992); <u>In re Bouy Hall and Howard and Assoc.</u>, 141 B.R. 784 (Bankr. S.D. Ga. 1992); <u>In re Appletree Partners, L.P.</u>, 131 B.R. 380 (Bankr. W.D. Tenn. 1991).  But for the business strategy of the Debtor, as articulated in the "means of implementation and effect of confirmation" section of the Plan, the OZK Claim would recover less than $3,500,000 in liquidation.  Instead, the OZK Secured Claim is likely to be paid in full, with a large distribution for the OZK Deficiency Claim as a Class 7 General Unsecured Claim.

        ii.   **Collateral Maintenance**:  The Debtor shall adhere to all covenants pertaining to maintenance of the Facility, including without limitation (a) maintenance of all insurance coverages required in connection with the ownership of the Facility and the operation of the Business, (b) utilization and maintenance of organized business records pertaining to the operation of the Business, and (c) effective operation of the Business subject to the Business Judgment Rule.  OZK shall have the right to inspect the Facility, and the books and records of the Debtor as they are maintained in the ordinary course of the Business, subject to reasonable notice.  OZK shall receive monthly reports during the Plan Term, for so long as the Secured OZK Claim is outstanding, containing all the information that is found in monthly

operating reports during the pendency of a Chapter 11 Reorganization.

iii.  **Remanded City Litigation:** The Debtor shall fund, prosecute, and otherwise advance the Remanded City Litigation with a goal of promptly, efficiently, and zealously maximizing the City Development Rights Claim and the City Litigation Damage Claim. The Debtor shall have discretion under the Business Judgement Rule to establish goals and strategies, and to settle, appeal, mediate, or otherwise address the handling of the Remanded City Litigation in a manner consistent with its best judgment. However, nothing about the status of the Remanded City Litigation at any point is intended to prevent the Debtor to sell the Facility or any portion thereof to an arms' length purchaser, with all net closing proceeds to be credited towards the Secured OZK Claim, and any residual proceeds to be disbursed in a manner consistent with the balance of the Plan. Subject to the "Common Interest Doctrine," OZK shall receive monthly reports on the status of the Remanded City Litigation, including any offers extended in mediation or otherwise by the City to amicably resolve the City Development Rights Claim and/or the City Litigation Damage Claim. It is expressly contemplated that all enhancements with respect to the City Development Rights Claim will redound to the benefit of OZK by augmenting the collateral position of the credit.

iv.  **Lot Sale:** Notwithstanding any other term or condition of the Plan, the Debtor shall be entitled to sell any ancillary portion of the Facility, not to exceed 25,000 square feet of surface area (the "Lot"), provided that such land will not be waterfront that OZK receives the greater of $1,000,000 or sixty-five (65%) percent of net closing proceeds from such sale to any bona fide purchaser for Cash at closing. The purposes of any such transaction are intended to include (a) funding of payoff to the Trade Creditors as described below, (b) the reduction of the Secured OZK Claim to address "negative amortization" above, (c) generation of working capital to subsidize any operating loss of the Business, (d) funding of the Remanded City Litigation, and (e) payment of Trade Creditors in advance of disposition of the Remanded City Litigation. Nothing shall preclude the Debtor from retaining an option, right of first refusal, or other comparable rights in order to leave open the possibility of rejoining the Lot to the balance of the Facility at a future date following completion of the Remanded City Litigation. The form of the transaction is at the discretion of the Debtor, in exercise of the Business Judgment Rule, provided that OZK receives the required payment. So long as such parcel excludes any waterfrontage and does not contain more than 100 feet of frontage on Treasure Island Causeway, OZK shall not have standing to object to any sale on the grounds that the parcel in question would unduly

18

inhibit value, marketability, or developability of the remainder of the tract.

v.   **Lock-Up Agreement:** In advance of the Confirmation Hearing, OZK, the Debtor, and Mr. Edwards will negotiate a commercially reasonable lock-up agreement, compliance with which will be required under the Plan.

vi.   **Enforcement Method:** Notwithstanding any other term or condition of the Plan, and notwithstanding the provisions of <u>Florida</u> <u>Statutes</u> §697.01, OZK's enforcement rights are intended to be virtually self-executing in the event of a default. On the Effective Date, the Debtor shall therefore execute pursuant to Bankruptcy Code §1142(b) a deed in lieu of foreclosure (the "Quitclaim Deed") in favor of OZK and its assigns in form satisfactory to the Bankruptcy Court. The term "Quitclaim Deed" shall be construed to include multiple documents if necessary, including a special warranty deed with antimerger language, an assignment of contract rights, a bill of sale, and any other documents reasonably required by OZK to immediately effectuate transfer of ownership and control of the Facility without delay.

vii.   **Events of Default:** The Escrow Agent shall act as escrow and hold the original of the Quitclaim Deed during the Plan Term, for so long as the Secured OZK Claim is outstanding. If the Debtor (a) fails to make monthly payments as required above, (b) violates collateral management covenants as required above and as determined by the Bankruptcy Court, (c) experiences a final adverse result in the Remanded City Litigation, and/or (d) materially violates the Plan or the Confirmation Order as determined by the Bankruptcy Court, after thirty (30) Business Days written notice and opportunity to cure to the Debtor and the Escrow Agent, the Escrow Agent shall deliver the Quitclaim Deed to OZK, in care of its counsel of record herein, in full satisfaction of the OZK Claim, as against the Debtor and Mr. Edwards. Third party releases in this context are asserted by the Debtor to be fair and equitable, in light of the other consideration provided in the Plan, provided that neither the Debtor nor Mr. Edwards interfere with enforcement rights in the event of a default. If the Debtor or Mr. Edwards disputes the existence of a material default, either or both of them may seek an emergency determination by the Bankruptcy Court in advance of delivery of the Quitclaim Deed, provided, however, that the extension of a deadline or cure of a material default will not be considered by the Bankruptcy Court in this context.

viii.   **Completion of Payments:** Upon payment of the full amount of the Secured OZK Claim, with interest as set forth above, OZK shall release its Liens encumbering the Facility, and shall execute any

document reasonably required by the Debtor to facilitate the objectives of the Plan. Under such circumstances, the Quitclaim Deed shall be destroyed by the Escrow Agent. It is expressly contemplated that the Secured OZK Claim may be satisfied by any combination of (a) monthly interest payments, (b) disbursements in connection with the Lot Sale, (c) payments derived from the City Litigation Damage Claim, and/or (d) sale or refinance of some or all of the Facility when the City Development Rights Claim has been adjudicated.

c. **Treatment of OZK Deficiency Claim**: In accordance with the result in the Valuation Contested Matter, the OZK Deficiency Claim shall be treated as a General Unsecured Claim for all purposes under the Plan.

d. **Alternative Treatment Under Bankruptcy Code §1111(b)**: Bankruptcy Code §1111(b) provides certain substantive rights to electing Creditors, in connection with the valuation of Collateral pursuant to Bankruptcy Code §506(b). In connection with adjudication of the Valuation Contested Matter, OZK shall have the right to make an election Bankruptcy Code §1111(b), so as to forfeit its entitlement to Distribution on the OZK Deficiency Claim. If such an election is timely made by OZK in a manner consistent with the Bankruptcy Code, pursuant to Bankruptcy Code §1111(b), OZK will be paid an Amount over the Plan Term that is the same as the discounted present value of the Secured OZK Claim, but which is equivalent to the entire OZK Claim, notwithstanding bifurcation. Under such circumstances, OZK will retain its Secured status as to the Facility through the completion of payments, and the default provisions and completion of payment provisions set forth above will continue to apply. The exact amount of monthly payments, as well as the length of the term, is subject to a final determination as to the calculation under Bankruptcy Code §1111(b); however, counsel for the Debtor believes that the election will be comparable to the monthly payment coming due should OZK not make an election. Final determination will be up to the Bankruptcy Court.

e. **Option for Acceptance of Deed in Lieu for Facility**: At any point during the Plan Term, the Debtor may elect to instruct the Escrow Agent to deliver the Quitclaim Deed to OZK in full satisfaction of the OZK Claim. If such an option is exercised, or if the Quitclaim Deed is delivered to OZK pursuant to Section 4.2.2(b)(vii) above, the City and the State of Florida shall be precluded from taking any action that would limit the ability of OZK or its assignee to operate the Business in the same manner that the Debtor has operated the Business during the pendency of this Reorganization. Accordingly, and without limitation, OZK or its assignee will be authorized to (i) operate the restaurant and bar portion of the Business, (ii) utilize all marina facilities regardless of use or occupancy, (iii) maintain all staff, and (iv) access bank accounts, utility accounts, and other accounts of the Debtor for purposes of transitioning business operations. All such relief will be set

20

forth in the Confirmation Order, with the statutory predicate being Bankruptcy Code §105. At its discretion, OZK or its assignee may commence a state court action and install a state court receiver to facilitate dominion of the Collateral under such circumstances.

    f. **Injunction Under Bankruptcy Code §105(a):** In a manner consistent with the Confirmation Order, judgment will be entered in the 105(a) Adversary Proceeding, in favor of the Debtor and Mr. Edwards, precluding OZK from taking any action against the Debtor or Mr. Edwards under Bankruptcy Code §§105(a), 362, 1123, and 1141. However, in the event of a default under the Plan, injunctive relief shall automatically terminate, subject to any right of the Debtor or Mr. Edwards to seek a determination in the 105(a) Adversary Proceeding as to whether a default has in fact occurred. The rights of the Debtor and Mr. Edwards to seek such a determination will not be construed as a right to seek an extension or opportunity to cure.

**4.3**    **Class 3 – Capri Claim**

4.3.1   Description

    This Class is comprised of the Allowed Secured Claim of Capri (the "Capri Claim") arising out of the same transaction in which the Debtor or its predecessor acquired the Facility in the 2008 Reorganization, and through which Capri acquired the residual Secured Claim of Regions Bank. The Capri Claim is in the principal amount of $9,297,771, together with interest accruing at the non-default rate under terms and conditions of the controlling documents, for a total balance in excess of $16,912,645 if computed simple interest, and $21,600,892 if compounded annually (either way, interest is calculated through the Petition Date). Under the Debtor Appraisal, the entire balance of the Capri Claim is Unsecured; however, under the OZK Appraisal, at least $2,077,355 of the Capri Claim is fully Secured. Because both OZK and Capri are parties to the Valuation Contested Matter, the outcome of the Valuation Contested Matter will be dispositive of Plan treatment, in a manner consistent with Section 4.2.1 above. Capri is seeking alternative counsel as of the date of filing the Plan, based upon a recent disqualification of counsel previously retained by OZK. However, the Debtor and Capri will interface when Capri is properly represented to ascertain the exact balance, and to address the matter of whether interest can/should be calculated at simple interest or compounding annually.

4.3.2   Treatment

    The Class 3 Claim of Capri shall be treated as follows:

    a. **Allowance of the Capri Claim:** As of the Effective Date, the Capri Claim shall be Allowed in its full Amount, subject to bifurcation pursuant to Bankruptcy Code §506(c) in a manner consistent with the result in the Valuation Contested Matter. If the Capri Claim is adjudicated to be bifurcated, it shall be separated into the "Secured Capri Claim" and the "Capri Deficiency

Claim" for purposes of treatment under the Plan. No further action will be required for Capri to retain its Liens as they presently exist. However, if the Capri Claim is adjudicated to be fully Unsecured, then no portion will be treated as the Secured Capri Claim.

b. **Debt Service on Secured Capri Claim:** The Secured Capri Claim, if Secured status is determined to exist in the Valuation Contested Matter, shall entitle Capri to treatment as follows:

   i. **Payment Obligations on Secured Capri Claim:** From any sale or refinance transaction involving any portion of the Facility, the Secured Capri Claim shall be satisfied subject to lien priority. Interest shall accrue on the Secured Capri Claim at a rate of six (6%) percent per annum, during the Plan Term. It is expressly contemplated that any default with respect to treatment of OZK will be a default with respect to Capri. And although Capri will not receive the Quitclaim Deed in the event of such default, Capri will be permitted to assert any rights that it possesses as Secured Creditor, subject to the rights of OZK.

   ii. **Completion of Payments:** Upon payment of the full amount of the Secured Capri Claim, with interest as set forth above, Capri shall release its Liens encumbering the Facility, and shall execute any document reasonably required by the Debtor to facilitate the objectives of the Plan.

   iii. **Special Rights of Capri as Junior Lien Creditor:** Notwithstanding any other term or condition of the Plan or Confirmation Order, Capri shall have the right, but not the obligation, to satisfy the OZK Secured Claim at any time that it is outstanding, for the then outstanding balance of the same, in order to better ensure its collateral position. If Capri submits a payoff request to OZK, OZK will provide a definitive payoff request to counsel for Capri within five (5) Business Days. OZK shall act diligently in connection with any potential payoff of the OZK Secured Claim by Capri.

   iv. **Treatment of Capri Deficiency Claim:** In accordance with the result in the Valuation Contested Matter, the Capri Deficiency Claim shall be treated as a General Unsecured Claim for all purposes under the Plan.

   v. **Alternative Treatment Under Bankruptcy Code §1111(b):** Bankruptcy Code §1111(b) provides certain substantive rights to electing Creditors, in connection with the valuation of Collateral pursuant to Bankruptcy Code §506(b). In connection with adjudication of the Valuation Contested Matter, Capri shall have the right to make an election Bankruptcy Code §1111(b), so as to forfeit its entitlement to Distribution on the Capri Deficiency Claim. If such an election is timely made by Capri in a manner consistent with the Bankruptcy Code,

22

pursuant to Bankruptcy Code §1111(b), Capri will be paid an Amount over the Plan Term that is the same as the discounted present value of the Secured Capri Claim, but which is equivalent to the entire Capri Claim, notwithstanding bifurcation. Under such circumstances, Capri will retain its Secured status as to the Facility through the completion of payments, and the default provisions and completion of payment provisions set forth above will continue to apply.

## 4.4    Class 4 – Pinellas County Secured Tax Claims

### 4.4.1    Description

This Class is comprised of the Pinellas County Tax Collector for the present amount of ad valorem property taxes and tangible personal property taxes, for 2022, with the understanding that they will not be paid by the current deadline of May 31, 2023, and that will therefore constitute a Lien upon the Facility. Because tax claims are a senior lien on the subject property, valuation is subject to these liens; however, because the Plan contemplates repayment separately, certain exhibits to the Disclosure Statement do not account for Secured tax liability, even though that might otherwise impact the Valuation Contested Matter.

### 4.4.2    Treatment

Beginning on the first (1st) day of the first (1st) month following the Effective Date, the Debtor will begin making a series of thirty-six (36) equal payments of principal and interest accruing on the principal amount of this Claim at a rate of six (6%) percent per annum, with ten (10) days' grace period, until the balance of this Claim is paid. No further action is required for the Pinellas County Tax Collector to retain its Liens as they presently exist.

## 4.5    Class 5 – Small Business Administration Claim

### 4.5.1    Description

This Class is comprised of the SBA for $150,000 (the "SBA Claim"), based upon its having qualified for a loan program under the CARES Act, referred to as "EIDL," an acronym for Economic Injury Disaster Loan. The SBA holds a Lien on the Debtor's inventory, equipment, instruments, chattel paper, documents, letter of credit rights, accounts, deposit accounts, commercial tort claims, general intangibles, and other rights (collectively, the "SBA Collateral"), more fully described in a UCC-1 financing statement recorded on or as of August 2, 2020. Based upon the senior Liens and security interests of OZK and Capri, the Claim of SBA may be de facto Unsecured; however, in the Debtor's business judgment, the Debtor is treating the SBA Claim as partially Secured by the SBA Collateral. No further action is required for the SBA to retain its Liens as they presently exist.

### 4.5.2    Treatment

The Class 5 Claim of SBA shall be treated as follows:

    a. **Allowance of the SBA Claim:** As of the Effective Date, the SBA Claim shall be Allowed in its full Amount, but shall be bifurcated into the "Secured SBA Claim" in the Amount of $30,000 and the "SBA Deficiency Claim" in the Amount of $120,000 for purposes of treatment under the Plan. No further action will be required for SBA to retain its Liens as they presently exist.

    b. **Debt Service on Secured SBA Claim:** The Secured SBA Claim, shall entitle SBA to treatment as follows:

        i. **Payment Obligations on Secured SBA Claim:** From any sale or refinance transaction involving any portion of the Facility, the Secured SBA Claim shall be satisfied subject to lien priority. Interest shall accrue on the Secured SBA Claim at a rate of six (6%) percent per annum, during the Plan Term. The Debtor shall make equal payments of $1,000 per month on the Secured SBA Claim until satisfied. Alternatively, the Debtor will have the obligation to satisfy the entire outstanding balance of the Secured SBA Claim in connection with any sale or refinance of the Facility after the City Development Rights Claim has been adjudicated.

        ii. **Completion of Payments:** Upon payment of the full amount of the Secured SBA Claim, with interest as set forth above, SBA shall release its Liens encumbering the Facility, and shall execute any document reasonably required by the Debtor to facilitate the objectives of the Plan.

        iii. **Treatment of SBA Deficiency Claim:** In accordance with the result in the Valuation Contested Matter, the SBA Deficiency Claim shall be treated as a General Unsecured Claim for all purposes under the Plan.

## 4.6    Class 6 – Trade Creditor Claims

4.6.1    Description

    This Class is comprised of a set of General Unsecured Creditors (collectively, the "Trade Creditors") with comparatively small Claims (the "Trade Creditor Claims"), all arising out of the operation of the Business in the ordinary course. All such Claims are deemed to be undisputed, fixed, and liquidated. All Creditors in this Class are individuals or entities required for the Debtor to continue the Business in an uninterrupted manner post-confirmation. A potentially non-exclusive list of these Creditors is set forth in Part 2 of Schedule E of the Schedules. The Debtor did not seek "critical vendor" status for any of the Trade Creditors; however, one cannot operate the Business, predicated upon highest quality service and dining, without strategic business partners.

4.6.2    Treatment

The Debtor shall pay the Trade Creditors Claims in full in connection with the Lot Sale, described elsewhere in the Plan, from proceeds not allocated for OZK. To the extent that any Trade Creditor objects to the Amount of its Claim as Scheduled, the Debtor shall reserve the right to fund the balance of the Trade Creditors' Claims and not to reserve funds from Lot Sale proceeds. If such an objection occurs, the Debtor shall have a right to dispute the Claim as Scheduled, even though all Claims of Trade Creditors are being deemed undisputed, fixed, and liquidated for purposes of the Plan.

**4.7    Class 7 – General Unsecured Claims**

4.7.1    Description

This Class is comprised of Holders of all Allowed Unsecured Claims that are not otherwise classified. This Class includes, among other Creditors, the OZK Deficiency Claim, the Capri Deficiency Claim, the SBA Deficiency Claim, and any other General Unsecured Claims that are not Claims of Trade Creditors.

4.7.2    Treatment

Based upon the adjudication and computation of deficiency Claims elsewhere in the Plan, and all such additional General Unsecured Claims as are filed in this Reorganization, a pool of Creditors shall be created for purposes of Pro Rata participation in the Unsecured Claims Pool. The Unsecured Claims Pool shall be maintained by the Escrow Agent, with full access to account information by Mr. Edwards, the Debtor, OZK, Capri, and the SBA, as to Amount at any given time. The Unsecured Claims Pool shall receive (a) all proceeds from the sale or refinance of the Facility after payment of Secured Claims in the manner described above, (b) all proceeds from the City Litigation Damage Claim, and (c) any other recoveries not expressly pledged as Collateral in favor of Creditors specifically identified above. In advance of Confirmation, the Debtor will offer the affidavits of the Debtor Appraiser and Sole for purposes of estimating the two primary components of funding the Unsecured Claims Pool. Notwithstanding any other term or condition, the Unsecured Claims Pool shall be in an amount of not less than $5,000,000 and not more than $8,000,000. The Debtor contends that, but for the efforts of Mr. Edwards and the Debtor to pursue the Remanded City Litigation, there could not possibly be any recovery for the General Unsecured Creditors under the Plan.

**4.8    Class 8 – Equity Interest of Edwards**

4.8.1    Description

This Class consists of the Equity interest of Edwards, and specifically that of "William L. Edwards as Trustee of the William Edwards Revocable Living Trust under agreement dated September 18, 1997," the owner of all authorized, issued, and outstanding securities in the

Debtor.

### 4.8.2    Treatment

Edwards shall retain the Equity interest in the Debtor post-Confirmation.  As of the Effective Date, the Debtor's management will no longer be debtor-in-possession, and Edwards rights as management of the Debtor will be subject to the Plan, the Confirmation Order, and the Business Judgment Rule, but shall not be subject to Bankruptcy Code §§1107 or 1108, as more fully described in Article 8 below.  Subject to the other terms and conditions of the Plan, Equity shall be entitled to cause the Debtor to retain title to all or so much of the Facility as it wishes, to the extent consistent with Plan treatment for Creditor set forth above.  In connection with any sale of the Facility, Edwards shall be entitled to any excess proceeds after satisfying Secured Claims as defined above.  After funding the Unsecured Claims Pool, Edwards shall be entitled to Disbursement or dividend of any excess funds from the recovery on the City Litigation Damage Claim.  It is anticipated that the Debtor, while still owned by Edwards, will continue to own portions of the Facility necessary to operate the Business after all Claims have been paid and otherwise treated in accordance with the Plan.

**ARTICLE 5**
**MEANS OF IMPLEMENTATION**
**AND EFFECT OF CONFIRMATION OF PLAN**

## 5.1    Overview of the Business, the Facility and Secured Creditors, Reorganization Concept, Remanded City Litigation, and Alternatives to the Plan

### 5.1.1    Bill Edwards, Community Leader

As a young man born into an industrious working class family in the Fall River area of Massachusetts, Mr. Edwards knew how to work hard and make the best of difficult situations. As a United States Marine fighting in Vietnam, Mr. Edwards demonstrated relentless tenacity, having been severely wounded in combat for his Country.  He demonstrated a lot of these same personal qualities in his business career in Pinellas County over the years, having been recognized in many ways, including the following:

a.    Founder of Mortgage Investors Corporation ("MIC"), one of the nation's largest veterans administration mortgage lenders, which provided mortgage refinancing benefits to more than 300,000 veterans with a base of operations located in Saint Petersburg, prior to its winding down operations in 2013.

b.    Recipient of Morehouse College's "Gandhi King Ikeda Community Bridge Builder Award For Philanthropic Work."

26

c. Inductee in the distinguished Tampa Bay Business Hall of Fame, an annual distinction conferred by the Tampa Bay Business Journal.

d. Recipient of the "Belcher Award," given by Johns Hopkins All Children's Foundation, recognizing leadership, commitment, and passionate advocacy for patients, including veterans from across the United States.

e. Founder of the Edwards Family Foundation, created more than two decades ago to help the needy, and especially veterans, procure the medical care they need, with many millions of dollars in gifts and guarantees to facilitate medical construction projects and improvement over the years. Mr. Edwards utilized his energy, financial resources, personal relationships, and strategic business partnerships to steer hundreds of millions of dollars to charities, rather than enriching himself and his own business conglomerate.

f. Recipient of the "Distinguished Citizen Award," from the Boy Scouts of America West Central Council.

g. Recipient of the "Don Schings Champion of Spirit Award," of the Muscular Dystrophy Association of Tampa Bay.

h. Leading Committee Member of non-partisan Republican National Convention Host Committee for Tampa and Saint Petersburg for 2012.

i. Visionary who transformed the declining "Baywalk" urban mall into "The Mall At Sundial," a luxury retail, dining, and entertainment center in downtown Saint Petersburg.

j. Visionary who transformed the Tampa Bay Rowdies soccer club into a nationwide success after acquiring it on the brink of disaster and giving it a permanent home at Al Lang stadium in downtown Saint Petersburg.

k. Visionary who acquired the long vacant "Tropicana Block" in downtown Saint Petersburg, leading to more than $200 million in local construction and infrastructure investment, in the form of a 40-story mixed use high rise.

l. Visionary who has championed the arts in the Pinellas County community, culminating in the management and operation of the 2031-seat performing arts center known as The Mahaffey Theater.

When Mr. Edwards was giving away many millions of dollars to worthy charities, he would never have imagined that he would have been financially wounded in the way he has been. First, Edwards had to endure many years of litigation involving MIC, in which many millions of dollars of defense were paid, but not a penny for tribute. Many large lenders settled out similar claims in the complex nationwide litigation that Mr. Edwards still finds to have been completely frivolous and mercenary. Then, COVID-19 devastated The Mall At Sundial, and most of his other investments, leading to a near complete financial collapse. The last business asset that he holds is a 100% Equity interest in the Debtor.

5.1.2   Overview of the Business and the Facility

The Debtor acquired the Facility from the Prior Debtor out of the 2008 Reorganization. Since during or about 2009, the Debtor has owned and operated the Facility. The Facility consists of commercial land and improvements, with multiple permitted uses that have continued over four (4) sets of owners in succession. The Business is centered within a restaurant and event center within a 38,166 square foot building, with 27,561 square feet of air-conditioned space. There is also a 44-slip marina, an Olympic size swimming pool, and a set of six (6) tennis courts. There is ample parking and excess space. The Facility consists of approximately 7.67 acres of waterfront property in one of the most coveted vacation venues in the United States.

The Debtor is owned and operated by Mr. Edwards, individually and through executives compensated through the Insider Lender, including David Lattner and Michael Garavaglia. The Business employs approximately forty (40) individuals in the ordinary course, in all aspects of its operation. The Business has hosted many prestigious events, although deferred maintenance has presented a challenge in recent years. Cash flow during the pendency of the Reorganization has been relatively steady, as evidenced by monthly operating reports that have been timely filed by the debtor throughout this Reorganization, summarized in Exhibit "B" to the Disclosure Statement.

The Insider Lender has been a constant source of working capital for the Debtor, funding operating losses in the ordinary course. The Insider Lender is a business entity that is an Insider of the Debtor and is controlled by Mr. Edwards. The Debtor's operating losses do not relate to any form of mismanagement per se, but instead to the limitations associated with the Facility. Historically, four (4) sets of owners in succession have tried and failed at operating the Business successfully. The problem is obvious: The debt service has been incurred based upon the likely value of excess land within the tract, assuming its current zoning entitlements are fully effective and enforceable. However, this is not the case: for decades the zoning has been Residential Medium, RM-15, or fifteen (15) dwelling units per acre. However, the City has wrongfully prevented any potential development of excess land included within the tract. The excess land not necessary to the operation of the Business should be sold to meet the obligations of the Plan, and the Business can then be run successfully and profitably.

### 5.1.3    Secured Creditors

The Debtor Appraisal accurately reflects that the Facility is presently worth $7,080,000, which is less than the amount of the $15,175,048.94 OZK Claim. Attached as an Exhibit "C" to the Disclosure Statement is a selection of relevant portions of the Debtor Appraisal explaining the starting point for the Reorganization. However, with proper land use entitlements, the value would be augmented to enough to fully secure the OZK Claim, increasing the value for OZK by $8,179,005.43. Under such circumstances, some are all of the Capri Claim would also be secured.

The OZK Appraisal affirms that the Debtor's assessment of the Business is correct: The OZK Appraiser sets the value of the Facility at $18,990,000, based upon the completely ridiculous assumption that the property may presently be developed as Residential Medium, RM-15, or 15 dwelling units per acre. But multiple contracts and letters of intent have terminated under the weight of such an erroneous assumption. So, assuming that the Debtor can and does address the land use problem in the Remanded City Litigation, OZK would have to concede that the benefit to OZK would be $8,179,005.43, assuming exercise of its' Bankruptcy Code §1111(b) rights. Then OZK would be paid in full in connection with a sale or refinancing of acreage not necessary for the going concern of the Business or repurposing the Facility.

With the respective claims of OZK and Capri at $15,175,048.94 and $16,912,645 (or $21,600,892 with annual compounding), and with the Tax Collector and SBA possessing additional encumbrances, the obvious question is how the Valuation Contested Matter will impact OZK and Capri. From there, OZK and Capri may make their election under Bankruptcy Code §1111(b) if they believe that the Remanded City Litigation will be successfully resolved as things relate to the City Development Rights Claim. But because the Remanded City Litigation also involves the City Litigation Damage Claim, they can participate in the Unsecured Claims Pool to the extent that it is funded with proceeds of the City Litigation Damage Claim.

Other than the Secured Creditors referenced above, there is no party in interest that possesses a Secured Claim or other in rem right of any kind, whether it be a mortgage, a Lien, an easement, a right of way, or any other ownership interest or encumbrance.

### 5.1.4    Remanded City Litigation

The Remanded City Litigation, at its core, represents the Debtor's efforts to prevent continuing improper denial from the City of the Debtor's rights in the form of (a) development rights consistent with the zoning of the Facility over the past several decades, and (b) money damages for the City having deprived the Debtor of its rights to develop the Facility in a manner consistent with existing zoning. By prevailing in the Remanded City Litigation, the Debtor can satisfy the claims of Secured Creditors, create an Unsecured Claims Pool for unsecured and deficiency Creditors, and keep the Business operating. Mr. Edwards and his staff have the tenacity and public-spiritedness to prevail. Sole Law has the experience and expertise to ardently represent the Debtor. All the Creditors need to do is wait for the results. Attached as an Exhibit "D" to the Disclosure Statement is a four-part summary by Sole Law of the Remanded

29

City Litigation, including (a) the factual basis and legal basis for the Debtor's claims against the City, (b) the procedural posture at present, (c) the specific relief requested as to the City Development Rights Claim, and its likely monetary impact on the Facility, and (d) the specific relief requested as to the City Litigation Damage Claim, and the most likely monetary recovery.

### 5.1.5    Reorganization Concept

As noted above, there are several interlocking steps in the reorganization concept presented in the Plan, as follows:

a.  The Valuation Contested Matter must conclude.

b.  OZK and Capri must be permitted the opportunity to elect under Bankruptcy Code §1111(b), or accept bifurcation under Bankruptcy Code §506(c).

c.  The Remanded City Litigation must produce a result as to the City Development Rights Claim, which will then allow the entire Facility to be repurposed or unneeded acreage to be sold or refinanced to pay off Secured Claims.

d.  The Remanded City Litigation must also produce a result to fund the City Litigation Damage Claim, funding the Valuation Contested Matter.

e.  The Lot Sale, as well as income from the Insider Lender, will continue to fund Sole Law, and the expert witness fees and other expenses needed to get the Remanded City Litigation to its conclusion(s). Post-Confirmation, the Insider Lender may seek to secure prospective advances for attorney's fees and costs of the Remanded City Litigation.

f.  If at any time the Debtor defaults in Debt service or fails to achieve anticipated results in the Remanded City Litigation, the Quitclaim Deed will be issued by the Escrow Agent and the Creditors will clearly be no worse off.  Under such circumstances, the Confirmation Order will expressly preclude the City and any other government entity from interfering with the operation of the Business by a fiduciary to be appointed by any court of competent jurisdiction as receiver, custodian, liquidating agent, or some other comparable role, pending OZK's final determination as to liquidation.  Under Bankruptcy Code §§105(a) and 1142(b), such relief is appropriate.

Attached as Exhibit "E" to the Disclosure Statement is a pro forma of the likely financial impact of the Plan as presently contemplated.

### 5.1.6    Alternatives to the Plan

30

For nearly six months that the reorganization has been pending, nobody has disputed the facts that (a) the Facility retains value while the Business is being operated, and (b) the Facility would substantially decline in value if it were to be shuttered. Without Mr. Edwards and his associates to operate the Business, and without the Insider Lender to fund losses and fund the Remanded City Litigation, the only alternatives would be dismissal or conversion. Under either scenario, OZK's recovery would be substantially smaller than under the Plan. Capri, SBA, and Trade Creditors would be unlikely to have any meaningful recovery. Employees would be terminated. Insurance, taxes, and premises security would present new expenses for whoever were in possession. Permitting, riparian rights, and other entitlements would be lost. And Mr. Edwards would obviously then not be released from the OZK liability, leading inexorably to his own involvement in defense of collection litigation and a potential bankruptcy filing.

Attached as Exhibit "F" to the Disclosure Statement is a liquidation analysis for the Debtor in the event of dismissal or conversion. The Debtor anticipates an additional $3,500,000 impairment of collateral if the Facility goes dark.

## 5.2    Amendment of Debtor's Articles and By-Laws

The Debtor shall continue to exist after the Effective Date as a separate legal entity in accordance with the laws of the jurisdiction in which it was incorporated and pursuant to its Articles and By-Laws as may be amended pursuant to the Plan, including any other amendments necessary to effectuate the provisions of the Plan and such other provisions as are necessary to comply with the Bankruptcy Code or applicable law.

## 5.3    Evidence of Plan Obligations/Exemption from State Transfer Taxes

Any obligation of the Debtor to pay deferred Cash payments after the Effective Date or on account of any Allowed Claim may, at the option of the Debtor (unless specifically provided for in the Plan), be evidenced by a promissory note, memorandum of indebtedness, or other instrument memorializing the material terms of such obligation. The Debtor will not refuse to execute any promissory note, mortgage, or other similar document as reasonably required by any Secured Creditor in the ordinary course of its business, drafted at its own expense, and consistent with the terms of the Plan and the Confirmation Order. Any conveyance contemplated in the Plan or Confirmation Order, including the Lot Sale, and the sale or refinance of the Facility to satisfy Secured Claims, shall be free of any state or local governmental unit stamp tax or similar assessment, to the fullest extent permitted under Bankruptcy Code §1146 and other applicable law.

## 5.4    Continuation of Bankruptcy Injunction or Stays

All injunctions or stays provided for in the Reorganization under Bankruptcy Code §§105 or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

## 5.5    Revesting of Assets

31

Except as otherwise provided by the Plan, upon the Effective Date, title to all property and assets of the Debtor shall pass from the Debtor to the Debtor free and clear of all Claims, Liens, encumbrances and interests of Creditors and the Confirmation Order shall be a judicial determination of discharge and extinguishment of all Claims or Liens. All pre-Effective Date Claims, liabilities and obligations of the Debtor are treated and/or discharged in accordance with the terms of the Plan and, except as otherwise set forth herein, shall not in any manner be (or be deemed to be) transferred or assumed by the Debtor.

### 5.6    General Release of Liens

Except as otherwise provided in the Plan, or in any contract, instrument, indenture or other agreement or document created in connection with the Plan or the implementation thereof, on the Effective Date, all mortgages, deeds of trust, Liens or other security interests against property of the Estate are hereby released and extinguished, and all the right, title and interest of any holder of such mortgages, deeds of trust, Liens or other security interests will revert to the Debtor as applicable, and the successors and assigns thereof.

### 5.7    Full and Final Satisfaction.

All payments and all Distributions hereunder shall be in full and final satisfaction, settlement, release, and discharge of all Claims, except as otherwise provided in the Plan.

### 5.8    Non-Waiver of Causes of Action

The Debtor is not waiving, releasing, or in any way impairing its rights under the Plan to investigate, pursue, and prosecute Avoidance Actions or any other Cause of Action, unless otherwise specifically provided in the Plan. However, no such Claims or rights are known to exist as of the date of filing the Plan.

### 5.9    Termination of Subordination Rights

Except as otherwise provided in the Plan, the classification and manner of satisfying all Claims under the Plan take into consideration all contractual, legal and equitable subordination rights, whether arising under general principles of equitable subordination, Bankruptcy Code §510(b) or otherwise, that a Holder of a Claim may have against other Claim Holders with respect to any Distribution made pursuant to the Plan. On the Effective Date, all contractual, legal or equitable subordination rights that a holder of a Claim may have with respect to any Distribution to be made pursuant to the Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined and Distributions pursuant to the Plan shall not be subject to payment to a beneficiary of such terminated subordination rights, or to levy, garnishment, attachment, or other legal process by any beneficiary of such terminated subordination rights.

### 5.10    No Successor Liability; No Liability for Certain Released Claims

As noted above, the Debtor never assumed any liability in connection with the 2008

Reorganization, other than the liability assigned by Regions Bank to Capri pursuant to order of the Bankruptcy Court. Except as otherwise expressly provided in the Plan, with respect to the Debtor, the Debtor does not, pursuant to the Plan, assume, agree to perform, pay, or indemnify creditors for any Claims, liabilities or obligations of the Debtor relating to or arising out of the business operations or assets of the Debtor whether arising prior to, or resulting from actions, events, or circumstances occurring or existing at any time prior to the Confirmation Date. The Debtor is not a successor to the Debtor by reason of any theory of law or equity, and shall have no successor or transferee liability of any kind or character, except that Debtor shall assume the obligations specified in the Plan and the Confirmation Order.

**5.11    Administration Pending Effective Date**

Prior to the Effective Date, the Debtor shall continue to operate its business as debtor-in-possession, subject to all applicable requirements of the Bankruptcy Code and the Federal Rule of Bankruptcy Procedure. After the Effective Date, the Debtor may operate its Business, and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Federal Rule of Bankruptcy Procedure, but subject to the continuing jurisdiction of the Bankruptcy Court.

**5.12    Setoffs**

Nothing contained in the Plan shall constitute a waiver or release by the Debtor of any rights of setoff the Debtor may have against any Person unless otherwise agreed in writing by the Debtor prior to the Effective Date or the Debtor after the Effective Date.

**5.13    Post-Confirmation Fees, Final Decree**

The Debtor shall be responsible for the payment of any post-Confirmation fees due pursuant to 28 U.S.C. §1930(a)(6) and the filing of post-Confirmation Disbursement reports, until a final decree is entered. A final decree shall be entered as soon as practicable after Distributions have commenced under the Plan.

**5.14    Acceptance of Distribution**

Notwithstanding anything to the contrary herein, upon receipt of and acceptance of a full and final Distribution from the Debtor, any and all Claims as against Debtor and the claimant accepting the Distribution shall be fully and finally resolved.

## ARTICLE 6
## VOTING AND DISTRIBUTIONS; TREATMENT OF
## DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS

**6.1    Voting of Claims**

Each holder of an Allowed Claim in an impaired Class which is entitled to retain or receive property under the Plan shall be entitled to vote separately to accept or reject the Plan and indicate such

vote on a duly executed and delivered Ballot as provided in such order as is entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court. In voting on the Plan, Rule 3018-1(c) of the Local Rules and the Final Orders of this Court, including without limitation the following, govern:

6.1.1    Ballots that are unsigned or where a company name is not shown on the signature line will not be counted either as an acceptance or rejection;

6.1.2    Where the amount shown as owed on the Ballot differs from the scheduled claim and a proof of claim has been filed, the amount shown on the proof of claim will be used for the purpose of determining the amount voting. If no proof of claim is filed, the amount shown on the Schedules will be used;

6.1.3    Ballots that do not show a choice of either acceptance or rejection will not be counted as either accepting or rejecting the Plan;

6.1.4    Ballots that are filed after the last date set for the filing of Ballots will not be counted as either accepting or rejecting the Plan without leave of the Court; and

6.1.5    Where duplicate Ballots are filed, and one elects to accept, and one elects to reject the Plan, neither Ballot will be counted unless the later Ballot is designated as amending the prior Ballot.

## 6.2    Nonconsensual Confirmation

If any Impaired Class entitled to vote shall not accept the Plan by the requisite statutory majorities provided in Bankruptcy Code §§1126(c) or 1126(d), as applicable, or if any impaired Class is deemed to have rejected the Plan, the Debtor reserves the right (a) to undertake to have the Bankruptcy Court confirm the Plan under Bankruptcy Code §1129(b) and (b) to amend the Plan in accordance with the provisions of the Plan to the extent necessary to obtain entry of the Confirmation Order.

## 6.3    Method of Distributions Under the Plan

6.1.6    In General

All Distributions shall be by the Debtor, except that the Escrow Agent shall fund Distributions at the direction of the Debtor as provided above. Subject to Federal Rule of Bankruptcy Procedure 9010, all Distributions under the Plan shall be made by the Debtor to the holder of each Allowed Claim at the address of such holder as listed in the Debtor's books and records or on the Schedules as of the Record Date, unless the Debtor have been notified in writing of a change of address, including, without limitation, by the filing of a proof of claim or notice of transfer of claim filed by such holder that provides an address, if any, for such holder different from the address reflected in the Debtor's books and records or on the Schedules.

### 6.1.7    Distributions of Cash

Any payment of Cash made by the Debtor pursuant to the Plan shall be made by check drawn on a domestic bank or by wire transfer.

### 6.1.8    Timing of Distributions

Any payment or Distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

### 6.1.9    Fractional Dollars

Whenever any payment of a fraction of a dollar would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollars (rounding up in the case of $0.50 or more and rounding down in the case of less than $0.50).

### 6.1.10    Unclaimed or De Minimis Distributions

If the holder of an Allowed Claim fails to negotiate a check issued to such holder within ninety (90) days of the date such check was issued, the amount of Cash attributable to such check will be deemed to be unclaimed, such holder's Claim will no longer be deemed to be Allowed, and such holder will be deemed to have no further Claim in respect of such check and will not participate in any further Distributions under the Plan. De minimis Distributions of Cash or property having a value of less than five dollars ($5.00) shall not be made.  If a Distribution pursuant to the Plan to any holder of an Allowed Claim is returned to the Debtor due to an incorrect or incomplete address for the holder of such Allowed Claim, as to such Distribution, within ninety (90) days of the return of such Distribution the amount of Cash attributable to such Distribution will be deemed to be unclaimed and such holder will be deemed to have no further Claim in respect of such Distribution and will not participate in any further Distributions under the Plan.

### 6.1.11    Distributions to Holders as of the Confirmation Date

As of the close of business on the Confirmation Date, the claims register (for Claims) shall be closed, and there shall be no further changes in the record holders of any Claims unless pursuant to properly noticed transfer of claim pursuant to Federal Rule of Bankruptcy Procedure 3003, as reflected on the Claims Register maintained by the Clerk of the Bankruptcy Court.

### 6.1.12    Objections to and Resolution of Administrative Claims and Claims

Except as to applications for allowance of compensation and reimbursement of expenses under Bankruptcy Code §§330 and 503, any party in interest may file objections to the allowance of any Administrative Claims and Claims subsequent to the Confirmation Date.  All objections shall be litigated in the Final Order; provided, however, that the Debtor shall have the exclusive authority to compromise, settle, otherwise resolve or withdraw any objections filed by the

Debtor. If any joinder is made with respect to an objection, and the objection is subsequently withdrawn, the joinder shall be deemed withdrawn as well. Unless otherwise ordered by the Bankruptcy Court, all objections to the allowance of Administrative Claims or Claims that are the subject of proofs of claim or requests for payment filed with the Bankruptcy Court (other than applications for allowances of compensation and reimbursement of expenses), shall be filed and served upon the holder of the Administrative Claim or Claim as to which the objection is made as soon as is practicable, but in no event later than thirty (30) days after the Effective Date or such later date as may be approved by the Bankruptcy Court. At present, the Debtor has identified no Claims in the Reorganization, scheduled or filed, that it intends to object to.

**6.4    Estimation of Claims**

The Debtor, at any time and from time to time, may request that the Bankruptcy Court estimate any Disputed Claim pursuant to Bankruptcy Code §502(c) regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim against any party or Entity, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor may elect to pursue any supplemental proceedings to object to any ultimate Distribution on account of such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, objected to, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. Because the Debtor contends that disposition of the Valuation Contested Matter is required to advance to Confirmation, the Debtor believes that estimation of Claims is unlikely.

**6.5    Distributions Upon Allowance of Disputed Claims**

The holder of a Disputed Claim that becomes an Allowed Claim subsequent to the Effective Date shall receive Distributions from the Disputed Claims Reserve as soon as practical following the date on which such Disputed Claim becomes an Allowed Claim pursuant to a Final Order. Such Distributions shall be made in accordance with the Plan based upon the Distributions that would have been made to such Holder under the Plan if the Disputed Claim had been an Allowed Claim on or prior to the Effective Date plus any interest, dividends or other Distributions earned thereon and less any taxes, charges, fees or costs chargeable to such property. No Holder of a Disputed Claim shall have any Claim against the Disputed Claims Reserve or the Debtor with respect to such Claim until such Disputed Claim shall become an Allowed Claim, and no holder of a Disputed Claim shall have any right to interest, dividends or other Distribution on such Disputed Claim except as provided in this Section.

**6.6    No Distribution in Excess of Allowed Amounts**

Notwithstanding anything to the contrary herein, no Holder of an Allowed Claim shall receive in respect of such Claim any Distribution of a value as of the Effective Date in excess of the Allowed

36

amount of such Claim.

**6.7    No Post-Petition Interest, Costs, or Attorney Fees**

Except as may be specifically provided under Bankruptcy Code §506(b) an Allowed Claim shall not include, and no Distribution shall be made on account of, any interest, costs, or attorney's fees accrued or incurred to the Holder of such Claim after the Petition Date.

## ARTICLE 7
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**7.1    Executory Contracts and Unexpired Leases**

7.1.1    Assumption and Rejection of Other Contracts and Leases

Any unexpired lease or executory contract that has not been expressly rejected by a Debtor or treated in the Plan with the Bankruptcy Court's approval on or prior to the Confirmation Date shall, as of the Effective Date, be deemed to have been assumed by the Debtor unless there is pending before the Bankruptcy Court on the Effective Date a motion to reject such unexpired lease or executory contract or such executory contract or unexpired lease is otherwise designated for rejection, provided that such lease or executory contract is ultimately rejected.

7.1.2    Designation of Contracts and Leases to be Assumed and Rejected

At least fifteen (15) days prior to the Confirmation Hearing (or such different date as the Bankruptcy Court may fix), to the extent a treatment is not already specifically described in the Plan, the Debtor shall file schedules setting forth each of its executory contracts and unexpired leases to be assumed (and assigned if applicable) under the Plan and identifying those contracts and leases to be rejected, and the Person to which any such executory contract or unexpired lease shall be assigned, together with the proposed cure amount(s), if any, to be paid respecting such executory contracts and leases. Any party who disputes the proposed cure amount must file an objection not later than the date fixed for filing objections to Confirmation of the Plan and any dispute respecting such Cure Amounts will be determined by the Bankruptcy Court at the Confirmation Hearing or on such later date as the Bankruptcy Court may fix. Notwithstanding the foregoing, the Debtor reserves the right, until five (5) days prior to the Confirmation Hearing, to seek to reject any executory contract or unexpired lease included on the Schedule, to assume subject to the other contract party's right to (a) receive notice of the rejection, (b) object to the Debtor's rejection and (c) change its vote on the Debtor's Plan. The listing of a contract or lease on the foregoing Schedules shall not constitute an admission by the Debtor that such agreement is an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

7.1.3    Cure Rights for Executory Contracts and Unexpired Leases Assumed Under the Plan

Any monetary defaults under executory contracts and/or unexpired leases to be assumed pursuant to the Plan shall be satisfied under Bankruptcy Code §365(b)(1), by the respective Cure. If there is a dispute regarding (a) the nature or amount of any Cure, (b) the ability of any Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of Bankruptcy Code §365) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order by the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be; provided, however, that if the Debtor, in the exercise of its sound business judgment, concludes that the amount of the Cure obligation as determined by such Final Order, renders assumption of such executory contract or unexpired lease unfavorable to the Debtor, it may elect to reject such contract or lease.

### 7.1.4    Assumption of Government Licenses

If any license granted to the Debtor by a governmental unit, and in effect immediately prior to the Effective Date, is considered to be an executory contract and is not otherwise terminated or rejected by the Debtor, such license shall be deemed to be assumed pursuant to Bankruptcy Code §365 under the Plan.

### 7.1.5    Limited Extensions of Time to Assume or Reject

In the event the Debtor become aware after the Confirmation Date of the existence of an executory contract or unexpired lease that was not included in the Schedules, the right of the Debtor to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after the date on which the Debtor become aware of the existence of such contract or lease. The deemed assumption provided for elsewhere in the Plan shall not apply to any such contract or lease.

### 7.1.6    Disputes as to Nature of Contract

In the event of a dispute as to whether a contract or lease is executory or unexpired, the right of the Debtor to move to assume or reject such contract or lease shall be extended until the date that is thirty (30) days after the entry of a Final Order by the Bankruptcy Court determining that the contract or lease is executory or unexpired. The deemed assumption shall not apply to any such contract or lease, notwithstanding any other term of the Plan.

### 7.1.7    Post-Petition Contracts and Leases

The Debtor shall not be required to assume or reject any contract or lease entered into by the Debtor after the Petition Date. Any such contract or lease shall continue in effect in accordance with its terms after the Effective Date, unless the Debtor has obtained a Final Order of the Bankruptcy Court approving rejection of such contract or lease.

## 7.2    Claims Deadline for Filing Proofs of Claim Relating to Executory Contracts and

**Unexpired Leases Rejected Pursuant to the Plan**

Other than General Unsecured Claims arising out of the rejection of an executory contract or unexpired lease designated for rejection hereunder or pursuant to the Confirmation Order, all Claims must be filed with the Bankruptcy Court and served upon the Debtor by no later than thirty (30) days after the notice of entry of an order approving such rejection or as otherwise may be provided in the Confirmation Order. Any Claims not filed within such time will be forever barred from assertion against the Debtor, the Estate, the Debtor, and its property, and the holders thereof shall not be entitled to any Distribution under the Plan or otherwise from the Debtor. Unless otherwise ordered by the Bankruptcy Court, all Claims arising from the rejection of executory contracts and unexpired leases shall be treated as General Unsecured Claims under the Plan. At present, the Debtor is unaware of the existence of any damages arising from rejection of executory contracts and/or unexpired non-residential real estate leases.

## ARTICLE 8
## CORPORATE GOVERNANCE,
## MANAGEMENT AND STRUCTURE OF ORGANIZED DEBTOR

**8.1    Management of Debtor**

On the Effective Date, the management, control and operation of the Debtor shall become the general responsibility of the board of directors of the Debtor in existence as of the Effective Date (the "New Board"), which shall, thereafter, have responsibility for the management, control and operation of the Debtor in accordance with the restated corporate documents (the "Debtor Restated Articles") and applicable law.

**8.2    Directors and Officers of Debtor**

8.1.1    Board of Directors of Debtor

On the Effective Date, the Board of Directors of the Debtor immediately prior to the Effective Date shall become the New Board of Directors of the Debtor and shall have responsibility for the management, control, and operations of Debtor.

8.1.2    Officers of Debtor

On the Effective Date, the officers of the Debtor immediately prior to the Effective Date shall become the officers of Debtor.

**8.3    Corporate Action**

8.1.3    Pursuant to applicable corporate law, all terms of the Plan may be put into effect and carried out without further action by the directors of the Debtor, who shall be deemed to have unanimously approved the Plan and all agreements and transactions provided for or contemplated herein, including, without limitation: (i) the adoption of the Debtor Restated

39

Articles; and (ii) the distribution of Cash pursuant to the Plan.

8.1.4    On the Effective Date, the adoption and filing of the Debtor's Restated Articles, the appointment of directors and officers of Debtor, and all actions contemplated hereby shall be authorized and approved in all respects pursuant to the Plan.  All matters provided for herein involving the corporate structure of the Debtor, and any corporate action required by the Debtor in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the directors of the Debtor.  On the Effective Date, the appropriate officers or directors of the Debtor are authorized and directed to issue, execute, and deliver the agreements, documents, and instruments contemplated by the Plan in the name of and on behalf of the Debtor without the need for any required approvals, authorizations, or consents, except for any express consents required under the Plan.

## ARTICLE 9
## DISCHARGE, EXCULPATION AND LIMITATION OF LIABILITY

### 9.1    Discharge

Except as otherwise expressly provided in Bankruptcy Code §1141 or the Plan, the Distributions made pursuant to and in accordance with the applicable terms and conditions of the Plan are in full and final satisfaction, settlement, release and discharge as against the Debtor of any debt that arose before the Effective Date, and any debt of a kind specified in Bankruptcy Code §§502(g), 502(h), or 502(i), and all Claims of any nature, including, without limitation, any interest accrued thereon from and after the Petition Date, whether or not (i) a proof of claim based on such Debt or obligation is filed or deemed filed under Bankruptcy Code §501, (ii) such Claim is Allowed under Bankruptcy Code §502, or (iii) the holder of such Claim has accepted the Plan.

### 9.2    Injunction Related to Discharge

As of the Effective Date and subject to its occurrence, all Persons that have held, currently hold or may have asserted, directly, indirectly, derivatively or otherwise, a Claim or a Cause of Action or other right of a holder that is discharged, released or terminated pursuant to the Plan, are hereby permanently enjoined from commencing or continuing, directly or indirectly, in any manner or in any place, any action or other proceeding, enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order, creating, perfecting or enforcing any lien or encumbrance, asserting a setoff, or right of subrogation of any kind against any Debt, liability or obligation due to any such releasing Person, and from commencing or continuing any action, in any manner or in any place where the foregoing does not comply with or is inconsistent with the provisions of the Plan, and the Confirmation Order shall provide for such injunctions.  The terms of this discharge are intended to be as broad as permitted pursuant to Bankruptcy Code §1141(d).

### 9.3    Exculpation, Liability for Post-Petition Disclosures, and Solicitation

To the extent provided under Bankruptcy Code §§1123(b)(3)(A) and 1125(e), and applicable law, the Debtor, its officers, board members, employees, agents, representatives, Professionals (acting in such

capacity), and their respective successors and assigns, will neither have nor incur any liability whatsoever to any Person or other Entity for any act taken or omitted to be taken in good faith in connection with or related to the formulation, preparation, dissemination, implementation, Confirmation, or Consummation of the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the Plan or the bankruptcy case. The rights granted under this Article are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Debtor and its agents have or obtain pursuant to any provision of the Bankruptcy Code. Consistent with Bankruptcy Code §1144, the Bankruptcy Court shall retain sole and exclusive jurisdiction for a period of 180 days following the entry of the Confirmation Order to consider modification of this exculpation provision in the event that any Holder of an Allowed Claim asserts that the Confirmation Order was procured by fraud.

**ARTICLE 10**
**EFFECTIVENESS OF THE PLAN**

**10.1    Conditions to Confirmation**

It is a condition to the entry of the Confirmation Order that the following conditions have been satisfied or waived pursuant to Section 10.3 of the Plan:

10.1.1  The Confirmation Order shall be in form and substance reasonably satisfactory to the Debtor.

**10.2    Conditions Precedent to Effectiveness**

The Plan shall not become effective unless and until the following conditions shall have been satisfied or expressly and permissibly waived:

10.1.2  Confirmation Order, in form and substance reasonably acceptable to the Debtor, shall have been entered by the Bankruptcy Court and shall have become a Final Order;

10.1.3  Each of the Plan Documents, in form and substance reasonably acceptable to the Debtor, shall have been affected or executed and delivered;

10.1.4  All actions, other documents, and agreements necessary to implement the Plan shall have been affected or executed and delivered; and

10.1.5  The Debtor Restated Articles shall be in full force and effect.

**10.3    Waiver of Conditions**

One or more of the conditions contained in Section 10.1 and Section 10.2 of the Plan may be waived with the prior execution of a written consent by or on behalf of the Debtor in its judgment reasonably exercised.

41

## ARTICLE 11
## RETENTION OF JURISDICTION

**11.1**    **Retention of Jurisdiction**

Following the Effective Date, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Reorganization and the Plan pursuant to, and for the purposes of, Bankruptcy Code §§105(a) and 1142 and for, among other things, the following purposes:

11.1.1  to hear and determine any and all objections to the allowance of any Claims or any controversies as to the classification of any Claims;

11.1.2  to hear and determine any and all applications by Professionals for compensation and reimbursement of reasonable fees and expenses;

11.1.3  to hear and determine any and all assumptions, rejections, and disaffirmance of executory contracts and unexpired leases, and fix and allow any Claims, Cure Claims or other damages resulting therefrom;

11.1.4  to liquidate any Disputed Claim;

11.1.5  to enforce the provisions of the Plan;

11.1.6  to enable the Debtor to prosecute any and all proceedings which have been or may be brought prior to the Effective Date, or subsequent to the Effective Date, to set aside liens or encumbrances and to recover any transfers, assets, property, or damages to which the Debtor may be entitled under applicable provisions of the Bankruptcy Code or any federal, state, or local laws;

11.1.7  to correct any defect, cure any omission, or reconcile any inconsistency in the Plan or in the Confirmation Order as may be necessary to carry out its purpose and the intent of the Plan;

11.1.8  to determine any Claim or liability to a governmental unit which may be asserted as a result of the transactions contemplated herein;

11.1.9  to hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code §§346, 505, and 1146;

11.1.10  to hear and determine any matters or disputes respecting the Debtor under Bankruptcy Code §§1113 and 1114; and

11.1.11  to determine such other matters as may be provided for in the Confirmation Order or as may be authorized under the provisions of the Bankruptcy Code, including all matters expressly identified in the Plan.

## ARTICLE 12
## MISCELLANEOUS PROVISIONS

**12.1    Effectuating Documents and Further Transactions**

The Debtor is authorized to execute, deliver, file or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, the Confirmation Order, or the Plan Documents.

**12.2    Exemption from Transfer Taxes**

In accordance with Bankruptcy Code §1146(a) the issuance, transfer, or exchange of a security including, without limitation, the making or delivery of an instrument of transfer pursuant to, in implementation of, or as contemplated by the Plan, may not be taxed under any law imposing a stamp or similar tax. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

**12.3    Amendment or Modification of the Plan**

Alterations, amendments, or modifications of the Plan may be proposed by the Debtor at any time prior to the Confirmation Date, provided that the Plan, as altered, amended, or modified, satisfies the conditions of Bankruptcy Code §§1122 and 1123, and the Debtor shall have complied with Bankruptcy Code §1125. The Plan may be altered, amended or modified at any time before or after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended or modified, satisfies the requirements of Bankruptcy Code §§1122 and 1123 and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under Bankruptcy Code §1129. A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim of such holder. The Debtor may, insofar as it does not materially and adversely affect the interests of any such holders, correct any defect or omission in the Plan and any exhibit hereto or in any Plan Documents.

**12.4    Severability**

In the event that the Bankruptcy Court determines, prior to the Confirmation Date, that any provision in the Plan is invalid, void or unenforceable, such provision shall be invalid, void or unenforceable with respect to the holder or holders of such Claims as to which the provision is determined to be invalid, void, or unenforceable. The invalidity, voidability, or unenforceability of any such provision shall in no way limit or affect the enforceability and operative effect of any other provision hereof.

**12.5    Revocation or Withdrawal of the Plan**

The Debtor reserves the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtor revokes or withdraws the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against the Debtor or any other Person or to prejudice in any manner the rights of the Debtor or any Person in any further proceedings involving the Debtor.

**12.6    Plan Supplement**

If needed, a plan supplement containing drafts or final versions of the Plan Documents shall be filed with the Bankruptcy Court and served upon the Office of the United States Trustee as early as practicable prior to the deadline established by the Bankruptcy Court for the filing of acceptances or rejections of the Plan, or on such other date as the Bankruptcy Court may establish, unless served with the Disclosure Statement. Holders of Claims may obtain a copy of the Plan Supplement upon written request to the Debtor in accordance with elsewhere in the Plan. The Plan Supplement is incorporated into and made a part of the Plan as if set forth in full herein.

**12.7    Binding Effect**

Upon entry of the Confirmation Order, and upon it becoming a Final Order, the Plan shall be binding upon and inure to the benefit of the Debtor, the holders of Claims, and their respective successors and assigns, including, without limitation, the Debtor.

**12.8    Notices**

All notices, requests and demands to or upon the Debtor, to be effective, shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| | |
|---|---|
| If to the Debtor: | **John A. Anthony, Esq.** |
| | Florida Bar Number:  0731013 |
| | janthony@anthonyandpartners.com |
| | **Stephenie Biernacki Anthony, Esq.** |
| | Florida Bar Number:  0127299 |
| | santhony@anthonyandpartners.com |
| | **Cameryn R. Lackey, Esq.** |
| | Florida Bar Number:  1038915 |
| | clackey@anthonyandpartners.com |
| | **Anthony & Partners, LLC** |
| | 100 South Ashley Drive, Suite 1600 |
| | Tampa, Florida 33602 |
| | Telephone:  813/273-5616 |
| | Telecopier:  813/221-4113 |
| | Attorneys for the Debtor |

### 12.9    Governing Law

Except to the extent the Bankruptcy Code, Federal Rules of Bankruptcy Procedure, or other federal law is applicable, or to the extent the Plan provides otherwise: (i) the rights and obligations arising under the Plan and all matters relating to corporate governance shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida and (ii) all rights relating to the debtor-creditor relationship between the Debtor and the holders of any Claim shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida, without giving effect to the principles of conflicts of law of such jurisdiction.

### 12.10    Withholding and Reporting Requirements

In connection with the consummation of the Plan, the Debtor, as the case may be, shall comply with all withholding and reporting requirements imposed by any federal, state, or local taxing authority and all Distributions hereunder shall be subject to any such withholding and reporting requirements.

### 12.11    Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall, for federal income tax purposes, be allocated to the principal amount of the Claim first, and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

### 12.12    Headings

Headings are used in the Plan for convenience and reference only, and shall not constitute a part of the Plan for any other purpose.

### 12.13    Inconsistency

In the event of any inconsistency between the Plan and the Disclosure Statement, any exhibit to the Plan or Disclosure Statement, or any other instrument or document created or executed pursuant to the Plan, the Plan shall govern.

Dated: May 31, 2023.

TREASURE ISLAND YACHT AND TENNIS
CLUB OF PINELLAS COUNTY, LLC
Debtor and Debtor-In-Possession

/s/

William L. Edwards, Manager

# EXHIBIT B

**IN THE UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

In re:

TREASURE ISLAND YACHT AND TENNIS
CLUB OF PINELLAS COUNTY, LLC,

     Debtor.

_____/

Case No.: 8:22-bk-05052
Chapter: 11

### SUMMARY OF DEBTOR'S MONTHLY OPERATING REPORT

| Month | Date Filed | Gross Receipts[1] | Total Disbursements | Surplus or Deficiency of Receipts |
|-------|-----------|-------------|---------------------|-----------------------------------|
| December 2022[2]: | January 24, 2023 | $23,477.00 | $7,493.00 | +$15,984.00 |
| January 2023: | February 28, 2023 | $135,022.00 | $161,920.00 | -$26,898.00 |
| February 2023: | April 7, 2023 | $206,848.00 | $174,529.00 | +$32,319.00 |
| March 2023: | April 20, 2023 | $193,914.00 | $285,736.00 | -$91,822.00 |
| April 2023: | May 24, 2023 | $232,093.00 | $235,777.00 | -$3,684.00 |

**TOTAL:**                                                              **-$74,101.00**[3]

---

[1] Gross receipts do not include a total of $93,000 advanced by the Insider Lender to fund losses during this Reorganization, which is the minimum that would be required to fund a state court receivership or some similar arrangement, without the executives and other resources in place that the Debtor and Edwards presently provide.

[2] The monthly operating report for December of 2022 represents a partial month because this Reorganization was initiated on December 22, 2022.

[3] Net loss excludes costs of senior management born by Insider Lender, as well as professional fees of bankruptcy counsel, land use counsel, and appraiser, all of which are subject to fee application and court order.

# EXHIBIT C



# __Appraisal Report__

The Club at Treasure Island
An Existing Restaurant/Event Center And Marina, With Tennis Courts And
Swimming Pool/Cabanas
Southeast Quadrant Of Treasure Island Causeway And Paradise Boulevard
400 Treasure Island Causeway
Treasure Island, Pinellas County, Florida 33706





# **Appraisal Report**

The Club at Treasure Island
An Existing Restaurant/Event Center And Marina, With Tennis Courts And
Swimming Pool/Cabanas
Southeast Quadrant Of Treasure Island Causeway And Paradise Boulevard
400 Treasure Island Causeway
Treasure Island, Pinellas County, Florida 33706


For:


Anthony & Partners, LLC
201 North Franklin Street, Suite 2800
Tampa, Florida 33602


Attn:


Mr. John Anthony, Esquire


Effective Date of Appraisal:


12/8/2022 (As Is Market Value)


Prepared by:


Ronald A. Oxtal, MAI



February 10, 2023


Anthony & Partners, LLC
201 North Franklin Street, Suite 2800
Tampa, Florida 33602

Attn:   Mr. John Anthony, Esquire

RE:    The Club at Treasure Island
       An Existing Restaurant/Event Center And Marina, With Tennis Courts And
       Swimming Pool/Cabanas
       Southeast Quadrant Of Treasure Island Causeway And Paradise Boulevard
       400 Treasure Island Causeway
       Treasure Island, Pinellas County, Florida 33706

       Our File No.: 22-177
       Federal Tax I.D. No.: 83-0730385

Dear Mr. John Anthony, Esquire:

As requested, we have conducted the necessary investigations and analyses in preparing an appraisal of the above 38,166 S.F. building with restaurant/event center (housing 27,561 S.F, of air-conditioned space), 44 boat slips, six tennis courts, and Olympic size swimming pool. The purpose of the appraisal is to develop an opinion of the as is market value for use in asset evaluation in U.S. Bankruptcy Court.

The subject property is more fully described in the following report.

This Appraisal Report is intended to comply with the reporting requirements set forth under Standards Rules 2-1 and 2-2(a) of the Uniform Standards of Professional Appraisal Practice (USPAP). It presents a summary of the data, and analyses that were used in the appraisal process to develop our opinion(s) of value. Supporting documentation concerning the data, reasoning and analysis is retained in our files.

Important Assumptions concerning the valuation can be found in the General Assumptions, Limiting Conditions and Extraordinary Assumptions sections of the report. One such condition is that neither all nor any part of the contents of this report, including the value conclusions, market research, comparables, etc. shall be distributed or copied without the prior written consent and approval of Tropical Valuation Advisory. We strongly recommend that you read the General Assumptions, Limiting Conditions and Extraordinary Assumptions sections of this report. The reader is also referred to the SWOT analysis for significant observations regarding the property.



Based on our investigations and analysis, it is our opinion that the concluded value opinions of the subject property, as of the date of this report, may be summarized as follows:

| CONCLUDED VALUE OPINIONS | | | | | |
|---|---|---|---|---|---|
| Perspective | Value Type | Condition | Date of Value | Property Interest | Value Estimate |
| As Is | Market Value | | 12/8/2022 | Fee Simple And Leasehold (Marina) | $7,080,000 |
| | ➢ **Subject:** | | An existing restaurant/event center and marina, with tennis courts and swimming pool/cabanas | | |

The following report was prepared in conformance with the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute. As such, it conforms to the Uniform Standards of Professional Appraisal Practice promulgated by the Appraisal Foundation. It also complies with and appraisal regulations of the State of Florida. Our compensation for completing this assignment is not contingent upon the development or reporting of predetermined values or direction in value that favors the cause of the client, the amount of the value opinions, the attainment of a stipulated result, a requested minimum valuation, a specific valuation, approval of a loan or the occurrence of a subsequent event directly related to the intended use of this appraisal.

**Specific Extraordinary Assumptions are applicable to the final value conclusion and should be referenced by the reader to fully understand our opinions and conclusion. The absence of the Extraordinary Assumptions would have an impact on the value conclusion to which these factors apply.**

Should you have any questions regarding the attached report, please do not hesitate to contact the author.

Respectfully Submitted,

**TROPICAL VALUATION ADVISORY**

Ronald A. Oxtal, MAI
Certificate 7212
State-Certified General Real Estate Appraiser RZ265
Principal



## TABLE OF CONTENTS

CERTIFICATION OF APPRAISAL............................................................................................. 1
GENERAL ASSUMPTIONS AND LIMITING CONDITIONS .................................................. 3
EXTRAORDINARY ASSUMPTIONS ....................................................................................... 4
HYPOTHETICAL CONDITIONS ............................................................................................... 5
SUMMARY OF SALIENT FACTS ............................................................................................. 6
INTRODUCTION ........................................................................................................................ 7
     Identification of Subject........................................................................................................ 7
     Legal Description................................................................................................................... 7
     Purpose and Effective Date of Appraisal ............................................................................. 8
     Intended Use, Client and User of Appraisal ......................................................................... 8
     Property Rights Appraised .................................................................................................... 8
     Scope of Work ...................................................................................................................... 8
     Ownership of Subject........................................................................................................... 9
     History of Subject ................................................................................................................ 9
     Marketing Time Estimate .................................................................................................. 10
     Exposure Time ................................................................................................................... 10
REGIONAL OVERVIEW .......................................................................................................... 12
SOUTH PINELLAS RETAIL SUBMARKET ANALYSIS ..................................................... 19
NATIONAL RESTAURANT OVERVIEW .............................................................................. 33
MARKET AREA OVERVIEW .................................................................................................. 36
     Market Area Access ........................................................................................................... 37
     Land Uses & Trends ........................................................................................................... 37
     Demographic Profile .......................................................................................................... 39
     Summary ............................................................................................................................. 41
SITE DATA ................................................................................................................................ 42
IMPROVEMENT DATA ............................................................................................................ 47
REAL ESTATE TAXES ............................................................................................................. 50
HIGHEST AND BEST USE ....................................................................................................... 51
     Highest and Best Use - As If Vacant .................................................................................. 51
     Highest and Best Use - As Improved.................................................................................. 52
INCOME CAPITALIZATION APPROACH ............................................................................. 53
     Vacancy and Collection Loss.............................................................................................. 63
     Expenses ............................................................................................................................. 63
     Net Operating Income......................................................................................................... 65
     Direct Capitalization .......................................................................................................... 65
SALES COMPARISON APPROACH........................................................................................ 69
     Analysis of Improved Comparables - Restaurant/Event Center ......................................... 72
     Summary and Conclusion-Restaurant/Event Center Building............................................ 73
     Analysis of Improved Comparables - Marina..................................................................... 74
RECONCILIATION AND FINAL VALUE ESTIMATE ......................................................... 77
A D D E N D A............................................................................................................................. 79



### <u>CERTIFICATION OF APPRAISAL</u>

The undersigned certify that to the best of our knowledge and belief:

- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.
- The statements of fact contained in this report are true and correct.
- The reported analyses, opinions, and conclusions are limited only by the reported assumptions, limiting conditions and special assumptions, and are our personal, unbiased professional analyses, opinions, and conclusions.
- We have no present or prospective interest in the property that is the subject of this report, and we have no personal interest with respect to the parties involved.
- We have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.
- Our engagement in this assignment was not contingent upon developing or reporting predetermined results.
- Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinions, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.
- The reported analyses, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Appraisal Institute's Code of Professional Ethics and Standards of Professional Appraisal Practice, which include the Uniform Standards of Professional Appraisal Practice.
- Ronald A. Oxtal, MAI has made a personal inspection of the property that is the subject of this report.
- As of the date of this report, Ronald A. Oxtal, MAI has completed the requirements of the continuing education program for the applicable state of licensure. Mr. Ronald A. Oxtal, MAI has also completed the requirements of the continuing education program for Designated Members of the Appraisal Institute.
- No one provided significant real property appraisal assistance to the person signing the certification.
- We have not performed any prior services regarding the subject property, as appraisers or in any other capacity, within the three-year period immediately preceding acceptance of this appraisal assignment.



Important "General Assumptions, Limiting Conditions, Extraordinary Assumptions and Hypothetical Conditions" affecting the aforementioned value estimate can be found within this section of the report.

Certified by:

Ronald A. Oxtal, MAI
Certificate 7212
State-Certified General Real Estate Appraiser RZ265
Principal



## <u>GENERAL ASSUMPTIONS AND LIMITING CONDITIONS</u>

**This appraisal report has been made with the following general assumptions:**

- The legal description used in this report is assumed to be correct.
- No survey of the property has been made by the appraisers and no responsibility is assumed in connection with such matters. Sketches in this report are included only to assist the reader in visualizing the property.
- No responsibility is assumed for matters of legal nature affecting title to the property nor is an opinion of title rendered. The title is assumed to be good and merchantable.
- Information and data furnished by others is usually assumed to be true, correct and reliable. When such information and data appears to be dubious and when it is critical to the analysis, a reasonable effort has been made to verify all such information; however, no responsibility for its accuracy is assumed by the appraisers.
- All mortgages, liens, encumbrances, leases, and servitudes have been disregarded unless so specified within the report. The property is analyzed as though under responsible ownership and competent management.
- It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures which would render it more or less valuable. No responsibility is assumed for such conditions or for engineering which may be required to discover them.
- It is assumed that there is full compliance with all applicable federal, state and local environmental regulations and laws unless noncompliance is stated, defined and considered in this report.
- It is assumed that all applicable zoning and use regulations and restrictions have been complied with, unless nonconformity has been stated, defined and considered in this report.
- It is assumed that all required licenses, consents or other legislative or administrative authority from any local, state, or national governmental or private entity or organization have been or can be obtained or renewed for any use on which the value estimate contained in this report is based.
- It is assumed that the utilization of the land and improvements is within the boundaries or property lines of the property described and that there is no encroachment or trespass unless noted within this report.
- The date of value to which the opinions in this report applies is reported herein. The appraisers assume no responsibility for economic or physical factors occurring at some later date which may affect the opinions stated herein.
- Unless otherwise stated in this report, the existence of hazardous material, which may or may not be present on the property, was not observed by the appraisers. The appraisers have no knowledge of the existence of such materials on or in the property. The appraisers, however, are not qualified to detect such substances. The presence of substances such as asbestos, urea-formaldehyde foam insulation or other potentially hazardous materials may affect the value of the property. The value estimate is predicated on the assumption that there is no such material on or in the property that would cause a loss in value. No responsibility is assumed for any such conditions, or for any expertise or engineering knowledge required to discover them. The reader is urged to retain an expert in this field, if desired.



This report is for the exclusive use of our client, Anthony & Partners, LLC, and the purpose of the appraisal is to develop an opinion of the as is market value for use in asset evaluation in U.S. Bankruptcy Court. As such, neither all nor any part of the contents of this report including conclusions as to value(s), market research, comparables, etc. shall be distributed or copied without the prior written consent of Tropical Valuation Advisory.

**This appraisal report has been made with the following limiting conditions:**

- Acceptance of and/or use of this report constitutes acceptance of the General and Extraordinary Assumptions and General Limiting Conditions.
- The distribution, if any, of the total valuation in this report between land and improvements applies only under the stated program of utilization. The separate allocations for land and buildings must not be used in conjunction with any other appraisal and are invalid if so used.
- Possession of this report, or a copy thereof, does not carry with it the right of publication. It may not be used for any purpose by any person other than the party to whom it is addressed without the written consent of the appraisers, and in any event only with proper written qualification and only in its entirety.
- The appraisers herein by reason of this appraisal are not required to give further consultation, testimony, or be in attendance in court with reference to the property in question unless arrangements have been previously made.
- Neither all nor any part of the contents of this report (especially any conclusions as to value, the identity of the appraisers, or the firm with which the appraisers are connected) shall be disseminated to the public through advertising, public relations, news, sales, or other media without the prior written consent and approval of the appraisers.
- The Americans with Disabilities Act ("ADA") became effective January 26, 1992. We have not made a specific compliance survey or analysis of this property to determine whether or not it is in compliance with the various detailed requirements of the "ADA". It is possible that a compliance survey of the property, together with a detailed analysis of the requirements of the "ADA" could reveal that the property is not in conformance with one or more of the requirements of the act. We assume that the existing subject improvements, while witnessing significant levels of obsolescence, are in conformance with all ADA regulations.

## <u>EXTRAORDINARY ASSUMPTIONS</u>

**The following Extraordinary Assumptions are of particular importance when considering the value conclusions of the subject property identified herein. The use of extraordinary assumptions might have affected the assignment results.**

- The adjacent condominium development to the east has an encroachment on the subject site where a number of their paved parking spaces and a portion of the building are located on the subject site. This encroachment area also includes access drives between the subject and the adjacent condominium. In the as is condition this is another item that impacts the property.



- The subject formerly operated as a private and semi-private membership restaurant and banquet facility and now operates for use by the general public. This is not specifically a stated permissible use by zoning, but an onsite representative of the owner noted that the restaurant and banquet facilities are licensed to operate by the municipality. It is a specific Extraordinary Assumption that a public restaurant use and banquet facility is permitted to operate on the site.

- The subject formerly operated as a private and semi-private membership restaurant and banquet facility and now operates for use by the general public. This use is not specifically stated by the submerged land lease for the marina. It is a specific Extraordinary Assumption that a public restaurant use and banquet facility are permitted to renew the submerged land lease.

<u>**HYPOTHETICAL CONDITIONS**</u>

**The following Hypothetical Conditions are of particular importance when considering the value conclusions of the subject property identified herein. The use of hypothetical conditions might have affected the assignment results.**

- None noted.



| SUMMARY OF SALIENT FACTS | |
|---|---|
| **Type of Property:** | Special Purpose - Other |
| **Location:** | Southeast Quadrant Of Treasure Island Causeway And Paradise Boulevard |
| | 400 Treasure Island Causeway |
| | Treasure Island, Pinellas County, Florida 33706 |
| **Parcel No.** | 24-31-15-00000-310-0100 |
| **Site Size (Gross):** | **Upland Acres**          **Submerged Lease Land Acres** |
| | 7.67± Acres          1.49± Acres |
| | 334,105± S.F.          64,927± S.F. |
| **Gross Leasable Area (S.F.)** | 27,561 S.F. |
| **Year Built:** | 2007 (Restaurant); 1990's (Tennis Courts/Marina) |
| **Zoning:** | RM-15- Residential Medium (Multiple Family Residential) by City of Treasure Island |
| **Future Land Use:** | RM  - Residential Medium  by City of Treasure Island |
| **Flood Zone Information:** | 12103C 0194H - August 24, 2021 |
| | "AE" - Special flood hazard area with base flood elevation (BFE) of 11 feet. |
| **Subject Ownership:** | Treasure Island Yacht & Tennis Club of Pinellas County, LLC |
| **Property Rights Appraised:** | Fee Simple And Leasehold (Marina) |
| **Highest and Best Use:** | **As If Vacant**: there is no readily identified development option available, and the site would likely remain vacant (except for the small marina operation). |
| | **As Improved**: given the restrictions impacting the site due to zoning issues it is our opinion that the improvements contribute to the overall value of the property and provide a significant return to the land. We are not aware of an alternative use that would provide for a greater overall return to the land. |
| **Date of Report:** | February 10, 2023 |
| **Last Date of Inspection:** | December 8, 2022 |

| VALUE INDICATIONS AND CONCLUSION | | |
|---|---|---|
| **Description** | **Valuation Date** | **Value Amount** |
| As Is Market Value of the Fee Simple And Leasehold (Marina) Interest - An existing restaurant/event center and marina, with tennis courts and swimming pool/cabanas | | |
| Income Capitalization Approach | | $6,240,000 |
| Sales Comparison Approach | | $7,920,000 |
| **Overall Conclusion** | **12/8/2022** | **$7,080,000** |

Specific Extraordinary Assumptions are applicable to the value conclusions derived by these approaches to value and should be referenced by the reader to fully understand our conclusions. The absence of the Extraordinary Assumptions would have an impact on the final value conclusions to which these factors apply.



## <u>INTRODUCTION</u>

**Identification of Subject**

The subject of this report is an existing restaurant/event center and marina, with tennis courts and swimming pool/cabanas located within the southeast quadrant of Treasure Island Causeway and Paradise Boulevard in Treasure Island, Pinellas County, Florida. Reference a representative photograph of the subject property below while additional identifying photographs can be found in the Addenda.



*~Front View of Subject Property~*

**Legal Description**

A complete legal description for the subject property can be found in the Addenda.



**Purpose and Effective Date of Appraisal**

The purpose of the appraisal is to develop an opinion of:

- The as is market value of the fee simple and leasehold (marina) interests in the existing restaurant/event center and marina, with tennis courts and swimming pool/cabanas as of December 8, 2022, the effective date of appraisal.

**Intended Use, Client and User of Appraisal**

This appraisal will be used for decision making associated with asset evaluation in U.S. Bankruptcy Court. The intended user is Mr. John Anthony, Esquire of Anthony & Partners, LLC. Intended users include Mr. John Anthony, Esquire and required entities in support of the intended use. The depth of discussion contained in this report is specific to the needs of the intended users, including the above-named client and no other intended users. We are not responsible for unauthorized use of this report.

**Property Rights Appraised**

The fee simple and leasehold interest(s) in the subject property have been appraised. A submerged ground lease with the State of Florida allows the marina.

**Scope of Work**

The scope of work involved inspections of the market area, the subject property and comparable market data. Specific property research with regard to the subject property's market area was analyzed with respect to location specific, physical, economic and various other relevant characteristics. The subject property's specific information was researched and analyzed, based on information provided by our property contact and obtained from public records. Information concerning comparables was obtained from CoStar, trade publications, brokers and other market participants active in the market area and public records, which aided in the development of a highest and best use as if vacant and as improved. We analyzed numerous listings and closed transactions throughout the state and on various property types including restaurants, private clubs, marinas and land in order to identify the most relevant set of comparables to represent the subject property. Following the estimation of the highest and best use, the Cost, Sales Comparison, and Income Capitalization Approaches were considered.

In this case, two of the three approaches were used to develop an as is market value opinion for the subject property. The Cost Approach was not used in the valuation due to the issues related to lack of development entitlements and the resultant impact on highest and best use considerations. Absence of a Cost Approach did not impair the credibility of the value conclusion.

The Income Capitalization Approach provides a reliable indication by analyzing comparable single tenant rental properties and deriving an appropriate capitalization rate based on appropriate sources. Note, the yield capitalization analysis was not applied given the nature of the building, as it would likely be leased on a long-term basis to a single tenant (the boat slips would continue to be leased month to month). Equal consideration was given to this approach with respect to Sales Comparison



The Sales Comparison Approach provides a reasonably reliable indication of value based on sales in relatively active markets. Overall, equal emphasis was placed on the Sales Comparison Approach.

In addition, market participants were interviewed with regard to prevailing market conditions for properties similar to the subject. A sampling of market participants interviewed includes, but is not limited to, the following:

| MARKET PARTICIPANTS | |
|---|---|
| Contact | Position, Company |
| Will Bingham | Owner/broker Bingham Realty |
| Lisa Smithson, CPA | CFO Beachside Hospitality group |
| Kalyn Brandewie | Retail Director, Florida Retail Partners |
| Dennis Prescott | Restaurant industry consultant/ former V.P. Bloomin' Brands/Former Pres/CEO Winghouse of Florida |
| Joshua Sims | Agent Vector Realty |

**Ownership of Subject**

Based on information obtained from Pinellas County public records and information provided by Anthony & Partners, LLC, as well as our investigations, the subject property is presently under the ownership of Treasure Island Yacht & Tennis Club of Pinellas County, LLC.

**History of Subject**

Based on our verifications, the subject property has not transferred ownership within the past three years and is not currently listed for sale. The current owner received the property in July 2009 pursuant to an order entered in Bankruptcy Case No. 8:08-bk-17339-CED, United States Bankruptcy Court Middle District of Florida as part of the debtor's plan of reorganization. The property was listed for sale but is now off the market due to the pending litigation. The following table shows relevant data relating to the listing and offers made. The offers from $15 million to $27 million were made contingent on the condition that 115 units could be developed on the site. These offers are well above the as is condition valuation, which contemplates no residential development rights are available (based on information from the City of Treasure Island) and only the existing building and marina are given consideration. The building is large and inefficient and suffers from functional obsolescence.



| LISTING AND OFFER INFORMATION | | | | | |
|---|---|---|---|---|---|
| Item | Name | Date | Amount | $/S.F. | $/Unit |
| Listing | | 1/21/2021 | $25,000,000 | $75 | $217,391 |
| LOI | Whitney Pacific Resource Group | 10/5/2022 | $27,000,000 | $81 | $234,783 |
| LOI | McCottry Service , Inc | 5/20/2021 | $20,000,000 | $60 | $173,913 |
| POS | BH Equity Investments, LLC | 4/23/2021 | $18,000,000 | $54 | $156,522 |
| LOI | SPE to be formed at future date | 4/14/2021 | $18,000,000 | $54 | $156,522 |
| LOI | Blue Beach Club, LLC | 3/17/2021 | $18,000,000 | $54 | $156,522 |
| POS | FLIP Holdings,LLC | Undated | $15,000,000 | $45 | $130,435 |

**Marketing Time Estimate**

*The Dictionary of Real Estate Appraisal – Seventh Edition* (Chicago: Appraisal Institute, 2022) defines marketing time as "an opinion of the amount of time to sell a property interest at the concluded market value or at a benchmark price during the period immediately after the effective date of an appraisal." The marketing period is estimated to be 12 months or less from the effective date of appraisal at the aforementioned market value opinion(s).

**Exposure Time**

*The Dictionary of Real Estate Appraisal – Seventh Edition* (Chicago: Appraisal Institute, 2022) defines exposure time as "an opinion, based on supporting market data, of the length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal."

Thus, exposure time is not synonymous with a marketing time estimate, as it is assumed to have occurred prior to the date of valuation. Inherent in the market value estimate is not that the property will sell within the estimated marketing time, but that it would have sold assuming prudent marketing within some reasonable exposure time prior to the date of valuation. In this instance, the reasonable exposure time occurring prior to the date of valuation that would have resulted in a consummation of a sale at the market value opinion has been estimated at 12 months or less.

**SWOT Analysis**

A SWOT (Strengths, Weaknesses, Opportunities, and Threats) analysis is a method to succinctly identify the valuation fundamentals that a property exhibits and that are considered when reconciling pertinent data to evaluate a valuation, purchase or renting decision. The following elements are identified for the subject:



**Strengths**
- The property is situated on a main access road to Treasure Island and the other barrier islands of Pinellas County that front the Gulf of Mexico and the Intracoastal Waterway.
- The site has over 500 feet fronting the Intracoastal Waterway and provides a somewhat protected harbor for an existing 44 wet slip marina with quick access to the Gulf of Mexico.
- The property has extensive first floor dry storage and amenities (pool, tennis courts)

**Weaknesses**
- The City of Treasure Island asserts that the subject property has no residential development rights rendering the current use of the site limited to the existing uses and restricting any long-term exit strategy.
- The subject event/restaurant improvements are large and have an inefficient layout as the purpose for which they were designed has continually been unprofitable. For example, gross building area is 38,166 S.F.; air-conditioned space is 27,561 S.F.; and "effective useable space" is 20,672 S.F.
- The existing improvements have operating costs significantly higher than most substitute properties for the alternate highest and best use as a public use restaurant/event center.
- The adjacent building to the east physically encroaches on the subject site.
- The adjacent building to the east, is according to the subject owner, "trespassing" on about .50 acre of land supporting approximately 83 parking spaces for that project.
- According to the owners' on-site representative, site signage is controlled by the residential zoning and is not adequate for a restaurant operation depending on public support and not private membership dues.
- The presence of the recreational amenities and storage produce additional operating costs (taxes, insurance, utilities and maintenance) that may be viewed as obsolescence by many market participants.

**Opportunities**
- The subject site has an existing building that could be adapted to a public use restaurant/event center (present use). The presence of the marina and other amenities offer potential accoutrements to an enterprising entrepreneur to provide unique events and guest experiences for potential patrons.

**Threats**
- The economy is cooling, interest rates are rising, and a possible recession is looming for 2023. The mantra in the real estate industry is "flight to quality". With all the weaknesses noted above, it may be difficult to attract a buyer or tenant willing to tackle these challenges, particularly in an uncertain economic time, absent a deep discount in price or rent.

# EXHIBIT D

**IN THE UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

In re:                                                                    Case No.: 8:22-bk-05052
                                                                          Chapter:  11
TREASURE ISLAND YACHT AND TENNIS
CLUB OF PINELLAS COUNTY, LLC,

      Debtor.

_____/

## <u>DEBTOR'S SUMMARY OF REMANDED CITY LITIGATION</u>

**I.**      <u>The Factual And Legal Basis For The Debtor's Claims Against The City</u>

In 2009, the Debtor purchased the land which the Facility if located on by a warranty deed (the "Deed") under a sale of assets entered by the Bankruptcy Court in the 2008 Reorganization. The Debtor performed a title search and all matters of public record were referenced in the Deed. The Debtor purchased the Land under RM-15 zoning, which yields building development entitlements of 15 units per acre.  In 1980, a lawsuit between a former owner, Guaranty Savings and Loan, filed a lawsuit against the City regarding the entitlements of the subject Land.  On September 9, 1982, a final judgment (the "Final Judgment") was rendered in the City's favor.  The final judgment was not recorded against the Land, has no identifiable information such as the property address, parcel identification number, or legal description, and was between the former owner, Guaranty Savings and Loan, and the City.  The City has rendered stipulations to the Bankruptcy Court that the City did not record the Final Judgment.  The City has also stipulated that (i) the Debtor was not a party to the proceeding in 1982; (ii) the Final Judgment is not against the Debtor; and (iii) the subject property is zoned RM-15.

The Debtor maintains that the Final Judgment cannot be enforced against the Land and the Debtor is rendered a bona fide purchaser for sale and value.  The Debtor further relies upon the City's comprehensive plan and land use maps, which are consistent with RM-15 designation.  In

1

fact, the City has further stipulated that (i) the City's comprehensive plan has not been amended from the date the Debtor purchased the subject property in 2009 until present, and (ii) transfer development rights are not recorded against the subject property – the Land.

The City has maintained that a resolution ("Resolution 80-111") determined that no residential entitlements exist on the Land. However, the City has also stipulated that Resolution 80-111 has never been recorded in Pinellas County property records, which is required under the law to provide purchasers, such as Debtor, with notice of any deficiencies in zoning or entitlements. The Debtor has provided the City with a Bert Harris notice under amended <u>Florida Statute</u> 70, and has filed an action, the Remanded City Litigation, against the City to determine the validity and effectiveness of the unrecorded Final Judgment and unrecorded Resolution 80-111.

## II.  **The Present Procedural Posture**

The Debtor's action against the City has been remanded to the Circuit Court's jurisdiction and is able to continue its case for approximately eight (8) Business Days from filing the Plan. In those eight (8) Business Days, the Debtor has been engaged in the Remanded City Litigation, the Debtor has aggressively taken the following actions:

a.  The Debtor has filed a notice with the Circuit Court of the Bankruptcy Court's order remanding the case to the Circuit Court;

b.  The Debtor has filed a motion for judicial notice of Bankruptcy Court records as it pertains to: (i) the motion for judicial notice of the Rule 26 conference referring to certain stipulations between the Debtor and the City, and (ii) a motion for judicial notice of a title property report identifying all matters of Pinellas County property records; and

c.  The Debtor has filed a motion for summary judgment as to count one of its declaratory relief action and an affidavit in support thereof.  The motion for summary judgment hearing is set to occur on July 24, 2023.

### III.    The Specific Relief Requested As To The City Development Rights Claim, And The Likely Monetary Impact On The Facility

The Debtor's non-monetary claims framed as declaratory relief actions request relief for the Circuit Court to find (i) the unrecorded Final Judgment has no enforceability or application to the Debtor as a non-party to the 1980 lawsuit, (ii) the unrecorded Final Judgment has no enforceability or application against the land as an unrecorded instrument; (iii) Debtor is a bona fide purchaser for sale and value of the land; and (iv) Resolution 80-111 is unenforceable against the land because it is an unrecorded instrument and because it is contrary to the City's comprehensive plan, which is strictly construed against the City.  In the event Debtor prevails on these issues, the land will be free to be marketed to third party purchasers without concern of two unrecorded instruments purportedly affecting the residential development opportunities on the land.  As a result, Debtor will be able to sell to a third party purchaser and satisfy OZK Claim and the Capri Claim.

### IV.    The Specific Relief Requested As To The City Litigation Damage Claim, And The Most Likely Monetary Recovery

The Debtor's monetary claim is framed as a Bert Harris notice to the City.  The Debtor further seeks to move forward on an extensive damages claim and add claims for violations of Florida Statutes §70; violations of Florida Statutes §163, tortious interference, inverse taking, regulatory taking, slander of title, and other similar causes of action.  The Debtor has been advised by various experts that it can seek between $25 million and $30 million in total damages against the City.

3

# EXHIBIT E

**IN THE UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

In re:                                          Case No.: 8:22-bk-05052
                                                Chapter:  11
TREASURE ISLAND YACHT AND TENNIS
CLUB OF PINELLAS COUNTY, LLC,

      Debtor.

_____/

### DEBTOR'S PRO FORMA FOR PLAN

**I.**    **Predicated upon OZK and Capri making Bankruptcy Code §1111(b) election**

| SECURED CREDITORS: | AMOUNT |
|---|---|
| Tax Collector: | $83,956.53[1] |
| OZK: | $15,175,048.94 |
| Capri (w/o annual compounding): | $16,912,645.00[2] |
| SBA: | $30,000.00[3] |
| **TOTAL SECURED CLAIMS:** | **$32,201,650.47** |
| Value Of Facility Reflecting City Development Rights Claim: | -$25,000,000.00 |
| Value of Lot Sale: | -$1,500,000.00 |
| **AGGREGATE DEFICIENCY CLAIMS:[4]** | **$120,000.00** |

| ADDITIONAL CREDITORS: | AMOUNT |
|---|---|
| Trade Creditors: | $100,000.00 |
| Litigation Expenses, Carrying Costs, and Related Losses: | $1,600,000.00 |
| **TOTAL AMOUNT OF UNSECURED CREDITORS,** | |
| **LITIGATION EXPENSE, AND OPERATING LOSS:** | **$1,700,000.00** |

---

[1] Some portion of the Tax Collector Claim would be paid from the Lot Sale in the ordinary course, but for purposes of this pro forma, it is hypothetically assumed that the entire Tax Collector Claim will be paid in connection with a sale or refinance.

[2] Assuming that (a) the City Development Rights Claim augments the value of the Facility (net of the Lot Sale) to $25,000,000, (b) assuming that the Tax Collector, OZK, and $30,000 of the SBA Claim are paid in full, $9,710,994.53 will be paid to Capri on account of the Secured Capri Claim based upon an election under Bankruptcy Code §1111(b), and the Capri Deficiency Claim would be Allowed in the balance of $7,201,650.47, for purposes of participating in the Unsecured Claims Pool.

[3] Under the Plan, $120,000 of the SBA Claim is treated as a deficiency, and $30,000 is treated as Secured, even though it would be completely Unsecured in any liquidation scenario.

[4] As a mathematical calculation, OZK will benefit in the amount of $8,209,005.47 from the Plan, because its Secured Claim would amount to $6,966,043.47, based upon a valuation of $7,080,000, and with the Tax Collector Claim as a senior encumbrance.  The SBA will benefit in the minimum amount of $30,000 from the Plan, and Capri will benefit in the amount of $9,710,994.53 from the Plan, as it relates to the increase in value of the Facility from $7,080,000 to $25,000,000.  However, under the election, the Capri's deficiency claim is waived.

| | |
|---|---|
| Value Of City Litigation Damage Claim: | $6,500,000.00 |
| **NET RECOVERY ON CITY LITIGATION DAMAGE CLAIM FOR EQUITY:** | **$4,800,000.00** |

**II.** **With OZK and Capri _not_ making Bankruptcy Code §1111(b) election**

| **SECURED CREDITORS:** | **AMOUNT** |
|---|---|
| Tax Collector: | $83,956.53 |
| OZK: | $6,966,043.47 |
| Capri (w/o annual compounding): | $0.00 |
| SBA: | $30,000.00 |
| **TOTAL SECURED CLAIMS:** | **$7,080,000.00** |
| Value Of Facility Reflecting City Development Rights Claim: | -$25,000,000.00 |
| Value of Lot Sale: | -$1,500,000.00 |
| **AGGREGATE DEFICIENCY CLAIMS:[5]** | **$25,241,650.47** |

| **CREDITORS SATISFIED FROM CITY LITIGATION DAMAGE CLAIM:** | **AMOUNT** |
|---|---|
| Gross Value Of City Litigation Damage Claim: | $6,500,000.00 |
| Trade Creditors: | -$100,000.00 |
| Litigation Expenses, Contingent Fees, Carrying Costs, and Related Losses: | -$1,600,000.00 |
| **TOTAL NET RECOVERY FROM CITY LITIGATION DAMAGE CLAIM:** | **$4,800,000.00** |
| Approximate Target Distribution To OZK: | $1,561,040.01 |
| Approximate Target Distribution To Capri: | $3,216,140.56 |
| Approximate Target Distribution To SBA: | $22,819.43 |

---

[5] As a mathematical calculation, if neither OZK nor Capri make an election under Bankruptcy Code §1111(b), then OZK will have an Allowed deficiency claim, the OZK Deficiency Claim, in the amount of $8,209,005.47, and Capri will have an Allowed deficiency claim, the Capri Deficiency Claim, in the amount of $16,912,645, such that the total number of General Unsecured Claims, including $120,000 for the SBA, will be $25,241,650.47, all of which will participate Pro Rata in the Unsecured Claims Pool.  Based upon a projected gross recovery on the City Litigation Damage Claim of $6,500,000, reduced to $4,800,000 net, to fund the Distributions for these three Creditors are calculated at a percentage distribution of approximately 19% above; however, the Debtor cannot presently confirm that these are the only Creditors likely participate in the Unsecured Claims Pool.

# EXHIBIT F

**IN THE UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

In re:                                                 Case No.: 8:22-bk-05052
                                                       Chapter:  11
TREASURE  ISLAND  YACHT  AND  TENNIS
CLUB OF PINELLAS COUNTY, LLC,

        Debtor.
_____/

## DEBTOR'S LIQUIDATION ANALYSIS

| SECURED CREDITORS: | AMOUNT |
|---|---|
| Tax Collector: | $83,956.53 |
| OZK: | $15,175,048.94 |
| Capri (w/o annual compounding): | $16,912,645.00 |
| SBA: | $150,000.00 |
| **TOTAL SECURED CLAIMS:** | **$32,321,650.47** |
| Value Of Facility As Per Debtor Appraisal: | -$7,080,000.00 |
| **AGGREGATE DEFICIENCY CLAIMS:** | **$25,241, 650.47** |

| ESTIMATED ADDITIONAL IMPACT OF LIQUIDATION: | AMOUNT |
|---|---|
| Est. Impact Of Liquidation (see page 2 for itemization): | $3,944,358.00 |
| Unpaid Trade Debt & Estimated Additional Claims: | $100,000.00 |
| **ESTIMATED  TOTAL  AMOUNT  OF  UNPAID CLAIMS  IN  ANY  LIQUIDATION  OR  DISMISSAL SCENARIO:** | **$29,286,008.47** |

## ESTIMATED IMPACT OF LIQUIDATION ON FACILITY

(Itemizes $3,944,358 adjustment to Facility value in the event of conversion or dismissal above)

| ESTIMATED UNAVOIDABLE COSTS: | AMOUNT |
|---|---|
| October 2023 Taxes Assessable On October 1, 2023: | $80,000.00 |
| Insurance Coverages In Force For Hurricane Season: | $100,000.00 |
| Costs To Secure And Guard Facility: | $25,000.00 |
| Professional Services For Wind Up: | $250,000.00 |
| Severance Pay And Costs Of Sixty (60) Days Payroll: | $169,358.00 |
| Liquidation Of Personal Property/Pilferage: | $50,000.00 |
| Six (6) Months Landscaping And Basic Maintenance: | $75,000.00 |
| **TOTAL ESTIMATED COSTS ASSOCIATED WITH CLOSURE:** | **$749,358.00** |

| ESTIMATED IMPAIRMENTS TO VALUE: | AMOUNT |
|---|---|
| Breach Of Lease Jeopardizing Riparian Rights, Extinguishing Marina Operation And Value Attributed To These Rights: | $2,500,000.00 |
| Liability For Pool And Marina If Unattended As Attractive Nuisance (Intercoastal Access And Approximately 500 Adjacent Neighbors Bypassing The Gate): | Significant undetermined potential liability |
| Diminution Of Value As Building Systems Atrophy And The Increased Probability For Growth Of Mold Inside Building Envelope Absent Air Conditioning: | Significant undetermined potential liability |
| Loss Of Going Concern Value Of Marina Leases, Licenses, Workforce In Place, Website, Etc.: | $1,000,000.00 |
| **TOTAL ESTIMATED IMPAIRMENTS TO VALUE:** | **$3,500,000.00** |

| ESTIMATED RECOVERIES TIED TO CLOSURE: | AMOUNT |
|---|---|
| Disposal Of 4-COP Liquor License: | -$300,000.00 |
| Disposal Of Liquor Inventory In Accordance With State Law: | -$5,000.00 |
| **TOTAL ESTIMATED RECOVERIES DUE TO CLOSURE:** | **-$305,000.00** |

| TOTAL ESTIMATED IMPACT OF LIQUIDATION, INCLUDING RECOVERIES ASSOCIATED WITH CLOSURE, COSTS ASSOCIATED WITH CLOSURE, AND ESTIMATED IMPAIRMENTS TO VALUE: | |
|---|---|
| | **$3,944,358.00** |